

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

DAY PACER LLC, f/k/a College Criteria
LLC, also d/b/a Edutrek, EdSoup, Our School
Search, College Info and Degree Spots and
successor in interest to EduTrek L.L.C., a
limited liability company;

EDUTREK L.L.C., also d/b/a EdSoup, a
dissolved limited liability company;

RAYMOND FITZGERALD, individually
and as an officer of Day Pacer LLC and
EduTrek L.L.C.;

IAN FITZGERALD, individually and as an
officer of Day Pacer LLC; and

DAVID CUMMING, individually and as an
officer of Day Pacer LLC and EduTrek
L.L.C.;

      Defendants.

1:19-cv-01984
Judge Edmond E. Chang
Magistrate Judge Mary M. Rowland

# FILED

E̶ MAR 2 2 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER RELIEF

1.      Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), brings this

action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a), and 19 of the FTC Act, 15 U.S.C. §§ 45(a),

45(m)(1)(A), 53(b), and 57(b), and Section 6 of the Telemarketing and Consumer Fraud and

Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, to obtain monetary civil

penalties, a permanent injunction, and other relief for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule (the "TSR" or "Rule"), as amended, 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 56(a).  This action arises under 15 U.S.C. § 45(a).

3.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (c)(2), and 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violation of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), and 57b.  The FTC is also authorized to obtain civil penalties for violations of the TSR.  15 U.S.C. § 45(m)(1)(A).

## DEFENDANTS

6.     Defendant **Day Pacer LLC**, previously known as College Criteria LLC also d/b/a Edutrek, EdSoup, Our School Search, College Info, and Degree Spots ("Day Pacer"), is a Utah limited liability company with its principal place of business at 1333 East 9400 South, Second Floor, Sandy, Utah 84093.  Day Pacer is a telemarketer that initiates outbound telephone calls on behalf of third parties to induce consumers to enroll in vocational training and post-secondary education programs, among other things.  Day Pacer obtained the assets of Defendant EduTrek, L.L.C. and continued the operation as a continuation of EduTrek L.L.C., de facto merger, or fraudulent conveyance to escape EduTrek L.L.C.'s liability.  Day Pacer transacts or has transacted business in this district and throughout the United States.

7.     Defendant **EduTrek L.L.C.**, also d/b/a EdSoup ("Edutrek"), is a dissolved Utah limited liability company with its principal place of business at 1333 East 9400 South, Second Floor, Sandy, Utah 84093.  Edutrek is a telemarketer that initiates or initiated outbound telephone calls on behalf of third parties to induce consumers to enroll in vocational training and post-secondary education programs, among other things.  Edutrek transacts or has transacted business in this district and throughout the United States.

8.     Day Pacer is a successor in interest to Edutrek.  For example, the two companies had common ownership, managers, employees, business functions, and office locations.  Day Pacer held itself out as a continuation of Edutrek.  Defendants began the process of dissolving Edutrek and creating Day Pacer to continue Edutrek's business around the time Edutrek was named as a defendant in a class action complaint and received a communication from a vendor demanding information about Edutrek's compliance with federal telemarketing laws.

9.      Defendant **Raymond Fitzgerald**, individually and through his company Dalsnan Family LLC, owns a primary interest in Day Pacer and Edutrek (collectively, the "Corporate Defendants"). He is identified as a managing member, manager, and registered agent on corporate registration papers of Day Pacer and Edutrek. In connection with the matters alleged herein, Raymond Fitzgerald transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this complaint, including but not limited to formulating the Corporate Defendants' policies, responding to consumer complaints, obtaining leads, handling legal matters related to calls to telephone numbers on the National Do Not Call Registry, and taking personnel action. Through his direct participation in, and control over, the Corporate Defendants' enterprise, Raymond Fitzgerald has had knowledge of the acts and practices constituting the violations alleged herein.

10.     Defendant **Ian Fitzgerald** is the President of Day Pacer and owns a substantial interest in the company, individually and through his company Crystal Peak I, LLC. Ian Fitzgerald also was an authorized signatory on Edutrek's corporate bank account. In connection with the matters alleged herein, Ian Fitzgerald transacts or has transacted business in this District and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this complaint, including but not limited to buying and selling leads, addressing reports of noncompliance and legal violations by lead purchasers, and setting company policy for Day Pacer's call center. Through his direct

participation in, and control over Day Pacer, Ian Fitzgerald has had knowledge of the acts and practices constituting the violations alleged herein.

11.     Defendant **David Cumming** owns a substantial interest in Day Pacer and Edutrek and is identified as a manager on the companies' corporate filings.  In connection with the matters alleged herein, Cumming transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this complaint, including but not limited to directing the payment of funds by one Corporate Defendant to another Corporate Defendant and to contractors, and implementing Defendants' dialing, lead tracking, and compliance systems.  Through his direct participation in, and control over, the Corporate Defendants' enterprise, Cumming has had knowledge of the acts and practices constituting the violations alleged herein.

12.     Defendants have placed outbound telephone calls to telephone numbers with area codes in this District and to consumers in this District, including calls to numbers listed on the National Do Not Call Registry.  Defendants also promote and sell consumer leads to post-secondary and vocational schools located within this District.

## COMMERCE

13.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## COMMON ENTERPRISE

14.     Corporate Defendants have operated as a common enterprise while engaging in the unlawful acts and practices alleged below.  Defendants have conducted the business practices

described below through an interrelated network of companies that have common ownership, managers, employees, business functions, and office locations, including the Corporate Defendants and EdSoup.com L.L.C., a predecessor company to Edutrek. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendants Raymond Fitzgerald, David Cumming, and Ian Fitzgerald have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise. Through their direct participation in, and control over, the common enterprise, they have had knowledge of the acts and practices constituting the violations alleged herein.

## DEFENDANTS' BUSINESS PRACTICES

15.     Defendants are telemarketers that call telephone numbers on the National Do Not Call Registry ("the Registry" or "the Do Not Call Registry") without consumers' consent. Defendants are paid by post-secondary and vocational schools to promote their programs and generate consumer leads. They do so by making unsolicited telephone calls to consumers who have submitted their contact information on websites that claim to help them apply for jobs, health insurance, unemployment benefits, Medicaid coverage, or other forms of public assistance. Defendants also pay other telemarketers ("Telemarketing Affiliates") to initiate such telephone calls and then transfer the calls to Defendants for further telemarketing. Instead of offering consumers what was promised on the websites – help in applying for jobs, health insurance, unemployment benefits, Medicaid coverage, or other forms of public assistance – Defendants pitch training and education programs. Defendants and their Telemarketing Affiliates have called millions of consumers who had listed their numbers on the Registry.

**Defendants' Outbound Telemarketing Calls to Unsuspecting Consumers**

16.     Defendants have initiated over five million outbound telephone calls to consumers whose telephone numbers are listed on the Registry.

17.     Defendants purchase telephone numbers from operators of websites that claim to help consumers apply for jobs, health insurance, unemployment benefits, Medicaid coverage, or other forms of public assistance (collectively, "job and benefits websites"). These websites direct consumers to complete an online form by entering their personal information, including their telephone numbers, purportedly to receive information on these subjects. But the websites then sell the information to Defendants who call the consumers to market post-secondary and vocational education products.

18.     The job and benefits websites use various tactics, including those described below, to hide the fact that consumers providing their information will receive calls from Defendants about post-secondary and vocational education products.

19.     First, in numerous instances, the job and benefits websites use fine, inconspicuous print to obtain consumers' purported consent to receive telemarketing calls.

20.     For example, Defendants obtain leads from the website depicted below, which prominently displays the headline "Jobs In Your Area" and claims that "Thousands of Government Jobs In Your Area Are Looking to Hire Immediately." Directly below these claims, an arrow directs consumers to enter their contact information and press a large button labeled "SUBMIT." Immediately below the button, the official seals of several federal government agencies appear, further reinforcing the impression that consumers could obtain information about "Thousands of Government Jobs" by entering their contact information.



21.     Below the seals, however, is a block of small, pale gray text on a pale background that is illegible without substantial magnification.  This text reads, "You certify that you are a us [*sic*] resident over the age of 18, and you agree to the terms and conditions and privacy policy." It then states that simply by clicking the "submit" button, ostensibly to request information about government jobs in the consumer's area, the consumer is "consent[ing]" to receive telemarketing calls about various subjects having nothing to do with obtaining a government job.

22.     Second, in numerous instances, the job and benefits websites require consumers to affirmatively opt out of receiving telemarketing calls, such as by clicking an opt-out link or

unchecking a pre-populated checkbox. These links and checkboxes often are inconspicuous and written in fine print.

23.    For example, the webpage below promises to help people apply for jobs, but consumers are automatically enrolled to receive calls from Defendants about education unless they notice and affirmatively opt out by unchecking a pre-checked box toward the bottom of the page.



24.     Third, in numerous instances, Defendants call telephone numbers obtained

through websites that mislead consumers into selecting "yes" in a checkbox placed directly

under a question having nothing to do with obtaining consent to receive telemarketing calls from Defendants or about educational and vocational products.

25.     For example, Defendants bought leads from "FindFamilyResources.com," a website claiming to offer consumers information about Temporary Assistance to Needy Families (TANF), welfare, and unemployment insurance.  The excerpt below shows a landing page that tells consumers they may "Learn More About Benefits Assistance" by submitting contact information in the boxes immediately following onscreen.



26.     Below the boxes is the stand-alone statement "I declare that I am a U.S. resident over the age of 18 and agree to this site's terms," followed by "Yes" and "No" radio buttons for the consumer to select.

27.     After the radio button is a dense block of text, the middle of which states that consumers who click "Yes" consent to receiving calls about "educational and other opportunities." The end of the text block states, "This is an optional offer for education. Consent is not required as a condition of using this service," but there is no explanation of how a consumer could learn more about benefits assistance without clicking "Yes."

28.     Following this text block is a large yellow button with the text "**Continue Here** with sponsored ads and offers**.**"

29.     If a consumer selects "Yes" and clicks the yellow button, the website and Defendants proceed as though the consumer has agreed to receive telemarketing calls for "sponsored ads and offers." and "educational and other opportunities" unconnected to the assistance the consumer requested.

30.     In addition to hiding the true nature of the calls, in many instances, the job and benefits websites do not identify the education providers or other sellers on whose behalf consumers will be called. Consumers therefore do not agree to receive calls from these sellers.

31.     For example, the web pages depicted in Paragraph 25 above, and below in this Paragraph, do not include any of the names used by Defendants, or any of the schools on whose behalf Defendants made telemarketing calls. Instead, each includes a hyperlink purporting to identify additional "partners" from whom consumers will receive calls. In numerous instances, such hyperlinks have named thirty or more telemarketers, but not the schools on whose behalf Defendants make calls.



**Defendants Have Received Complaints about Unwanted Calls**

32.     Numerous of Defendants' clients, either directly or through intermediaries, have

informed them of the deceptive nature of the websites through which they obtain consumers'

telephone numbers.  For example, one client sent Defendants 22 compliance alerts regarding the

deceptive websites over the course of a five-month period.  In response, Defendants have often

falsely denied purchasing telephone numbers from the operators of the websites or promised

their clients that they would cease using the deceptive websites, but surreptitiously continued to buy, and make calls to, telephone numbers from these websites.

33.     Defendants have received numerous complaints from consumers who received telemarketing calls, stating that they were on the Registry and that they had not authorized Defendants or the sellers Defendants represent to call them.

34.     Defendants train their sales representatives to market vocational and post-secondary education over consumers' objections.  This training includes providing call representatives with a script that instructs them to continue marketing even if consumers have not requested the information or have stated they have no interest in vocational and post-secondary education programs.  Defendants award representatives prizes for making "rebuttals" to complete their sales pitch over consumer objections in this manner.

35.     Defendants also have a specific script to instruct telemarketers on how to overcome objections from consumers who thought they were applying for help obtaining health insurance or Medicaid benefits.  They instruct telemarketers to "[l]isten to the student's objections on going back to college," then "[r]epeat the student's objections back to the student using [e]xcitement," and finally move on with their pitch.

36.     In one instance, for example, Defendants' representative called a consumer and asserted that she had indicated online that she wanted information about higher education.  The consumer expressly denied having requested such information and stated that she was only looking for information about health insurance.  Defendants' sales agent responded, "[a]ll right, you just trying to get a little help with getting some insurance?"  The consumer confirmed that she was just looking for help with insurance.  Disregarding the consumer's clearly-stated lack of

interest and the obvious absence of consent, Defendants' representative then continued pitching educational programs.

### Calls Transferred from Telemarketing Affiliates

37. In addition to dialing consumers directly, Defendants also cause their Telemarketing Affiliates to make unsolicited calls to consumers. These Telemarketing Affiliates obtain consumers' telephone numbers through websites similar to those described in Paragraphs 17 to 31. Telemarketing Affiliates then make outbound calls to those numbers, market post-secondary and vocational education products, and then transfer the calls with the consumer still on the line to Defendants for further telemarketing. Defendants refer to these transferred consumers as "warm transfers" and employ the same script and marketing approach that they use for their own outbound calls.

38. Defendants' Telemarketing Affiliates have initiated millions of outbound calls to consumers, resulting in more than 740,000 "warm transfers" to Defendants, of which more than 190,000 were consumers whose telephone numbers were on the Registry.

39. Defendants provide Telemarketing Affiliates with substantial assistance and support by retaining and paying them to make the outbound calls that resulted in warm transfers to Defendants, and in other ways. For example, Defendants agree to share with Telemarketing Affiliates nearly half of the revenue Defendants earn from the sale of leads that result from warm transfers. In some instances, Defendants also supply Telemarketing Affiliates with consumer telephone numbers to call on Defendants' behalf. Defendants also, in some instances, review and approve Telemarketing Affiliates' scripts.

40. Defendants received numerous reports from their clients, directly or through their intermediaries, about the deceptive nature of the websites used by Telemarketing Affiliates and

their failure to inform consumers adequately that they would receive Defendants' telemarketing calls about post-secondary and vocational education. They also received complaints from consumers alerting them to conduct that violated the TSR. Despite such notices, Defendants continued to pay Telemarketing Affiliates to make outbound calls and provide warm transfers to Defendants.

41.     In one instance, Defendants learned from a post-secondary education provider, directly or through an intermediary, that one of Defendants' Telemarketing Affiliates was calling consumer leads obtained from the website excerpted below, www.armyenlist.com. On that website, consumers were told to provide their information if they wanted "information about joining the Army or educational opportunities." Below this was an option for consumers to indicate that they were only interested in the military, as opposed to educational opportunities. Yet, even when consumers selected the option stating that they were interested only in the military, the Telemarketing Affiliate nonetheless called the consumers about educational and vocational opportunities and warm-transferred them to Defendants. Defendants, in turn, continued the telemarketing effort and tried to convince the consumers to speak with a sales representative for a post-secondary education provider. And even after the education provider directly or indirectly discussed this practice with Defendants, they continued to work with the same Telemarketing Affiliates and market schools to consumers the Telemarketing Affiliates transferred to Defendants.



42.     In another example, a post-secondary education provider directly or indirectly told Defendants that one of their Telemarketing Affiliates was calling consumer leads obtained from a website that promised to help consumers earn money by working from home. The website, which is excerpted below, did not inform consumers that they would receive telemarketing calls from Defendants and, to the contrary, includes language stating, "We respect your privacy and will not rent or share your information with anyone." Despite this statement, the Telemarketing Affiliate attempted to market vocational and post-secondary education to consumers who had entered their information on the website, and they warm-transferred many of

these consumers to Defendants, who continued the marketing effort. And even after the

education provider directly or indirectly discussed this practice with Defendants, they continued

to work with the same Telemarketing Affiliates and market schools to consumers the

Telemarketing Affiliates transferred to Defendants.



For Immediate Release on:

## Make money and change your life NOW! Within 5 minutes you could be making REAL MONEY working from the comfort of your own home!

- No Prior Experience, or Skills Required
- Be Your Own Boss and Choose Your Own Hours.
- Start Earning Immediately!
- Limited Number of Spots Open. Check Availability in Your Area



Work From Home Opportunities Have Been Featured On:

    

Earnings Disclaimer · Privacy Policy · Terms and Conditions · Disclaimer · Refund Policy

© 2015 All Rights Reserved

support@cashfromhomemembers.com

COMPLAINT

18

43. In still another instance, Defendants learned from a post-secondary education provider, directly or indirectly, that one of Defendants' Telemarketing Affiliates was calling consumers who had only expressed interest in obtaining employment. In the excerpt below, the Telemarketing Affiliate's website, simplyjobs.com, purported to advertise "Coca Cola Jobs" in the consumer's area and instructed the consumer to enter his or her telephone number to "[c]omplete your registration." Despite the claims made on the website, the Telemarketing Affiliate telemarketed vocational and post-secondary education to those consumers and warm-transferred many of them to Defendants, who tried to convince the consumers to speak with a sales representative for a post-secondary education provider.



44. Defendants have failed to monitor and enforce their Telemarketing Affiliates' compliance with the TSR, even after Defendants were on notice of violations of the law.

## THE TELEMARKETING SALES RULE AND
## THE NATIONAL DO NOT CALL REGISTRY

45.     Congress directed the Commission to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The Commission adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

46.     Among other things, the 2003 amendments to the TSR established a do-not-call registry, maintained by the Commission, of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at donotcall.gov.

47.     The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download the numbers not to call.

48.     Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.  16 C.F.R. § 310.2(dd).

49.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

50.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry unless the seller or telemarketer can demonstrate that the seller (1) has obtained the consumer's express agreement, in writing, to place such calls, or (2) has an

established business relationship with that consumer, and the consumer has not stated that he or she does not wish to receive such calls. 16 C.F.R. § 310.4(b)(1)(iii)(B). Valid written consent to receive a live telemarketing call to a number on the Registry requires: (i) a writing signed by the consumer, (ii) clearly evidencing authorization to receive calls placed by or on behalf of a specific party, and (iii) stating the telephone number to which such calls may be placed. 16 C.F.R. § 310.4(b)(1)(iii)(B)(1).

51.     The TSR also prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates § 310.4 of the Amended TSR. 16 C.F.R. § 310.3(b).

52.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

## COUNT I

### Calls to Persons Registered on the National Do Not Call Registry

53.     In numerous instances, in connection with telemarketing, Defendants have initiated or caused others to initiate an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT II

**Assisting and Facilitating Calls to Persons Registered on the National Do Not Call Registry**

54.     Defendants have provided substantial assistance and support to one or more

Telemarketing Affiliates even though Defendants knew or consciously avoided knowing that one

or more such Telemarketing Affiliates were engaged in violations of § 310.4 of the TSR.

Defendants, therefore, have violated 16 C.F.R. § 310.3(b).

## <u>CONSUMER INJURY</u>

55.     Consumers in the United States have suffered and will suffer injury as a result of

Defendant's violations of the TSR.  Absent injunctive relief by this Court, Defendants are likely

to continue to injure consumers and harm the public interest.

## <u>THIS COURT'S POWER TO GRANT RELIEF</u>

56.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant

injunctive and other ancillary relief to prevent and remedy any violation of any provision of law

enforced by the FTC.

57.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by

Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as

amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary

civil penalties of up to $40,000 for each violation of the TSR, 16 C.F.R. § 1.98(d).  Defendants'

violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the

FTC Act, 15 U.S.C. § 45(m)(1)(A).

58.     This Court, in the exercise of its equitable jurisdiction, may award ancillary relief

to remedy injury caused by Defendants' violations of the TSR and the FTC Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court, as authorized by Sections 5(a), 5(m)(1)(A), and 13(b) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and pursuant to its own equitable powers:

A.      Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this complaint;

B.      Award Plaintiff monetary civil penalties from each Defendant for every violation of the TSR;

C.      Enter a permanent injunction to prevent future violations of the TSR and the FTC Act by Defendants; and

D.      Award Plaintiff such other and additional relief, including disgorgement, as the Court may determine to be just and proper.

Dated: March 22, 2019                                 Respectfully submitted,

Alden F. Abbott
General Counsel

WILLIAM J. HODOR, Local Counsel
Federal Trade Commission
Midwest Region
230 South Dearborn Street, Room 3030
Chicago, IL 60604
312-960-5634 [telephone]
312-960-5600 [facsimile]
whodor@ftc.gov

JASON SCHALL
LEAH FRAZIER
PATRICK ROY
Federal Trade Commission
600 Pennsylvania Ave, NW
Mail Stop CC-10232
Washington, DC 20580
202-326-2251 [telephone]
202-326-3768 [facsimile]
jschall@ftc.gov [e-mail Schall]
lfrazier@ftc.gov [e-mail Frazier]
proy@ftc.gov [e-mail Roy]

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION