**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 1:19-cv-01984 |
| Plaintiff, | Judge: Edmond E. Chang |
| v. | Magistrate Judge: Young B. Kim |
| DAY PACER LLC, et al. | |
| Defendants. | |

**PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY
JUDGMENT**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 1

II.   SUMMARY OF MATERIAL FACTS ........................................................... 1

III.  LEGAL STANDARD ..................................................................................... 4

IV.  ARGUMENT .................................................................................................. 4

   A.   Defendants Have Violated the TSR by Initiating Calls to DNC Numbers (Count I). . 5

      1.   Defendants Are Telemarketers Under the TSR That Have Initiated Millions of Outbound Telephone Calls to DNC Numbers. ..................................................... 5

      2.   Defendants Are Liable For Calls Their IBT Partners Have Placed To DNC Numbers As Defendants' Agents. ................................................................................. 7

   B.   Defendants Have Violated the TSR by Assisting and Facilitating IBT Partners' Calls to DNC Numbers (Count II). ......................................................................... 10

      1.   Defendants Provide Substantial Assistance to the IBT Partners by Paying Them to Make the Calls, Providing Them Numbers to Call, and Reviewing Telemarketing Scripts. ....................................................................................................... 11

      2.   Defendants Have Knowledge or Have Consciously Avoided Knowing of the IBT Partners' Calls to DNC Numbers. ......................................................................... 12

   C.   Corporate Defendants Day Pacer LLC and EduTrek L.L.C. Are Liable for Injunctive Relief and Civil Penalties. ................................................................. 14

      1.   Corporate Defendants Are Liable for Injunctive Relief and Civil Penalties for the TSR Violations. ........................................................................................... 15

      2.   Corporate Defendants Are Jointly and Severally Liable Because They Operate as a Common Enterprise. ........................................................................................... 15

      3.   Day Pacer LLC Is Also Liable for EduTrek L.L.C.'s TSR Violations Because It Is a Successor to EduTrek. ........................................................................................ 17

   D.   Raymond Fitzgerald, Ian Fitzgerald, and David Cumming Are Individually Liable for Injunctive Relief and Civil Penalties. ............................................................ 19

      1.   The Individual Defendants Are Personally Liable for Injunctive Relief. ............... 20

i

**2. The Individual Defendants Are Personally Liable for Civil Penalties.** ................... 21

**E. The Court Should Enter a Permanent Injunction and Award Civil Penalties in the Amount of $28,681,863.88 Against Defendants.** .................................................... 24

**1. Defendants Are Likely to Continue to Violate the TSR, Warranting the Entry of a Permanent Injunction.** ................................................................................. 25

**2. The Court Should Award Civil Penalties in the Amount of $28,681,863.88.** .......... 28

**V. DEFENDANTS' AFFIRMATIVE DEFENSES FAIL BECAUSE THEY ARE MERE DENIALS, PREMISED ON MISSATEMENTS OF THE RELEVANT LAW OR HAVE BEEN EXPLICITLY REJECTED BY COURTS, OR FACTUALLY UNSUPPORTED OR CONTRADICTED.** ............................................................................................................ 32

**A. Defendants' Pleading or Standing-Related Affirmative Defenses Fail Because the FTC Has Properly Pled This Case, the FTC Has Standing to Enforce the TSR, and This Court Has Jurisdiction.** .................................................................................... 33

**B. This Court, the Seventh Circuit, and Other Courts Have Rejected Defendants' Constitutional Affirmative Defenses.** .................................................................... 36

**C. Defendants' TSR-Related Affirmative Defenses Fail Because They Are Unavailable As a Matter of Law, Defendants' Have Provided No Evidence to Prove Them, and the Undisputed Factual Record Forecloses Them.** .................................................... 37

**VI. CONCLUSION** ...................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014) ........................................................ 35

*Anetsberger v. Me. Life Ins. Co.*, 14 F.3d 1226 (7th Cir. 1994) ..................................................... 8

*Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 1294659 (N.D. Ill. Mar. 21, 2019) ................................................................................................................................................ 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................... 4

*CFPB v. Corinthian Colleges, Inc.*, No. 1: 14-cv-07194, 2015 WL 10854380 (N.D. Ill. 2015) . 26

*CFTC v. Hunt*, 591 F.2d 1211 (7th Cir. 1979) .............................................................................. 25

*FTC v. 120194 Canada, Ltd.*, No. 04 C 7204, 2007 WL 9815958 (N.D. Ill. Feb. 12, 2007)... 4, 16

*FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal. May 31, 2017) ............................. 28

*FTC v. Asia Pac. Telecom, Inc.*, 802 F. Supp. 2d 925 (N.D. Ill. 2011) ......................................... 4

*FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627 (7th Cir. 2005) ......................................... 4, 16

*FTC v. Chapman*, 714 F.3d 1211 (10th Cir. 2013) ................................................................. 11, 12

*FTC v. Citigroup Inc.*, 239 F. Supp. 2d 1302 (N.D. Ga. 2001) .................................................... 18

*FTC v. Cleverlink Trading Ltd.*, 519 F. Supp. 2d 784 (N.D. Ill. 2007) ......................................... 4

*FTC v. Com. Planet, Inc.*, No. SACV0901324CJCRNBX, 2010 WL 11673795 (C.D. Cal. July 6, 2010) .............................................................................................................................................. 35

*FTC v. Consumer Alliance, Inc.*, No. 02-cv-2429, 2003 WL 22287364 (N.D. Ill. Sept. 30, 2003) .......................................................................................................................................................... 19

*FTC v. Consumer Health Benefits Ass'n*, No. 10 CIV 3551, 2012 WL 1890242 (E.D.N.Y. May 23, 2012) ........................................................................................................................................ 11

*FTC v. Consumer Health Benefits Ass'n*, No. 10-cv-3551, 2011 WL 3652248 (E.D.N.Y. Aug. 18, 2011) ............................................................................................................ 12

*FTC v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d 852 (N.D. Ill. 2018) ..................... 8, 10, 25, 26

*FTC v. Febre*, 128 F.3d at 530 (7th Cir. 1997) ............................................................. 25

*FTC v. INC21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010) ................................ 27

*FTC v. J. William Enters.*, 283 F. Supp. 3d 1259 (M.D. Fla. 2017) ............................ 34

*FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006 (C.D. Cal. 2012) ............... 27, 28

*FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757 (N.D. Ill. 2016) ..................................... 8, 9

*FTC v. Lifewatch Inc.*, No. 1:15-cv-05781 (N.D. Ill. July 1, 2019) ............................. 28

*FTC v. Money Now Funding LLC*, No. CV-13-01583, 2015 WL 11120847 (D. Ariz. July 1, 2015) ............................................................................................................ 18

*FTC v. Mortg. Relief Advocates LLC*, No. CV-14-5434-MWF (AGRx), 2015 WL 11257575 (C.D. Cal. July 1, 2015) ............................................................................... 16

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) ............................. 16

*FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 5632123 (D. Ariz. Sept. 21, 2020) ... 35

*FTC v. Oks*, No. 05 C 5389, 2007 WL 3307009 (N.D. Ill. Nov. 2, 2007) ...................................... 4

*FTC v. Partners In Health Care Ass'n., Inc.*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016) ........... 12, 28

*FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257 (S.D. Fla. 2019) .............................. 27, 28

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993 (N.D. Ind. 2000) ................. 19, 26, 27, 28

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) ................................... 4, 15

*Grashoff v. Payne*, 478 F. Supp. 3d 735 (N.D. Ind. 2020) ............................................ 36

*Macris & Assocs. v. Neways, Inc.*, 986 P.2d 748 (Utah Ct. App. 1999) ...................................... 18

iv

*Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004) ...................................... 37

*Nat'l Coalition of Prayer, Inc. v. Carter*, 455 F.3d 783 (7th Cir. 2006) ...................................... 37

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697 (7th Cir. 2011) ...................................... 4

*P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261 (6th Cir. 1970)................................................... 18

*Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303 (7th Cir. 2017)................................................. 37

*Raquet v. Allstate Corp.*, 348 F. Supp. 3d 775 (N.D. Ill. 2018)..................................................... 14

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ........................................................................... 26

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)................................................ 25

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F. 3d 664 (7th Cir. 2004)........................ 10

*United States v. Ancorp Nat. Servs., Inc.*, 516 F.2d 198 (2d Cir. 1975) ...................................... 34

*United States v. Bajakajian*, 524 U.S. 321 (1998) ...................................................................... 36

*United States v. Com. Recovery Sys., Inc.*, 179 F. Supp. 3d 728 (E.D. Tex. 2016)............... 22, 25

*United States v. Com. Recovery Sys., Inc.*, No. 4:15-CV-00036, 2017 WL 1065137 (E.D. Tex.

   Mar. 21, 2017)......................................................................................................................... 32

*United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811 (N.D. Tex. 2008).................. 31

*United States v. Dish Network L.L.C.*, 667 F. Supp. 2d 952 (C.D. Ill. 2009)................... 11, 12, 13

*United States v. Dish Network L.L.C.*, 954 F.3d 970 (7th Cir. 2020).................................... passim

*United States v. Dish Network LLC*, 256 F. Supp. 3d 810 (C.D. Ill. 2017)............... 15, 25, 29, 36

*United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942 (C.D. Ill. 2014)........................ passim

*United States v. FMFG, Inc.*, No. 03:05CV00711-LRH-VPC, 2006 WL 2639366 (D. Nev. Sept.

   13, 2006) ................................................................................................................................. 19

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975) .................................................... 32

v

*United States v. Lasseter*, No. 3:03-1177, 2005 WL 1638735 (M.D. Tenn. June 30, 2005)........ 23

*United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131 (4th Cir. 1996)...................................... 22, 32

*United States v. Reader's Digest Ass'n Inc.*, 494 F. Supp. 770 (D. Del. 1980)........................... 32

*United States v. Tech. Commc'ns Indus., Inc.*, No. 85-137-CIV-7, 1986 WL 15489 (E.D.N.C.

Dec. 22, 1986)........................................................................................... 21, 22, 23

*Vernon v. Schuster*, 688 N.E. 2d 1172 (Ill. 1997)...................................................... 18

**Statutes**

15 U.S.C. § 45(m) .................................................................................. 36

15 U.S.C. § 45(m)(1)(A) ............................................................................ 19, 25, 28

15 U.S.C. § 45(m)(1)(C) ............................................................................. 29

15 U.S.C. § 45(n) ................................................................................... 40

15 U.S.C. § 53(b) .................................................................................. 25

15 U.S.C. § 56 ..................................................................................... 34

15 U.S.C. § 56(a) .................................................................................. 34

15 U.S.C. § 6101 ................................................................................... 24

15 U.S.C. § 6106(4) ................................................................................. 6

15 U.S.C. § 6151(a) ................................................................................ 40

15 U.S.C. § 6153 ................................................................................... 22

15 U.S.C. § 6155(b) ................................................................................ 37

15 U.S.C. §§ 6101-6108 ............................................................................. 40

28 U.S.C. § 2462 ................................................................................... 35

**Other Authorities**

16 C.F.R. § 1.98(d) ........................................................................................................ 28

16 C.F.R. § 310.2(ff) ................................................................................................... 5, 6

16 C.F.R. § 310.2(gg) .................................................................................................. 5, 6

16 C.F.R. § 310.3(b) ................................................................................................... 8, 11

16 C.F.R. § 310.4(b) ...................................................................................................... 22

16 C.F.R. § 310.4(b)(1)(iii)(B) ........................................................................................ 5

16 C.F.R. § 310.4(b)(1)(iii)(B)(1) ............................................................................... 7, 38

16 C.F.R. § 310.4(b)(1)(iii)(B)(2) ............................................................................... 7, 38

16 C.F.R. § 310.4(b)(3) ................................................................................................. 39

16 C.F.R. § 310.6(b)(5) ................................................................................................. 39

16 C.F.R. §§ 310.4(b)(3)(i) ........................................................................................... 39

47 C.F.R. §§ 64.1200(c)(2) ........................................................................................... 22

60 Fed. Reg. 30406 ....................................................................................................... 12

74 Fed. Reg. 857 ........................................................................................................... 28

81 Fed. Reg. 42476 ....................................................................................................... 28

82 Fed. Reg. 8135 ......................................................................................................... 28

83 Fed. Reg. 2902 ......................................................................................................... 28

84 Fed. Reg. 3980 ......................................................................................................... 28

Fed. R. Civ. P. 56(c) ....................................................................................................... 4

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 14

**Restatements**

Restatement (Third) of Agency, § 2.03 (2006) ............................................................... 10

## I.  INTRODUCTION

For over a decade, Individual Defendants Raymond Fitzgerald, David Cumming, and Ian Fitzgerald and their companies, Corporate Defendants EduTrek L.L.C. and Day Pacer LLC, (collectively, "Defendants") have operated an illegal telemarketing operation that has harassed tens of millions of consumers whose telephone numbers are on the National Do-Not-Call Registry with calls marketing post-secondary education.   These unwitting consumers have merely sought information about job opportunities and public benefits on websites where they provided their contact information.   Not only have Defendants placed many of these illegal calls themselves, but they have also assisted and facilitated telemarketing partners in placing illegal calls.   The overwhelming undisputed evidence demonstrates that the FTC is entitled to summary judgment against Defendants, including the award of a permanent injunction and civil penalties.

## II.  SUMMARY OF MATERIAL FACTS

Defendants are telemarketers who place outbound telephone calls nationwide to consumers who—in search of job opportunities or public benefits—have submitted their contact information on websites specifically advertising those matters.   (Plaintiff's Statement of Undisputed Material Fact ("PSMF") ¶¶ 15-17, 20-21, 24).   Defendants instead call them to market post-secondary educational services on behalf of for-profit schools seeking to enroll new students.   (PSMF ¶¶ 16-21, 29).   Defendants do not and have never subscribed to the National Do-Not-Call Registry ("Registry") and do not scrub lists of consumer telephone numbers they call against the Registry.   (PSMF ¶ 27).   Defendants' own call records indicate that they have made millions of calls to consumers with telephone numbers on the Registry.   (PSMF ¶ 26).

In addition to placing calls to consumers directly, Defendants have contracted with

1

various telemarketing companies, often based outside of the United States, to make additional

calls to consumers across the country, determine potential eligibility for enrollment in

post-secondary education, and then transfer the calls (hereinafter "inbound transfers") to

Defendants for continued telemarketing.   (PSMF ¶ 35).   Defendants pay these telemarketing

companies (hereinafter "IBT Partners") to place calls, and in many cases, have given them the

specific telephone numbers to call, reviewed their telemarketing scripts, and provided other

guidance and direction.   (PSMF ¶¶ 35, 37, 43-46, 54).   The schools on whose behalf

Defendants have telemarketed treat the IBT Partners as Defendants' agents and hold Defendants

accountable for the legal compliance violations of these IBT Partners.   (PSMF ¶ 36).

Defendants' call records and other documents reflect that their IBT Partners have placed tens of

millions of calls to numbers on the Registry ("DNC Numbers").   (PSMF ¶ 41).

     Defendants are well aware of the Registry and know that federal law prohibits

telemarketing calls to DNC Numbers.   (PSMF ¶¶ 55-57, 62, 80, 84, 89).   The relevant federal

laws and rules implementing the Registry and telemarketing restrictions—the Telephone

Consumer Protection Act ("TCPA") and the Telemarketing Sales Rule ("TSR")—are

incorporated in contracts between Defendants and their IBT Partners, other vendors, schools, and

consumer lead aggregators acting on behalf of schools.   (PSMF ¶¶ 36, 56-57).   On many

occasions, Defendants exchanged emails discussing the TCPA and TSR.   (PSMF ¶¶ 80-83, 91).

Defendants also had a written a "Do Not Call Policy" to give the superficial appearance of

compliance with the TCPA and TSR.   (PSMF ¶¶ 28, 62).

     Defendants also know that they and their IBT Partners have been placing calls to DNC

Numbers, and that the websites from which they harvest consumer contact information have not

obtained the express written authorization of consumers to be called by Defendants or their IBT

Partners about educational opportunities.   (PSMF ¶¶ 30, 33-34, 42, 48-49, 85-86).   Defendants

have been sued multiple times by consumers on the Registry who complained about receiving

illegal and unwanted calls, and have faced threatened lawsuits and complaints from other

consumers for the same conduct.   (PSMF ¶¶ 30, 49, 91).   They have received numerous

violation notices and warnings from schools, the compliance company Omniangle (hired by

schools), and lead purchasers.   (PSMF ¶¶ 54, 58).   Defendants' employees have even

complained internally that the consumers they call are interested in jobs, not education.   (PSMF

¶ 47; *see also* PSMF ¶ 29).   Despite the legal requirement to do so, Defendants have also failed

to maintain records (such as screenshots of websites) demonstrating that the consumers they and

their IBT Partners call have given express written authorization ("EWA") to be called by

Defendants or have an established business relationship ("EBR") with a school on whose behalf

Defendants or their IBT Partners were calling.   (PSMF ¶¶ 52, 106).

The Individual Defendants have the authority to control and do control the conduct of the

Corporate Defendants, EduTrek and Day Pacer—small, closely-held companies.   (PSMF

¶¶ 65-79).   As negative publicity and scrutiny of their practices has increased, they have

attempted to use the corporate form to evade responsibility for their conduct by incorporating

new companies and transitioning to new fictitious corporate identities, while engaging in the

same business, at the same location, with the same ownership and employees.   (PSMF

¶¶ 93-101).   They transitioned from EduTrek to Day Pacer in late 2015 after negative publicity

about their practices hurt their business, and from Day Pacer to Allied Contact Management LLC

and Entropy Leads LLC shortly after the FTC filed this suit.   (PSMF ¶¶ 97, 100, 102).

3

## III.    LEGAL STANDARD

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial burden of proving there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party "must affirmatively demonstrate, by producing evidence that is more than merely colorable, that there is a genuine issue for trial" to avoid summary judgment.  *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011).  Courts in this Circuit routinely grant the FTC summary judgment on TSR claims.[1]

## IV.    ARGUMENT

The undisputed facts show that Defendants have violated the TSR by:   (A) targeting millions of consumers who were looking for help finding jobs, public assistance, and health care, with unwanted calls to telemarket enrollment in for-profit post-secondary education programs; and (B) assisting and facilitating their IBT Partners in making millions more of these unwanted calls.  The undisputed facts also show that:   (C) Corporate Defendants are jointly and severally

---

[1] *See, e.g.*, *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005) (affirming summary judgment for Plaintiff FTC); *FTC v. World Media Brokers*, 415 F.3d 758, 763 (7th Cir. 2005) (same); *FTC v. Asia Pac. Telecom, Inc.*, 802 F. Supp. 2d 925, 928 (N.D. Ill. 2011) (MJ Denlow) (granting in part and denying in part FTC's motion for partial summary judgment); *FTC v. Oks*, No. 05 C 5389, 2007 WL 3307009, at *7 (N.D. Ill. Nov. 2, 2007) (J. Guzman) (same); *FTC v. Cleverlink Trading Ltd.*, 519 F. Supp. 2d 784, 792 (N.D. Ill. 2007) (J. Kendall) (granting FTC's motion for summary judgment); *FTC v. 120194 Canada, Ltd.*, No. 04 C 7204, 2007 WL 9815958, at *6-8 (N.D. Ill. Feb. 12, 2007) (J. Gottschall) (same).

liable for the TSR violations as a common enterprise and because Day Pacer is a corporate successor to EduTrek; (D) Individual Defendants directly participated in, and knew of, the violations and therefore should be held liable for injunctive relief and civil penalties for the TSR violations; and (E) a permanent injunction and civil penalties of $28,681,863.88 are warranted against Defendants for their unrepentant illegal conduct and to deter future violations.

### A. Defendants Have Violated the TSR by Initiating Calls to DNC Numbers (Count I).

The TSR prohibits "telemarketers" from "[i]nitiating any outbound telephone call to a person when . . . [t]hat person's telephone number is on the 'do-not-call' registry." 16 C.F.R. § 310.4(b)(1)(iii)(B). Violations of the TSR are deemed by law to constitute "unfair and deceptive act[s] or practice[s]." *United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942, 957-58 (C.D. Ill. 2014). The undisputed facts show that Defendants are telemarketers who have initiated millions of outbound telephone calls regarding post-secondary education to DNC Numbers. In addition to Defendants' own violations of the TSR, they are also liable for millions of additional calls their agent IBT Partners placed to DNC Numbers.

### 1. Defendants Are Telemarketers That Have Initiated Millions of Outbound Telephone Calls to DNC Numbers.

Defendants' business is quintessential telemarketing as defined in the TSR: engaging in a "plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate call." 16 C.F.R. § 310.2(gg); *see also* 16 C.F.R. § 310.2(ff). As discussed further below, the evidence shows indisputably that Defendants call people around the country to induce enrollments at post-secondary schools, including to millions of DNC Numbers.

5

The undisputed evidence demonstrates that the purpose of Defendants' telemarketing campaigns is to induce "the purchase of goods or services"—specifically, enrollments in schools. Defendants identified their businesses' principal business activity in official state and federal filings as "educational marketing services". (PSMF ¶ 16). Defendants' contracts with schools, lead purchasers, and IBT Partners also describe Defendants' business as providing marketing services to generate "qualified leads" for schools—people eligible for enrollment at those schools. (PSMF ¶ 17). The end goal of Defendants' lead generation business was the sale of post-secondary education to consumers in the form of enrollments at schools. (PSMF ¶ 18). Day Pacer even stated on government documents that the company "solicits, promotes, or induces the sale of goods or services." (PSMF ¶ 19).

The undisputed evidence also demonstrates that Defendants use "one or more telephones" to make "more than one interstate telephone call."[2] Defendants' own call records reflect that the vast majority of the calls they made were interstate calls.[3] (PSMF ¶ 22).

---

[2] The TSR's basic requirement is that telemarketing only involve "*more than one* interstate telephone call." 16 C.F.R. § 310.2(gg) (emphasis added). The plain language of the TSR thus forecloses Day Pacer Defendants' related *Twenty-Third* and *Twenty-Fourth* "affirmative" defenses (R. 33 ¶¶ 84-85) that to prove TSR violations, the FTC must paradoxically prove that *each call* violating the TSR consisted of *at least two* interstate calls. The TSR does not exempt intrastate call violations, nor does it require that each violation consist of more than one interstate call. Once the FTC establishes that Defendants made "more than one interstate telephone call," all of the violative calls—interstate or intrastate—are covered by the TSR. *See* 16 C.F.R. §§ 310.2(ff), (gg); 15 U.S.C. § 6106(4); *Dish Network*, 75 F. Supp. 3d at 1003-04 (finding that a campaign that included interstate telemarketing calls constituted "'telemarketing' under the TSR, making even the intrastate calls from the campaign 'telemarketing' subject to the TSR"). For this reason, the FTC seeks civil penalties for *all* of the violative calls placed by Defendants, whether construed as intrastate calls or interstate calls. *See infra* Section IV.E.3.

[3] This is true whether comparing the area codes of the telephone numbers Defendants used to place calls with the area codes of the telephone numbers called ("Area Code Comparison Methodology"), or by

6

Defendants have also admitted expressly that they spoke with consumers nationwide and that they did not have any policies or procedures in place to prevent agents employed by their Utah-based business from calling telephone numbers outside of Utah.   (PSMF ¶¶ 20-21, 23). Thus, Defendants are clearly "telemarketers" subject to the TSR.[4]

Finally, the undisputed evidence establishes that Defendants have made millions of outbound calls to DNC Numbers.   From March 22, 2014 through June 12, 2019, more than a quarter of the outbound telephone calls Defendants initiated—3,669,914 calls, or 25.5%—were made to telephone numbers on the Registry.   (PSMF ¶ 26).   Though Defendants acknowledge that they know of the TSR and the Registry, (PSMF ¶¶ 55-57, 62, 80, 89), they admit they do not subscribe to the Registry and do not scrub their calling lists of DNC Numbers; nor can they demonstrate that they obtained consumers' EWA, 16 C.F.R. § 310.4(b)(1)(iii)(B)(1), or relied on any EBR, 16 C.F.R. § 310.4(b)(1)(iii)(B)(2), to exempt their calls from the DNC prohibitions (*see* Section V.C, *infra*).   (PSMF ¶¶ 27, 106-109).

### 2. Defendants Are Liable For Calls Their IBT Partners Have Placed To DNC Numbers As Defendants' Agents.

In addition to Defendants' liability for outbound calls they directly placed to DNC

---

identifying calls placed to telephone numbers with non-Utah area codes ("Non-Utah Methodology"). The Area Code Comparison Methodology was endorsed by the district court in the *Dish Network* matter, and utilized here, results in 5,697,230 interstate calls placed by Defendants between 2014 and June 12, 2019.   The Non-Utah methodology indicates that 96.5% of calls placed by Defendants were made to consumers outside of Utah, for a total of 17,637,108 interstate calls between 2014 and June 12, 2019.

[4] Accordingly, Day Pacer Defendants' related *Second, Fifteenth,* and *Seventeenth* "affirmative" defenses, essentially mere denials that the Defendants' acts or practices are within the scope of the TSR or that the TSR is "specific" enough to cover Defendants' conduct, are without merit.   (R. 33 ¶¶ 60, 76, 78).

Numbers, the undisputed evidence further demonstrates that, as principals, Defendants are liable

for calls initiated to DNC Numbers by their IBT Partners—telemarketers who acted as

Defendants' agents.[5]   *See, e.g.*, *FTC v. Credit Bureau Ctr., LLC*, 325 F. Supp. 3d 852, 859 (N.D.

Ill. 2018), *aff'd in part, vacated in part on unrelated grounds*, 937 F.3d 764 (7th Cir. 2019)

(citing *FTC v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 779 (N.D. Ill. 2016).   "To bind the principal,

the agent must have either actual authority, apparent authority, or the principal must ratify [the

agent's] actions."   *Credit Bureau Ctr.*, 325 F. Supp. 3d at 859 (quoting *Anetsberger v. Me. Life

Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir. 1994)).   Even though only one of these forms of agency is

needed to establish Defendants' liability, the IBT Partners meet the conditions for all three.

The IBT Partners are telemarketers because they make calls nationwide on behalf of

Defendants to market post-secondary education, and then transfer the calls to Defendants for

further telemarketing.   (PSMF ¶¶ 35, 40).   The undisputed evidence from Defendants' call

records documents that, between March 22, 2014 and June 12, 2019, Defendants' IBT Partners

made 498,597 inbound transfers to Defendants that were the product of outbound telephone calls

to numbers on the Registry.   (PSMF ¶ 41).   Although Defendants did not keep records of all the

outbound calls made by their IBT Partners that *did not* result in a transfer to Defendants, the

---

[5] As discussed in Section IV.B, *infra*, Defendants are alternatively liable for the IBT Partners' TSR
violations under the assisting and facilitating provisions of the TSR.   16 C.F.R. § 310.3(b); *United States
v. Dish Network L.L.C.*, 954 F.3d 970, 977-78 (noting that agency and assisting-and-facilitating liability
under the TSR—what the FTC pursues here—are acceptable alternative theories of liability for
telemarketing defendants).

evidence shows they made approximately an additional 39,847,000 violative calls.[6]   (*Id.*)

The undisputed evidence demonstrates that the IBT Partners have actual authority to act as Defendants' agents in that they act on behalf of Defendants (the principal) and are subject to Defendants' control.   *Lifewatch*, 176 F. Supp. 3d at 773 (citing Restatement (Third) of Agency § 1.01 (2006)).   Defendants' contracts with the IBT Partners show expressly that they pay the IBT Partners to make telemarketing calls on their behalf and transfer the calls to Defendants. (PSMF ¶¶ 35, 43).   In many cases, Defendants have provided lists of numbers for the IBT Partners to call, and also provided and reviewed the call scripts used by the IBT Partners. (PSMF ¶¶ 44-46).   The contracts Defendants signed with the schools and lead aggregators to whom Defendants sold leads also hold Defendants liable for the leads generated by any IBT Partners Defendants use.[7]   (PSMF ¶ 36).

The undisputed evidence further demonstrates that the IBT Partners have apparent authority to act on behalf of Defendants.   Apparent authority exists when a third party "reasonably believe[s] the purported agent has the authority to act for the principal and that belief must be traceable to the principal."   *Dish Network*, 75 F. Supp. 3d at 1016-17 (citing

---

[6] As discussed in Section IV.E, *infra*, though the FTC is not seeking civil penalties specifically for these additional 39,847,000 calls, the Court should take them into consideration when assessing the scope of Defendants' violations and the appropriateness of the relief sought by the FTC.   Defendants' failure to keep records of the calls placed on their behalf should not immunize them from liability.   *Cf. Bakov v. Consol. World Travel, Inc.*, No. 15 C 2980, 2019 WL 1294659, at *19 (N.D. Ill. Mar. 21, 2019) (defendants' failure to keep records that could help identify potential class members cannot be used as a defense to class certification because it would incentivize poor recordkeeping).

[7] Day Pacer Defendants' *Twenty-Seventh Affirmative Defense* (R. 33 ¶ 88), which is not an affirmative defense but rather a mere denial that the IBT Partners acted on Defendants' behalf and were subject to Defendants' control, is therefore without merit.

Restatement (Third) of Agency, § 2.03 (2006)).   As stated above, the contracts Defendants signed with schools and lead aggregators treat the IBT Partners as the agents of Defendants for which they are responsible.   (PSMF ¶ 36).   Moreover, consumer complainants who received calls from Defendants' IBT Partners and were subsequently transferred to Defendants generally do not distinguish between the IBT Partners and Defendants; indeed, some consumers have threatened lawsuits against Defendants for calls placed by their IBT Partners.   (PSMF ¶ 49). Additionally, in some cases, Defendants have instructed their IBT Partners to use Defendants' fictitious identities when speaking with consumers.   (PSMF ¶ 37).   And Defendants knew that the IBT Partners have often included language in scripts or otherwise conducted their call transfers to Defendants in a manner that made it appear to consumers that they were being transferred within a single company.   (PSMF ¶ 38).

Finally, the undisputed evidence demonstrates that Defendants ratified the illegal conduct of their IBT Partners.   Ratification requires that a principal know of the conduct of a purported agent and provide "long-term acquiescence" by "accepting 'the benefits of an allegedly unauthorized transaction.'"   *Credit Bureau Ctr.*, 325 F. Supp. 3d at 859-60 (quoting *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F. 3d 664, 677 (7th Cir. 2004)).   Defendants have received numerous complaints from consumers, schools, and compliance-monitoring companies that their IBT Partners are calling consumers whose numbers were on the Registry without EWA.   *See infra* Section IV.B.   Yet, Defendants have continued to pay and work with those IBT Partners, continuing to send their leads to schools and lead aggregators.   (PSMF ¶¶ 42, 54).

## B.    Defendants Have Violated the TSR by Assisting and Facilitating IBT Partners' Calls to DNC Numbers (Count II).

Alternatively, Defendants may be held liable for their IBT Partners' DNC violations under the TSR's "assisting and facilitating" provision. Liability for assisting and facilitating telemarketers' calls to DNC Numbers requires: 1) providing substantial assistance or support to the telemarketer; and 2) knowing or consciously avoiding knowing that the telemarketer is engaged in any act or practice that violates Section 310.4 of the TSR, including initiating calls to DNC Numbers. 16 C.F.R. § 310.3(b). Here, the undisputed facts show that Defendants pay the IBT Partners to make the calls that violated the TSR, and provide other support directly related to the violations. Defendants have also received ample notice that the IBT Partners were calling consumers on the DNC Registry, in violation of the TSR, and even received notice that they had not obtained consumers' EWA to be called.

> **1.** **Defendants Provide Substantial Assistance to the IBT Partners by Paying Them to Make the Calls, Providing Them Numbers to Call, and Reviewing Telemarketing Scripts.**

The undisputed evidence establishes that Defendants provide substantial assistance or support that is essential to the IBT Partners' TSR violations. "The threshold for what constitutes 'substantial assistance' is low." *FTC v. Consumer Health Benefits Ass'n*, No. 10 CIV 3551, 2012 WL 1890242 (E.D.N.Y. May 23, 2012). "[T]here must be a connection between the assistance provided and the resulting violations of the core provisions of the TSR." *United States v. Dish Network L.L.C.*, 667 F. Supp. 2d 952, 961 (C.D. Ill. 2009); *FTC v. Chapman*, 714 F.3d 1211, 1216-17 (10th Cir. 2013) (noting that "casual or incidental help to the telemarketer" such as "cleaning a telemarketer's office, [or] delivering lunches to the telemarketer's premises" does not constitute substantial assistance) (internal quotations omitted).

Here, the support Defendants provide to their IBT Partners are textbook examples of

11

"substantial assistance." They pay their IBT Partners to make the calls that violated the TSR. (PSMF ¶¶ 35, 41, 43); *see Dish Network*, 667 F. Supp. 2d at 961 ("[N]o assistance could be more substantial or more directly connected to the core violations of the TSR than paying someone to commit the acts that violated the TSR."). Additionally, in many cases, Defendants provide the IBT Partners with consumer telephone numbers to call, and either review or provide the IBT Partners' telemarketing scripts. (PSMF ¶¶ 44-45); *see FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1368-69 (S.D. Fla. 2016) (holding that "substantial assistance" includes providing "'lists of contacts to a … telemarketer'" or "'any script …used in telemarketing'") (quoting TSR Statement of Basis and Purpose, 60 Fed. Reg. 43,842, 43,852 (August 23, 1995)). Defendants have also provided feedback to the IBT Partners to optimize their performance. (PSMF ¶ 46).

### 2. Defendants Have Knowledge or Have Consciously Avoided Knowing of the IBT Partners' Calls to DNC Numbers.

The undisputed evidence also establishes that Defendants know or consciously avoid knowing about the IBT Partners' calls to DNC Numbers. "Actual knowledge is not necessary under the 'conscious avoidance' standard." *Chapman*, 714 F.3d at 1219; *see also* 60 Fed. Reg. 30406, 30414 n.68 (conscious avoidance can be established by a showing of "reckless indifference" or an "awareness of a high probability" of a violation "coupled with an intentional avoidance of the truth"). "Knowledge or conscious avoidance of knowledge may be inferred when the person providing assistance receives complaints about violations." *FTC v. Consumer Health Benefits Ass'n*, No. 10-cv-3551, 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011), *aff'd sub nom. FTC v. Consumer Health Benefits Ass'n*, 2011 WL 13254502 (E.D.N.Y. Oct. 12,

2011) (citing *Dish Network*, 667 F. Supp. 2d at 961 (government adequately pled knowledge or conscious avoidance standard by alleging that Dish received consumer complaints about dealers' violations of the TSR)).   Defendants have had many warning signs that the IBT Partners are calling DNC Numbers, and also that they fail to obtain the consumers' EWA to be called, but have either consciously avoided those warnings or continued their substantial assistance despite knowledge of the violations.

The undisputed evidence demonstrates that Defendants have received many red flags that the IBT Partners are calling DNC Numbers in violation of the TSR.   Defendants have never subscribed to, or checked any number they called against, the DNC Registry (PSMF ¶ 27). Thus, they never scrubbed any of the numbers they provided to IBT Partners to call, nor checked to see whether any of the IBT Partners' inbound transfers were DNC Numbers.   Defendants even admit that their IBT Partners likely do not scrub for DNC Numbers, making it a near certainty—based on the high volume of calls Defendants know the IBT Partners are initiating—that the IBT Partners are calling numbers on the DNC Registry (and upon analysis by the FTC, in fact 20% of the IBT Partners' calls were to DNC Numbers).   (PSMF ¶¶ 41, 48). Defendants have also received complaints and threats of lawsuits from consumers on the DNC Registry who were called by the IBT Partners.   (PSMF ¶ 49).

Additionally, the undisputed evidence shows that Defendants have received ample notice that their IBT Partners were calling consumers without EWA, but have done nothing to rectify the situation.   Many of the compliance reports Defendants have received pertain to problematic

websites that generated leads for Defendants' IBT Partners.[8]   (PSMF ¶¶ 53, 58).   Additionally, Defendants themselves have discussed in internal communications that they believe Philippine call centers (where many of their IBT Partners were located) routinely violate U.S. telemarketing laws.   (PSMF ¶¶ 39, 51).   But despite being aware of a high probability of DNC violations, Defendants have been indifferent to the practices of their IBT Partners and avoided monitoring them and the data sources they use for TSR compliance, evincing either a reckless indifference or an intentional avoidance of the truth.   Defendants have kept no documentation indicating that they reviewed the websites their IBT Partners used, and have admitted they did not monitor the websites.   (PSMF ¶¶ 52, 106).   In fact, they also admitted they had trouble keeping track of the websites their IBT Partners used and did not trust the information they received from their partners.   (PSMF ¶ 53).   Even after receiving complaints that IBT Partners were not obtaining EWA, not only did Defendants continue working with these IBT Partners, in some instances they even helped the IBT Partners avoid clients' compliance monitoring efforts by instructing them not to use a recognized business name over the phone.   (PSMF ¶¶ 42, 54).[9]

### C.     Corporate Defendants Day Pacer LLC and EduTrek L.L.C. Are Liable for Injunctive Relief and Civil Penalties.

---

[8] Defendants also received feedback from their own college search advisors that IBT Partners often transferred consumers to them who indicated they were not interested in furthering their education. (PSMF ¶¶ 47, 87).

[9] As the FTC has clearly established it has stated claims for relief under the TSR against Defendants, the Day Pacer Defendants' *First Affirmative Defense* (R. 33 ¶ 59) for failure to state a claim, which is not an affirmative defense at all, is without merit.   *Raquet v. Allstate Corp.*, 348 F. Supp. 3d 775, 786 (N.D. Ill. 2018) ("'[F]ailure to state a claim' is not technically an affirmative defense, and the proper vehicle to establish a failure to state a claim defense is to raise a Rule 12(b)(6) motion.").

As discussed above, *see supra* Sections IV.A & B, Corporate Defendants Day Pacer and EduTrek have violated the TSR, and they are liable for injunctive relief and civil penalties. Though each corporation nominally operated at different points in time, they have functionally operated as a common enterprise, and so they are jointly and severally liable for all of the TSR violations. Additionally, Day Pacer, the later formed company, is liable for EduTrek's TSR violations because it is a corporate successor to EduTrek.

> **1.    Corporate Defendants Are Liable for Injunctive Relief and Civil Penalties for the TSR Violations.**

The undisputed evidence demonstrates that Day Pacer and EduTrek have placed calls to DNC Numbers and have substantially assisted their IBT Partners in doing the same, and so they are liable for injunctive relief for these violations of the TSR. *See, e.g.*, *FTC v. World Media Brokers*, 415 F.3d 758, 763 (7th Cir. 2005) (upholding finding of corporate liability for injunctive relief for violations of the FTC Act and TSR when underlying elements of the violations were proved at summary judgment). Moreover, the undisputed evidence also shows that Day Pacer and EduTrek are liable for civil penalties, because as discussed *infra* in Section IV.C.2, their personnel, including the Individual Defendants, knew or should have known that the companies and their IBT Partners' calls to DNC Numbers violated the TSR. *See, e.g.*, *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 930-37 (C.D. Ill. 2017) (Dish liable for civil penalties where its personnel knew Dish and agent telemarketing affiliates were placing calls to DNC Numbers).

> **2.    Corporate Defendants Are Jointly and Severally Liable Because They Operate as a Common Enterprise.**

15

Corporate defendants that operate as a common enterprise, like Day Pacer and EduTrek, are jointly and severally liable for each corporation's acts or practices that violate the TSR. *E.g.*, *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 635 (7th Cir. 2005) (affirming summary judgment and common enterprise liability); *FTC v. 120194 Canada, Ltd.*, No. 04 C 7204, 2007 WL 9815958, at *4 (N.D. Ill. Feb. 12, 2007) (finding a common enterprise and granting summary judgment). In determining whether a common enterprise exists, courts look to factors including, but not limited to: "(1) common control; (2) sharing office space and officers; (3) whether business is transacted through a maze of interrelated companies; and (4) commingling of funds." *120194 Canada*, 2007 WL 9815958, at *4; *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008). The FTC need not "prove any particular number of entity connections in order to establish a common enterprise," and "no one connection is dispositive." *FTC v. Mortg. Relief Advocates LLC*, No. CV-14-5434-MWF (AGRx), 2015 WL 11257575, at *6 (C.D. Cal. July 1, 2015). But in this case, the undisputed evidence demonstrates that Day Pacer and EduTrek satisfy all of the common enterprise factors.

Day Pacer and EduTrek are under the common control of the Individual Defendants. Raymond Fitzgerald and David Cumming formed both companies and own substantial percentages of each company, both are listed as corporate managers on the companies' papers of incorporation and operating agreements, and both orchestrated the companies' business and legal compliance strategy. (PSMF ¶¶ 3-4, 7-8, 65-68, 71-79, 86, 91-92). Additionally, key leadership of EduTrek remained consistent during the transition to Day Pacer. (PSMF ¶¶ 94-95). Moreover, Ian Fitzgerald is the President of Day Pacer and owns a substantial percentage of that company and also directly and indirectly served in positions of authority at

16

EduTrek.   (PSMF ¶¶ 5-6, 69-70).

Day Pacer and EduTrek have also operated out of the same office space in Sandy, Utah at 1333 E 9400 S, Sandy, UT 84093, a building owned by Raymond Fitzgerald and David Cumming through their Utah company, Thorpe/Sandy LLC.   (PSMF ¶¶ 1-2, 93).   In addition to sharing corporate officers, Defendants admit that all or nearly all of the employees of Day Pacer after it formed were also employed by EduTrek; and these employees had the same job responsibilities at both companies.   (PSMF ¶ 95).

Further, Day Pacer and EduTrek operated as interrelated companies, with the undisputed evidence demonstrating that there was no real distinction between them.   For example, employees continued to use "edutrek.com" email addresses well after Day Pacer was formed in the fall of 2015.   (PSMF ¶ 96).   The company described the transition to Day Pacer ("College Criteria") to its employees as a "new name change," rather than a new company.   (PSMF ¶ 94). Day Pacer took over the EduTrek name as a d/b/a and even told its clients that the change from EduTrek to Day Pacer was merely a "rebranding."   (PSMF ¶¶ 6 , 97).   Day Pacer and EduTrek shared the same computer and telephone systems, and had the same clients.   (PSMF ¶ 98). Some clients continued to send invoices to Day Pacer in EduTrek's name after EduTrek's supposed dissolution.   (*Id.*)

Finally, Day Pacer and EduTrek commingled funds, as Day Pacer took over the financial accounts of EduTrek.   (PSMF ¶¶ 77, 99).

### 3.     Day Pacer LLC Is Also Liable for EduTrek L.L.C.'s TSR Violations Because It Is a Successor to EduTrek.

The undisputed evidence also demonstrates that Day Pacer is liable for EduTrek's TSR violations as a corporate successor to EduTrek.   Courts apply successorship liability when a

17

corporation is a mere continuation of a predecessor. *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 272 (6th Cir. 1970); *Macris & Assocs. v. Neways, Inc.*, 986 P.2d 748, 752 (Utah Ct. App. 1999) (Utah law recognizes mere continuation theory of successorship liability); *Vernon v. Schuster*, 688 N.E. 2d 1172, 1175-76 (Ill. 1997) (recognizing mere continuation theory under Illinois law and noting that "a mere change in form without a significant change in substance . . . should not [] allow[] [a corporation] to escape liability" (internal citation omitted)).

Day Pacer is "merely a disguised continuance" of EduTrek, and so is subject to successorship liability. *P.F. Collier*, 427 F.2d at 272 (6th Cir. 1970) (internal quotations omitted). Several factors apply in making the determination that a corporation is a mere continuation of a predecessor entity, including whether the entities:

> engaged in the same business . . . have in common individuals who have served in similar corporate capacities . . . whether there is substantial identity of ownership between the dissolved and the operative corporation; and, in general, circumstances surrounding the dissolution of the one and the establishment of the other.

*Id.*; *see also FTC v. Citigroup Inc.*, 239 F. Supp. 2d 1302, 1306-07 (N.D. Ga. 2001) (same); *FTC v. Money Now Funding LLC*, No. CV-13-01583, 2015 WL 11120847, at *4 (D. Ariz. July 1, 2015). As detailed in Section IV.C.2, *supra*, Day Pacer and EduTrek have engaged in the same business—telemarketing on behalf of schools; are under common control, with the same employees and substantially similar ownership; and have shared the same office space, clients, and systems. Moreover, the undisputed evidence demonstrates that the Individual Defendants formed Day Pacer to escape negative publicity, lawsuits, and consumer complaints to continue to operate the exact same business under a different name. (PSMF ¶¶ 98, 100-101). Accordingly, Day Pacer is a corporate successor to EduTrek and is liable for EduTrek's TSR violations.

### D. Raymond Fitzgerald, Ian Fitzgerald, and David Cumming Are Individually Liable for Injunctive Relief and Civil Penalties.

The undisputed evidence shows that Raymond Fitzgerald, Ian Fitzgerald, and David Cumming are individually liable for injunctive relief under Section 13(b) of the FTC Act, and for civil penalties under Section 5(m).   Under the FTC Act,[10] individuals can be held liable for injunctive relief for corporate violations if they either participated in the acts or practices or had authority to control them.   *E.g., FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002).   Section 5(m)(1)(A) provides that the FTC may obtain civil penalties against defendants[11] who violate an FTC rule "respecting unfair or deceptive acts or practices," including the TSR, "with actual knowledge, or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule."   15 U.S.C. § 45(m)(1)(A).   The individual defendants clearly meet the standards for injunctive relief and civil penalties.[12]

---

[10]  TSR violations are treated as violations of the FTC Act and subject to the same injunctive relief.   15 U.S.C. § 6105(b); *FTC v. Consumer Alliance, Inc.*, No. 02-cv-2429, 2003 WL 22287364, *5 (N.D. Ill. Sept. 30, 2003).

[11]  "It is undisputed that it is possible to hold an individual liable under the TSR."   *United States v. FMFG, Inc.*, No. 03:05CV00711-LRH-VPC, 2006 WL 2639366, at *3–4 (D. Nev. Sept. 13, 2006) (citing *Consumer Alliance*, 2003 WL 22287364).

[12]  Accordingly, Day Pacer Defendants' *Twenty-Eighth* (R. 33 ¶ 88) and David Cumming's related *Second* and *"3a" Affirmative Defenses* (R. 81-1 ¶ 64)—that they cannot be held individually liable for corporate violations of the TSR—are without merit.

1. **The Individual Defendants Are Personally Liable for Injunctive Relief.**

Although only authority to control or participation is needed for injunctive relief, the individual defendants meet both standards. Each of the individual defendants have the authority to control the Corporate Defendants' acts or practices. Raymond Fitzgerald and David Cumming are not only the largest shareholders in both companies, they are also the "Managers," with broad authorities, including the ability to hire and fire corporate officers. (PSMF ¶¶ 3-4, 7-8, 74). Additionally, Raymond Fitzgerald and David Cumming are both creditors of the Corporate Defendants, on whom the Corporate Defendants relied for continued loans and who had the power to foreclose on the Corporate Defendants. (PSMF ¶¶ 74, 76-77). Ian Fitzgerald has been the President of Day Pacer since at least June 2016, and controls the day-to-day operations of that company. (PSMF ¶¶ 5, 69). Before then, he served as the President of Dalsnan Family LLC, the holding company for Raymond Fitzgerald's interest in EduTrek and Day Pacer. (PSMF ¶¶ 70). In that role, Ian worked for EduTrek and Day Pacer since at least December 2010 in order to safeguard Raymond Fitzgerald and David Cumming's investment. (PSMF ¶¶ 6, 70).

The Individual Defendants have also participated in the Corporate Defendants' acts or practices. As the President of Day Pacer, Ian Fitzgerald's responsibilities include business development and dealing with compliance issues. (PSMF ¶ 69). Raymond, Ian, and David are all involved in responding to complaints, lawsuits, and threatened lawsuits for DNC violations. (PSMF ¶¶ 86, 89, 91-92). Raymond and David have also reviewed the Corporate Defendants' contracts with IBT Partners, schools, and lead purchasers; provided direction and guidance regarding business opportunities; and provided direction and guidance on legal compliance

20

issues, including those related to telemarketing. (PSMF ¶¶ 65-66, 71-72, 75, 78-81, 83, 90-91). Moreover, David and Raymond both attempted to hide the existence of successor companies violating the TSR from the FTC. (PSMF ¶¶ 60, 84, 103). All of the Individual Defendants are aware the Corporate Defendants were calling DNC Numbers, but have done nothing to stop those calls. *See supra* Section IV.B.2.

It is especially important that the injunctive relief apply to the Individual Defendants in this case given their propensity to start new corporate identities to continue the illegal telemarketing operations. After an article came out exposing some of EduTrek's practices (the "EduTrek Article"), the Individual Defendants started Day Pacer, which, as discussed in Section IV.C.2, *supra*, was just a "rebrand" or continuation of EduTrek. (PSMF ¶¶ 88, 100). Likewise, shortly after the Complaint was filed in this action, the Individual Defendants started Entropy Leads and Allied Contact Management to continue Day Pacer's operations. (PSMF ¶¶ 102-104). Injunctive relief against these individuals is necessary to prevent further iterations of these lawbreaking companies and end the individuals' rampant law violations.

## 2. The Individual Defendants Are Personally Liable for Civil Penalties.

For defendants to be liable for civil penalties under Section 5(m)(1)(A) of the FTC Act, "[t]he law only requires that the defendant or his agent have some knowledge, actual or constructive, of the requirements of the rule such that the defendant knew or should have known this his conduct was unlawful. Actual knowledge is not required." *United States v. Tech. Commc'ns Indus., Inc.*, No. 85-137-CIV-7, 1986 WL 15489, at *3 (E.D.N.C. Dec. 22, 1986) (internal quotations and citation omitted). "Whether a defendant violated a rule with actual or implied knowledge is based on objective factors. A defendant is responsible where a reasonable

21

person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131,139 (4th Cir. 1996); *United States v. Com. Recovery Sys., Inc.*, 179 F. Supp. 3d 728, 737 (E.D. Tex. 2016) (same; awarding civil penalties against owner and president on summary judgment).

The undisputed evidence shows that the Individual Defendants are well aware that calling DNC Numbers is unlawful. The Individual Defendants have long known about the Registry and exchanged emails discussing the consent requirements of the TCPA.[13] (PSMF ¶¶ 51, 80-81, 83, 90-92). Defendants have trained their call representatives on compliance with a TCPA script and had a written, albeit superficial, Do-Not-Call policy. (PSMF ¶¶ 28, 55). In contracts that Raymond Fitzgerald has reviewed since at least 2012, Defendants also represented and warranted to schools and lead purchasers (or required their IBT Partners to represent and warrant to them) that they (or their IBT Partners) would comply with applicable federal laws including the TCPA and TSR. (PSMF ¶¶ 36, 65, 90). The Corporate Defendants were also sued on multiple occasions for DNC violations, and, as previously stated, all three Individual Defendants were involved in responding to these lawsuits. (PSMF ¶¶ 86, 89, 91-92); *see Tech. Commc'ns Indus.*, 1986 WL 15489, at *3 (defendants having been sued for state franchise disclosure rules

---

[13] The TCPA and its related FCC rule contains the same prohibitions against telemarketing calls to DNC Numbers as the TSR, with the same affirmative defenses available for when the consumer has provided their express prior written consent to receive such a call, or when they have an established business relationship. 47 C.F.R. §§ 64.1200(c)(2) & (f)(15). In fact, in promulgating its own rule, the FCC was directed to "consult and coordinate with the [FTC] to maximize consistency with the rule promulgated by the [FTC] (16 C.F.R. § 310.4(b))." Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 § 3 (codified at 15 U.S.C. § 6153). Accordingly, the Individual Defendants' awareness of the TCPA shows that they "have some knowledge, actual or constructive, of the requirements of the [TSR] such that

supported a finding that they knew or should have known they were violating the federal analog).

Apart from the direct evidence demonstrating that Defendants are, in fact, aware of the DNC rules, any reasonable telemarketer commencing operations in 2010—seven years after both the FTC and FCC adopted Do Not Call restrictions—*should have known* about them. By 2014, the beginning of the period when the FTC seeks civil penalties for DNC violations, "[r]easonable parties in the defendants' positions would certainly have known of the existence and applicability of the . . . rule." *Tech. Commc'ns Indus.*, 1986 WL 15489, at \*3.

Further, Defendants became aware of the FTC's investigation no later than April 2016, yet persisted in their illegal practices. The FTC issued Civil Investigative Demands ("CIDs") to EduTrek L.L.C. in April 2016 and to both Day Pacer LLC and EduTrek L.L.C. in April 2017, expressly seeking TSR compliance information. (PSMF ¶ 84). That alone establishes knowledge. *See United States v. Lasseter*, No. 3:03-1177, 2005 WL 1638735, at \*5 (M.D. Tenn. June 30, 2005) (defendants' knowledge fairly inferred because FTC had been in contact about potential rule violations three years prior). Defendants also discussed the TSR amongst themselves. (PSMF ¶¶ 80, 83; *see also* PSMF ¶ 82 (Ian recommending Day Pacer get a Utah state telemarketing permit in the future)). On April 25, 2016, shortly after having received the first CID, David Cumming sent each of the other individual defendants an email that included a link to the TSR itself instructing them that they "should also review the FTC's Telephone Sales Rule which implements the Telemarketing Consumer Fraud and Abuse Prevention Act 15 U.S.C.

---

. . . [they] knew or should have known that [their] conduct was unlawful." *Tech. Commc'ns Indus.*, 1986 WL 15489, at \*3.

§ 6101 et seq."   (PSMF ¶ 80).

The Individual Defendants also know or should have known their practices violated the

TSR.[14]   All three received notice of lawsuits filed against the Corporate Defendants, as well as

threatened lawsuits, for DNC violations.   (PSMF ¶¶ 49, 86).   Ian Fitzgerald regularly received

reports from the compliance company Omniangle indicating that the websites Day Pacer

received consumer information from did not obtain consumers' consent.   (PSMF ¶¶ 33, 54, 69).

Raymond Fitzgerald and David Cumming both received the EduTrek Article, which reported

specifically that the overwhelming majority of consumers who received calls from Defendants

had no interest in education.[15]   (PSMF ¶ 88).   The Individual Defendants also know that the

Corporate Defendants did not subscribe to the Registry.   (PSMF ¶ 85).   Given these undisputed

facts, the Individual Defendants know or should have known of the Corporate Defendants'

practices that violated the TSR.[16]

### E. The Court Should Enter a Permanent Injunction and Award Civil Penalties in the Amount of $28,681,863.88 Against Defendants.

---

[14] Indeed, the Court has previously entered a discovery presumption in favor of the FTC that the numerous complaints that the FTC has found and identified are "deemed to have been received by Defendants [Raymond, Ian, EduTrek, and Day Pacer] and Defendants are deemed to have been aware of these complaints when made."   (R. 153 at 8).

[15] The EduTrek Article also contained allegations that consumers from one website were routed to Defendants even if they failed to click the checkbox indicating they were interested in education opportunities, and that one consumer was called fourteen times, even after requesting to be added to the do-not-call list.   (PSMF ¶ 88).   Despite receiving these allegations, Defendants did not take steps to investigate whether they were true.   (*Id.*)

[16] Accordingly, Day Pacer Defendants' related *Twenty-First* and *Twenty-Ninth Affirmative Defenses* (R. 33 ¶¶ 82, 90)—not affirmative defenses at all but rather mere assertions that they did not have knowledge that they did not have the requisite level of knowledge for liability—are without merit.

Defendants' longstanding disregard for the TSR's restrictions on telemarketing to consumers with DNC Numbers warrants entry of a permanent injunction and imposition of civil penalties. Section 13(b) of the FTC Act expressly authorizes entry of a permanent injunction in these circumstances to prevent further violations of the FTC Act. 15 U.S.C. § 53(b); *FTC v. Febre*, 128 F.3d at 530, 534 (7th Cir. 1997) (entering permanent injunction under Section 13(b)). And Section 5(m)(1)(A) authorizes the imposition of civil penalties against parties who, like Defendants, knowingly violate FTC trade regulation rules, including the TSR. 15 U.S.C. § 45(m)(1)(A); *Com. Recovery Sys.*, 179 F. Supp. 3d at 737 (awarding civil penalties against owner and president on summary judgment). Defendants have harassed many millions of consumers on the Registry, while frustrating clients' compliance efforts, and attempting to conceal their violations from government regulators.

1. **Defendants Are Likely to Continue to Violate the TSR, Warranting the Entry of a Permanent Injunction.**

The FTC "need only show that there is a reasonable likelihood of future violations" to obtain an injunction under Section 13(b). *FTC v. Credit Bureau Ctr. LLC*, 325 F. Supp. 3d 852, 867 (N.D. Ill. 2018), *aff'd in part, vacated in part,* 937 F.3d 764, 770 (7th Cir. 2019); *accord United States v. Dish Network, LLC*, 256 F. Supp. 3d 810, 984 (C.D. Ill. 2017). Courts have long held that past misconduct is "highly suggestive of the likelihood of future violations." *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979) (quoting *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975)). Here, Defendants' past misconduct in persistently calling DNC Numbers despite enforcement and compliance warnings, consumer complaints, and

DNC lawsuits (*see supra* Section IV.D.2) is highly suggestive that they will continue to violate the TSR in the future absent strong injunctive relief.[17]   In fact, the undisputed evidence shows that post-complaint, Defendants began two new companies to continue Day Pacer's telemarketing operations, which they attempted to hide from the FTC during discovery.   (PSMF ¶¶ 102-104).

Courts also consider several other factors to assess the likelihood of future violations, all of which point to the necessity of a permanent injunction in this case.   These additional factors include:

> (1) the gravity of the harm, (2) the extent of [Defendants'] participation, (3) the nature of the infraction and the likelihood that they may become involved in similar conduct in the future; (4) any recognition of culpability; and (5) the sincerity of assurances against further violations.

*Credit Bureau Ctr.*, 325 F. Supp. 3d at 867 (citing *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)).   *First*, Defendants have made over 44 million unwanted calls to consumers on the Registry, which, in addition to wasting those consumers' time, distracted them from their job searches, caused them to avoid answering the phone even though prospective employers might be calling, and left them concerned about the security of their personal information.   (PSMF ¶¶ 25-26, 41, 48).   *Second*, as discussed *supra* Section IV.D, the Individual Defendants were

---

[17] Day Pacer Defendants' arguments in their related *Seventh, Eighth,* and *Ninth Affirmative Defenses* (R. 33 ¶¶ 65-67) that EduTrek cannot be subject to claims for injunctive relief because it is a dissolved corporation are without merit.   *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1018 (N.D. Ind. 2000) ("Although the Corporate Defendants are now defunct[] . . . there is cognizable danger that, in the absence of a nationwide injunction . . . they will continue to violate the law and thus [] a permanent injunction is necessary to protect the public from further violations of the FTC Act"); *CFPB v. Corinthian Colleges, Inc.*, No. 1: 14-cv-07194, 2015 WL 10854380, at *8 (N.D. Ill. 2015) (same).

aware of, and participated in, the Corporate Defendants' TSR violations. *Third*, the nature of the infraction—telemarketing to consumers regardless of whether their number is on the Registry—has been at the core of Defendants' business since EduTrek began operations in 2010. (PSMF ¶¶ 26, 27, 41-42). *Fourth*, far from acknowledging their culpability, Defendants have steadfastly denied that they are subject to the TSR based on the most far-fetched of arguments. *See, infra* Section V (affirmative defenses). *Finally*, Defendants have not provided *any* assurances against future violations; in fact, their pattern of misconduct—ignoring the law, frustrating clients' compliance efforts, and attempting to hide their conduct from regulators even during this litigation (*see infra* Section IV.E.2)—indicates they are likely to commit future violations if afforded the opportunity.

In determining the scope of injunctive relief, the Court is not limited to enjoining the unlawful conduct at issue, rather it can order appropriate "fencing-in" provisions to prevent Defendants from engaging in illegal practices. *Think Achievement*, 144 F. Supp. 2d at 1017-18. Numerous courts have imposed bans permanently enjoining defendants from engaging in telemarketing activities.[18] The Court can also order record-keeping and compliance monitoring provisions to ensure compliance with the permanent injunction. *Id*. at 1018. Section I of the proposed order (Att. A) would permanently enjoin Defendants from engaging in telemarketing or assisting others in engaging in telemarketing activities. Section II provides for the payment of a

---

[18] *See, e.g.*, *Think Achievement*, 144 F. Supp. 2d at 1024; *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1273 (S.D. Fla. 2019); *FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006, 1013-15 (C.D. Cal. 2012); *FTC v. INC21.com Corp.*, 745 F. Supp. 2d 975, 1010 (N.D. Cal. 2010).

civil penalty, as discussed further below.   The remaining sections contain standard compliance monitoring and recordkeeping provisions to ensure compliance with the order.   All of these provisions are appropriate and necessary given Defendants' unrepentant conduct in calling millions of consumers on the Registry, and attempting to hide their violations from the FTC. Moreover, each of these provisions is similar or identical to those imposed by courts in other FTC matters.[19]

### 2. The Court Should Award Civil Penalties in the Amount of $28,681,863.88.

The FTC requests that the Court impose on Defendants, jointly and severally, a civil penalty of $28,681,863.88, which is substantially less than the maximum allowable civil penalty that is in excess of $100 billion.[20]   The factors courts take into account when determining the

---

[19] *See, e.g., FTC v. Lifewatch Inc.*, No. 1:15-cv-05781, (N.D. Ill. July 1, 2019) ECF No. 424 (stipulated order); *Think Achievement*, 144 F. Supp. 2d at 1023-29 (on summary judgment); *FTC v. Pointbreak Media, LLC*, No. 18-cv-61017 (S.D. Fla. Apr. 25, 2019), ECF No. 266 (on summary judgment); *FTC v. Partners In Health Care Ass'n*, No. 14-23109-CIV (S.D. Fla. June 27, 2016), ECF No. 208 (on summary judgment against the individual defendant and default judgment against the corporate defendant); *FTC v. John Beck Amazing Profits LLC*, No. 2:09-cv-04719 (C.D. Cal. Aug. 21, 2012), ECF No. 643 (on summary judgment); *FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal. May 31, 2017), ECF No. 88 (on default judgment).

[20] Even aside from calls made by new telemarketing businesses Defendants formed after this litigation commenced, and calls made by some of Defendants' IBT Partners, the civil penalty amount exceeds one hundred billion dollars based on Defendants' 4,168,511 documented violations.   (PSMF ¶¶ 26, 41).   The FTC Act, from March 22, 2014 to July 31, 2016, listed a $16,000 civil penalty per violation, and there were 2,548,695 violations during that period; from August 1, 2016 to January 23, 2017, $40,000 per violation with 366,626 violations; from January 24, 2017 to January 21, 2018, $40,654 per violation with 592,650 violations; from January 22, 2018 to February 13, 2019, $41,484 per violation with 507,894 violations; and after February 14, 2019, $42,530 for per violation with 152,646 violations.   15 U.S.C. § 45(m)(1)(A); 16 C.F.R. § 1.98(d); 74 Fed. Reg. 857 (January 9, 2009); 81 Fed. Reg. 42,476 (June 30, 2016); 82 Fed. Reg. 8135 (January 24, 2017); 83 Fed. Reg. 2902 (January 22, 2018); 84 Fed. Reg. 3980 (February 14, 2019).   Based on those figures the maximum allowable civil penalty would be

amount of civil penalty are set forth by statute:    1) the degree of culpability; 2) any history of

prior such conduct; 3) ability to pay; 4) effect on ability to continue to do business; and 5) such

other factors as justice may require.    15 U.S.C. § 45(m)(1)(C); *United States v. Dish Network

L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020).    Based on these factors, the FTC seeks a civil penalty

of $28,681,863.88, which corresponds to proceeds from the wrongdoing.

 *First*, Defendants are highly culpable, having ignored the TSR's requirements in

committing many millions of TSR violations, and having deliberately misled their business

partners and the FTC to shield their illegal conduct from scrutiny.    Defendants' failure to

implement any procedures to comply with the TSR—including failing to scrub telephone

numbers against the DNC Registry, failing to maintain records of purported consent or regularly

monitor and inspect their sources of consumer data, and failing to monitor its IBT partners'

compliance (PSMF ¶¶ 27, 31, 33-34, 48, 52-53, 58, 85, 106)—resulted in over 44 million

violations[21] and speaks to a high level of culpability.    *See, e.g.*, *Dish Network*, 256 F. Supp. 3d

at 977-78 (defendant's "lack of care" in reading and applying the TSR warranted a finding of

culpability).

 Not only did Defendants fail to implement any safeguards to comply with the TSR, they

have been dishonest and evasive in response to regulatory scrutiny, compliance monitoring

---

$107,099,262,176.

[21] Defendants' culpability is based not just on the 4,168,511 TSR violations documented by their call records, but also by the additional approximately 39,847,000 violative calls made by Defendants' IBT partners that are not directly reflected in Defendants' call records (PSMF ¶¶ 26, 41).    *See Dish Network*, 256 F. Supp. 3d at 977 ("The actual magnitude of the illegal conduct [compared to the illegal calls the

efforts, and in this very litigation. Specifically, they lied to the FTC during discovery about the fact they had begun two new telemarketing companies to continue Day Pacer's business. (PSMF ¶¶ 102-104). Likewise, David Cumming intentionally misled the FTC during its investigation of EduTrek L.L.C., saying that the company was out of business even though it continued operations under a new corporate identity. (PSMF ¶ 60). He also side-stepped questions about its members' current business activities, and ultimately refused to comply with the FTC's Civil Investigative Demand. *Id*. After a school decided to terminate its business relationship with Defendants over compliance concerns, Defendants began using intermediaries to continue surreptitiously doing business with the school. (PSMF ¶ 61). Defendants also told a school group with which they were trying to contract that they were not subject to any legal proceedings, despite knowing this suit by the FTC was imminent. (PSMF ¶ 59). They lied to other prospective clients and a website publisher about having procedures in place to scrub telephone numbers against the DNC Registry. (PSMF ¶ 62). Defendants falsely denied receiving leads from problematic websites when confronted by active clients. (PSMF ¶ 58; *see also* PSMF ¶ 34). They also gave IBT Partners instructions on how to identify themselves (or not identify themselves) over the phone to try to make it harder for clients to trace the source of problematic leads. (PSMF ¶ 54).

*Second*, Defendants have a long history of misconduct. Specifically, they have been illegally calling DNC Numbers for nearly ten years (PSMF ¶ 26), despite receiving repeated notices of potential TSR violations (*see supra* Section IV.B.2 & D.2). Indeed, even after the

government sought liability for] speaks to a more significant level of culpability.").

Complaint was filed in this case, Defendants began two new companies to continue telemarketing operations, both of which have been flouting this action.   (PSMF ¶¶ 102-104).

 *Third*, though not a dispositive factor, the proposed civil penalty takes Defendants' ability to pay into consideration.   As the Seventh Circuit has noted, ability to pay is only one of five criteria considered in determining the amount of a civil penalty.   *Dish Network*, 954 F.3d at 980. While ability to pay "pushes the civil penalty away from the maximum amount," it "is not a determinative factor" and "does not prevent the court from imposing a significant penalty." *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 824 (N.D. Tex. 2008).   Here, the proposed civil penalty is drastically smaller than the maximum civil penalty, and much closer to Defendants' purported ability to pay ($20,955,830.37).[22]   Moreover, Defendants' listed assets do not include their potential contract indemnification claims against IBT Partners for liabilities arising from TSR violations.   (PSMF ¶ 57).

 *Fourth*, Day Pacer is a telemarketing company whose illegal conduct pervaded all of its operations, so there is little value in ensuring its continued operation.   *Cf. Cornerstone Wealth*, 549 F. Supp. 2d at 824 (court did not consider effect on ability to continue to do business where defendants' conduct warranted a ban).   Moreover, the proposed civil penalty would have a negligible impact on Defendants' ability to continue doing business, because Day Pacer's balance sheet shows liabilities more than five times greater than its assets, so the company is

---

[22] Based on their self-reported assets and liabilities, the individual Defendants reportedly have the ability pay the following:   Raymond Fitzgerald $12,803,143.92 (PSMF ¶ 63); David Cumming $7,204,818.34 (*id.*); and Ian Fitzgerald $947,868.11 (*id.*).

unlikely to contribute to the payment of a civil penalty, regardless of the amount. (PSMF ¶ 63).

*Finally*, regarding the final factor—justice—courts have given paramount importance to ensuring that the penalty amount be large enough to deter future violations. *United States v. Com. Recovery Sys., Inc.*, No. 4:15-CV-00036, 2017 WL 1065137, at *3 (E.D. Tex. Mar. 21, 2017) ("The amount of a civil penalty should reflect the seriousness of the violation, must punish the offender, and most importantly, must provide a deterrent to future violations by the offender and others.") (citing *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 232 (1975)).[23] Here, a civil penalty of $28,681,863.88, equal to Defendants' gross revenue during the applicable period (PSMF ¶ 64), would deter future violations of the TSR by depriving Defendants of the proceeds from telemarketing operations that were permeated with law violations. Moreover, as discussed above (*supra* Section IV.E.1), the 44 million unwanted calls that violated the TSR caused significant consumer harm.

## V. DEFENDANTS' AFFIRMATIVE DEFENSES FAIL BECAUSE THEY ARE MERE DENIALS, PREMISED ON MISSATEMENTS OF THE RELEVANT LAW OR HAVE BEEN EXPLICITLY REJECTED BY COURTS, OR FACTUALLY UNSUPPORTED OR CONTRADICTED.

Defendants plead a combined total of thirty-five scattershot affirmative defenses against the FTC's Complaint, all lacking merit. The affirmative defenses frequently overlap and generally fall into three categories:

---

[23] *See also United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 141 (4th Cir. 1996) ("Without a real sting, the defendants would be unlikely to be deterred from violating the Act, in light of the substantial profit to be made…."); *United States v. Reader's Digest Ass'n Inc.*, 494 F. Supp. 770, 779 (D. Del. 1980) (*aff'd* 662 F.2d 955 (3d Cir. 1981)) ("A civil penalty should be more than a mere 'license fee' or 'an acceptable cost of violation' of an order and should provide 'meaningful deterrence.'")(citation omitted).

(A) pleading or standing-related affirmative defenses (Day Pacer Defendants' Third, Fourth, Fifth, Sixth, Tenth, Twelfth, and Twenty-Second Affirmative Defenses and Defendant Cumming's First Affirmative Defense);

(B) constitutional affirmative defenses (Day Pacer Defendants' Fourteenth Affirmative Defense and Defendant Cumming's "3b," "3c," and "3d"[24] Affirmative Defenses); and

(C) TSR-related affirmative defenses (Day Pacer Defendants' Sixteenth, Eighteenth, Nineteenth, Twentieth, Twenty-Fifth, and Twenty-Sixth Affirmative Defenses).

Many of these "affirmative" defenses merely deny the FTC's allegations and do not entitle Defendants to judgment as a matter of law; others are arguments premised on fundamental misstatements of applicable law or have been explicitly rejected by this and other courts; and others are simply unsupported—or outright contradicted—by the undisputed facts.[25]

### A. Defendants' Pleading or Standing-Related Affirmative Defenses Fail Because the FTC Has Properly Pled This Case, the FTC Has Standing to Enforce the TSR, and This Court Has Jurisdiction.

Defendants' pleading or standing-related affirmative defenses have no legal or factual support. The FTC, a federal agency, alleged in its Complaint that Defendants violated federal laws the FTC enforces, and explicitly pled the legal (R. 1 ¶ 2) and factual (*e.g.*, R. 1 ¶¶ 4-13)

---

[24] Defendant Cumming's "Third Affirmative Defense" in his Amended Answer actually consists of four separate affirmative defenses. (R. 81-1 ¶¶ 64-67). For clarity, the FTC will refer to them as "3a," "3b," "3c," and "3d," corresponding respectively to paragraphs 64, 65, 66, and 67 of the Amended Answer.

[25] In setting forth its case-in-chief, the FTC has already addressed Day Pacer Defendants' *First, Second, Seventh, Eighth, Ninth, Fifteenth, Seventeenth, Twenty-First, Twenty-Third, Twenty-Fourth, Twenty-Seventh, Twenty-Eighth,* and *Twenty-Ninth Affirmative Defenses* and Defendant Cumming's *Second* and *"3a" Affirmative Defenses*. The Court previously struck Day Pacer Defendants' *Eleventh* (waiver and estoppel) and *Thirteenth* (equal protection and due process) *Affirmative Defenses*. (R. 79).

bases for standing and jurisdiction, and therefore the Court should reject out of hand Defendants'

several related affirmative defenses that the FTC does not have standing to sue and the Court

does not have jurisdiction to hear this matter.   *See* Day Pacer Defendants' *Third, Fourth, Fifth,*

and *Twenty-Second Affirmative Defenses* (R. 33 ¶¶ 61-63, 83); Defendant Cumming's *First*

*Affirmative Defense* (R. 81-1 ¶¶ 61-62).   Indeed, courts in the Seventh Circuit and the Northern

District of Illinois, as well as many other circuit and district courts, have adjudicated FTC cases

involving the TSR and National DNC Registry, clearly establishing that the FTC has standing to

bring, and the courts have jurisdiction to hear, such cases.[26]

Contrary to Day Pacer Defendants' *Sixth Affirmative Defense* (R. 33 ¶ 64) that a three-

year statute of limitations applies in this case and bars some of the FTC's claims, the FTC's

claims for equitable relief under Section 13(b) of the FTC Act "are simply not subject to any

statute of limitations."   *United States v. Dish Network, L.L.C.*, 75 F. Supp. 3d 942, 1004 (C.D.

Ill. 2014), *vacated in part on other grounds upon reconsideration*, 80 F. Supp. 3d 917 (C.D. Ill.

2015).   *See also FTC v. J. William Enters.*, 283 F. Supp. 3d 1259, 1262 (M.D. Fla. 2017)

(rejecting application of three- or five-year statute of limitations to Section 13(b)).   Further, a

five-year statute of limitations is applicable to the FTC's civil penalty claims under Section 5(m),

---

[26] With specific respect and contrary to the *Twenty-Second Affirmative Defense*, the FTC did plead that it brought this case pursuant to 15 U.S.C. § 56(a), which requires that the FTC first provide written notification of civil penalty actions to the Attorney General and wait forty-five days before commencing the action.   The FTC also provided Defendants the dated notification it provided to the Attorney General and the Attorney General's response permitting the FTC to proceed with filing this case.   *Cf. United States v. Ancorp Nat. Servs., Inc.*, 516 F.2d 198, 200 n.4 (2d Cir. 1975) (refusing to find action "jurisdictionally defective" when analogous factual certification from FTC to the Attorney General required by a previous version of 15 U.S.C. § 56 was provided to the court).   A copy of the FTC's

and the FTC is only seeking civil penalties for that period. *Dish Network*, 75 F. Supp. 3d at 1004-05 (citing 28 U.S.C. § 2462).

Day Pacer Defendants' *Tenth Affirmative Defense* (R. 33 ¶ 68) regarding collateral estoppel is entirely unexplained in the Amended Answer. Even if construed in light of the MIDPP disclosures (PSMF ¶ 111 (PX594 at 33)), it is improper and illogical to apply collateral estoppel with respect to arguments made by another party (the Department of Justice) in another matter (*Dish Network*) and which are inapplicable in this case. *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014) (finding establishing collateral estoppel requires that, *inter alia*, "the issue sought to be precluded is the same as an issue in the prior litigation"). Specifically, the FTC here pursues (alternatively) *both* an agency theory of liability as well as an assisting-and-facilitating theory of liability for the conduct of telemarketing affiliates under the TSR. *See Dish Network*, 954 F.3d at 977-78.

Likewise, Day Pacer Defendants neglect to explain their *Twelfth Affirmative Defense* (R. 33 ¶ 71) that the FTC did not "add indispensable parties" as defendants, but the defense fails even when construed in light of the MIDPP disclosures (PSMF ¶ 111 (PX594 at 35)). The FTC is not required by Rule 19 to name the IBT Partners as defendants in this action. *See, e.g.*, *FTC v. Com. Planet, Inc.*, No. SACV0901324CJCRNBX, 2010 WL 11673795, at *3 (C.D. Cal. July 6, 2010) ("[A]s a matter of law . . . the FTC is not required to bring enforcement actions against all entities involved with an allegedly unfair or deceptive practice."); *FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2020 WL 5632123, at *4 (D. Ariz. Sept. 21, 2020) (rejecting

notification to the Attorney General and his response is included with this Motion. (PSMF ¶ 110).

argument that, pursuant to Rule 19(a), the FTC was required to name affiliates of corporate

defendant that defendants contended had interests in the FTC's action).

### B. This Court, the Seventh Circuit, and Other Courts Have Rejected Defendants' Constitutional Affirmative Defenses.

No court has ever embraced Defendants' constitutional affirmative defenses against the

FTC's TSR claims based on the Eighth Amendment or (in Cumming's case) the First

Amendment.   Indeed, this Court has already expressed its disapproval of Day Pacer Defendants'

*Fourteenth Affirmative Defense* (R. 33 ¶ 75) and Cumming's related "*3b*" and "*3c*" *Affirmative*

*Defenses* (R. 81-1 ¶¶ 65-66), which claim the FTC seeks an excessive fine prohibited by the

Eighth Amendment and (in Cumming's case) due process rights.[27]   The civil penalty sought by

the FTC here for Defendants' millions of violations of the TSR is based on the factors outlined in

15 U.S.C. § 45(m), and is not "grossly disproportional to the gravity of a defendant's offense."

*Grashoff v. Payne*, 478 F. Supp. 3d 735, 742 (N.D. Ind. 2020) (quoting *United States v.*

*Bajakajian*, 524 U.S. 321, 334 (1998)).

The Seventh Circuit and numerous other courts have also rejected Defendant Cumming's

"*3d*" *Affirmative Defense* (R. 81-1 ¶ 67) that do-not-call provisions like those in the TSR violate

the First Amendment.   *See, e.g.*, *Dish Network*, 256 F. Supp. 3d at 913-15 (rejecting First

Amendment challenge to National DNC Registry and noting binding Seventh Circuit decisions

---

[27] (R. 98 (Magistrate Judge Kim's April 9, 2020 Minute Order stating that "Cummings' [Eighth Amendment] constitutional challenge is without merit") (citing *United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020) ("Someone whose maximum penalty reaches the mesosphere only because the number of violations reaches the stratosphere can't complain about the consequences of its own extensive misconduct."); R. 132 (District Judge Chang's Minute Order overruling objections to R. 98 and

rejecting First Amendment challenges to analogous DNC registries); *Nat'l Coalition of Prayer, Inc. v. Carter*, 455 F.3d 783, 792 (7th Cir. 2006) (Indiana DNC Registry); *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 306 (7th Cir. 2017) (citing *Mainstream Mktg. Servs., Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004)) (National DNC Registry has been "sustained against constitutional challenge").

### C. Defendants' TSR-Related Affirmative Defenses Fail Because They Are Unavailable As a Matter of Law, Defendants' Have Provided No Evidence to Prove Them, and the Undisputed Factual Record Forecloses Them.

The law and undisputed factual record preclude Day Pacer Defendants' numerous and overlapping TSR-related affirmative defenses. Contrary to Day Pacer Defendants' *Sixteenth Affirmative Defense* (R. 33 ¶ 77), the FTC has complied with 15 U.S.C. § 6155(b), a requirement in the Telemarketing Act for the FTC to "periodically check telephone numbers" on the National DNC Registry and remove those that have been disconnected and reassigned. (PSMF ¶ 105). Further, that statutory provision does not mandate any prerequisites for TSR enforcement, nor does it create a defense to an enforcement action. *Dish Network*, 75 F. Supp. 3d at 1007-08 (rejecting use of 15 U.S.C. § 6155(b) as a defense and noting "a telemarketing call to a number on the Registry is a call to the person who held that number at the time of the call in violation of the TSR").

Day Pacer Defendants have provided no evidence to prove their related *Eighteenth* (R. 33 ¶ 79) and *Nineteenth* (R. 33 ¶ 80) *Affirmative Defenses* regarding the TSR's established business relationship ("EBR") and express written authorization ("EWA") affirmative defenses to liability

---

stating that "if misconduct is found and it is enormous, then the fine may be commensurately enormous").

for telephone calls initiated to a person's telephone number on the National DNC Registry.

Each affirmative defense requires a "seller" or "telemarketer" to demonstrate that the *seller* has

either received an "inquiry or application" regarding its products or services from the person

within three months preceding the call, 16 C.F.R. § 310.4(b)(1)(iii)(B)(2), or that the *seller* "has

obtained the express agreement, in writing, of such person to place calls to that person," 16

C.F.R. § 310.4(b)(1)(iii)(B)(1).

As a general matter, consumers did not expect to receive telephone calls regarding

post-secondary educational opportunities from Defendants because many of the websites from

which Defendants purchased their consumer contact information were job and benefits websites.

(PSMF ¶¶ 24, 32, 50).   Moreover, Defendants, who are telemarketers, have not sustained their

burden to prove their EBR and EWA affirmative defenses that consumers consented to be called

because they have failed to provide any proof that the *sellers* (*i.e.*, the schools) on whose behalf

they telemarket have either received an inquiry or application or obtained the express written

agreement to contact the people they called with telephone numbers on the National DNC

Registry.   (PSMF ¶¶ 31, 106-109).   The only evidence that Defendants claim constitutes proof

of any EBR or EWA are their call records, which they claim identify URLs—or website

locations—where the consumers entered their phone numbers.   (PSMF ¶ 106).   But a website

URL alone—a mere bit of text—does not demonstrate proof of anything.   Indeed, Defendants

admit that they did not regularly preserve screenshots of websites that might help them sustain

their burden of proving their affirmative defenses.   (PSMF ¶¶ 52, 106).

Further, and though it is not the FTC's burden, the FTC has reviewed a statistically valid

random sample of Defendants' call records and the purported URLs listed therein to see if the

URL records were complete and that the URLs linked to websites that indicated evidence of EBR or EWA. (PSMF ¶¶ 107). The FTC found that in nearly all cases, the URL records: were blank, contained text that was not a web page, or did not point to an active web page; or when they did point to an active web page, did not contain any language about telephone calls. (PSMF ¶¶ 108-109). Thus, contrary to Defendants' assertions, Defendants' call records definitively *do not* demonstrate that consumers consented to be called. (PSMF ¶ 109). This is no surprise, given that Defendants admit that they did not regularly review or monitor the content of the websites from which they obtained consumer contact information. (PSMF ¶¶ 52, 106).

The plain language of the TSR forecloses Day Pacer Defendants' *Twentieth Affirmative Defense* (R. 33 ¶ 81) regarding the exemption in the TSR for telephone calls initiated by a "customer" in response to an advertisement. 16 C.F.R. § 310.6(b)(5). Defendants and their IBT Partners initiated the telephone calls, not "customers," and as noted above, Defendants failed to produce records of purported "advertisements."

Likewise, the Court should summarily reject Day Pacer Defendants' *Twenty-Fifth Affirmative Defense* (R. 33 ¶ 86) regarding the "safe harbor" provisions of the TSR[28] because Day Pacer Defendants admit that they never subscribed to the National DNC Registry and did not have a process to prevent making calls to numbers on the Registry (PSMF ¶ 27). 16 C.F.R. §§ 310.4(b)(3)(i), (iv).

---

[28] 16 C.F.R. § 310.4(b)(3) (affirmative defense to a seller or telemarketer's liability for initiating calls to DNC Numbers if the seller or telemarketer can demonstrate, as part of its "routine business practice," that it had, *inter alia*, written procedures and a process to comply with the TSR and not make calls to DNC Numbers).

Finally, this Court has already rejected the argument encompassed in Day Pacer Defendants' *Twenty-Sixth Affirmative Defense* (R. 33 ¶ 87) that the FTC's action is barred by 15 U.S.C. § 45(n), a codification of the FTC's "unfairness" standard, and which rests on an incorrect understanding and application of Section 45(n).   As the FTC has explained in prior briefing, it did not bring this action under Section 45(n), so the Section 45(n) factors do not apply to the FTC's TSR claims.[29]   (R. 104 at 9-12; R. 143 at 3-6).   The Court has agreed that "the FTC is not proceeding under a provision that requires a showing of substantial consumer injury."  (R. 133; *see also* R. 155 at 2-3 (finding in discovery dispute that TSR violations are deemed by law to be "unfair" acts or practices)).

## VI.    CONCLUSION

The FTC requests that the Court grant its motion for summary judgment.


Dated: August 2, 2021                            */s/ Adam M. Wesolowski*_____
                                                 Adam M. Wesolowski
                                                 Patrick Roy
                                                 Mark L. Glassman
                                                 600 Pennsylvania Avenue, NW
                                                 Mail Stop CC-10232
                                                 Washington, D.C. 20580
                                                 (202) 326-3020 [telephone]
                                                 (202) 326-3768 [facsimile]
                                                 awesolowski@ftc.gov [e-mail]
                                                 Attorney for Plaintiff
                                                 FEDERAL TRADE COMMISSION

---

[29] As noted in those briefs, the FTC promulgated the TSR and National DNC Registry pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.   Congress has explicitly authorized the FTC's creation of the National DNC Registry.   15 U.S.C. § 6151(a), (b).

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2021, I filed Plaintiff's Motion for Summary Judgment via ECF, through which the documents are being served to all other parties, directly or through counsel, at the foregoing email addresses via ECF:

Raymond Fitzgerald
rfitzgerald@bffmlaw.com
*Attorney for Day Pacer LLC, EduTrek, L.L.C., Raymond Fitzgerald, and Ian Fitzgerald*

David Cumming
dcomyn@gmail.com
*Pro se*

/s/ Adam M. Wesolowski
Adam M. Wesolowski
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, D.C. 20580
(202) 326-3020 [telephone]
(202) 326-3768 [facsimile]
awesolowski@ftc.gov [e-mail]
Attorney for Plaintiff
FEDERAL TRADE COMMISSION
