**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 1:19-cv-01984 |
| Plaintiff, | Judge: Edmond E. Chang |
| v. | Magistrate Judge: Young B. Kim |
| DAY PACER LLC, et al. | |
| Defendants. | |

**PLAINTIFF FEDERAL TRADE COMMISSION'S STATEMENT OF MATERIAL
FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rule 56.1(a)(2), Plaintiff Federal Trade Commission ("FTC" or "Commission") submits the following Statement of Material Facts as to Which There Is No Genuine Issue ("Plaintiff's Statement of Material Facts" or "PSMF").[1]

## A. BACKGROUND

1.      Corporate Defendant Day Pacer LLC ("Day Pacer"), previously known as College Criteria LLC, also d/b/a EduTrek, EdSoup, Our School Search, College Info, and Degree Spots, is a Utah limited liability company with its principal place of business at 1333 East 9400 South, Second Floor, Sandy, Utah 84093.   At one point, EduTrek also operated from 498 N. Kays Drive, Kaysville, Utah 84037.   Day Pacer transacts or has transacted business in this district and throughout the United States.   (R. 1 (FTC Complaint) ¶ 6; R. 33 (Amended Answer of Day Pacer Defendants[2]) ¶ 6 (admitting that College Criteria LLC was the former name of Day Pacer, that Day Pacer "has used various d/b/as; and that its principal place of business is at 1333 East 9400 South, Second Floor, Sandy, Utah 84093"); R. 81-1 (Amended Answer of Defendant David Cumming) ¶ 7 (admitting "that Day Pacer LLC's name prior to it being changed was College Criteria LLC; that it has used the names EduTrek, as d/b/as; and that its principal place of business is at 1333 East 9400 South, Second Floor, Sandy, Utah 84093"); PX112 at 1; PX113; PX115 at 1-2; PX116 at 1 (Our School Search, College Info, and Degree Spots are all Day Pacer d/b/as); PX60; DX30 at ¶¶ 19-23, Tables T.3 & T.4, & App'x B (listing calls to Illinois area

[1] The exhibits cited in this PSMF are numbered and described in the Declaration of Elena Hoffman, included as PX404.

[2] The Day Pacer Defendants are Day Pacer, EduTrek, Raymond Fitzgerald, and Ian Fitzgerald.

codes); PX522 at Resp. No. 1 (business locations)).

2.      Corporate Defendant EduTrek L.L.C. ("EduTrek") also d/b/a EdSoup, is a dissolved Utah limited liability company with its principal place of business at 1333 East 9400 South, Second Floor, Sandy, Utah 84093. At one point, EduTrek also operated from 498 N. Kays Drive, Kaysville, Utah 84037. EduTrek transacts or has transacted business in this district and throughout the United States. (R. 1 ¶ 7; R. 33 ¶ 7 (admitting EduTrek is a dissolved Utah limited liability company); R. 81-1 ¶ 8 (same); PX87 at 1-2 (EduTrek formed in April 2010); PX133 (EdSoup d/b/a Application); PX572 at 1 (EduTrek administrative dissolution on March 31, 2016); PX301 at 76:17-21 (EduTrek spoke with consumers nationwide); DX30 at ¶¶ 19-23, Tables T.3 & T.4, & App'x B (listing calls to Illinois area codes); PX109 at Resp. No. 1 (business locations)).

3.      Individual Defendant Raymond Fitzgerald ("Raymond") owns a primary interest in EduTrek and Day Pacer directly and through his company, The Dalsnan Family LLC ("Dalsnan"). Raymond transacts or has transacted business in this district and throughout the United States. (R. 1 ¶ 9; PX114 at 33, 35 (College Criteria LLC Operating Agreement); PX125; PX126 at 6-12 (attachment to PX125); PX2 at 7, 15, 33-35 (EduTrek LLC Operating Agreement); PX189 at 10, 31-33 (The Dalsnan Family LLC Operating Agreement); PX574 at Resp. No. 2).

4.      Raymond is a managing member, manager, and registered agent of EduTrek and Day Pacer. (R. 1 ¶ 9; PX87 at 1-2; PX112 at 1-2; PX113; PX114 at 7-9, 33, 35; PX115 at 1-2; PX2 at 7, 15, 33-35; PX574 at Resp. No. 1).

5.      Individual Defendant Ian Fitzgerald ("Ian") has been the President of Day Pacer

since approximately June 2016 and owns a substantial interest in Day Pacer, individually and through his company, Crystal Peak I LLC.   (R. 1 ¶ 10; R. 33 ¶ 10 (admitting Ian is the President of Day Pacer and that Crystal Peak I owns an interest in Day Pacer); PX114 at 33, 35; PX116 at 3-4; PX119 at 2; PX125; PX126 at 6, 17-18 (attachment to PX125); PX304 at 94:22-24; PX307 at 82:2-15, 97:4-11; PX573 at Resp. No. 1-2).   As President his responsibilities include, *inter alia*, identifying business opportunities and responding to compliance issues.   (PX307 at 98:14-99:7; PX573 at Resp. No. 8).

6.      Ian was employed by EduTrek since at least December 2010 and told vendors that: "I have been involved in the company [EduTrek/Day Pacer] since 2009 while working for the investment group that owns it."   (PX48 at 9; PX116 at 3-4; PX573 at Resp. No. 1).

7.      Individual Defendant David Cumming ("David" or "Cumming") owns a substantial interest in EduTrek and Day Pacer.   (R. 1 ¶ 11; R. 81-1 ¶ 12 (admitting owning an interest in EduTrek and Day Pacer); PX2 at 35; PX114 at 35; PX125; PX126 at 13-14 (attachment to PX125); PX306 at 22:5-11, 120:23-121:4, 131:19-21, 156:23-157:2).

8.      Cumming is a corporate manager of EduTrek and Day Pacer.   (R. 1 ¶ 11; R. 81-1 ¶ 12 (admitting being identified as a manager in EduTrek and Day Pacer's corporate filings); PX2 at 7, 33; PX87 at 2; PX112 at 2; PX113; PX114 at 7-9, 33, 35; PX306 at 38:18-20, 65:24-66:3, 128:21-129:3).

9.      At all times material to the FTC's Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.   (R. 1 ¶ 13; R. 33 ¶ 13; R. 81-1 ¶ 14; DX30 at ¶ 22 & App'x B (listing calls to all states)).

**B. EVIDENTIARY MATTERS**

10.     The emails produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).   (PX521 at Resp. No. 1 (admitting that "overwhelming majority" of the emails produced are business records); PX309 at 49:23-52:3; 61:14-62:9; PX307 at 49:21-50:23).

11.     The call records produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).   (PX521 at Resp. No. 2).

12.     The QuickBooks financial reports produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).   (PX521 at Resp. No. 3).

13.     The call recordings produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).   (PX521 at Resp. No. 4).

14.     The documents produced to the FTC by recipients of Civil Investigative Demands ("CIDs") are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).   (PX576; PX577; PX578).

**C. OUTBOUND CALLS**

15.     Defendants operated a 100-200 seat call center from which they employed agents called "College Search Advisors" ("CSAs") who communicated with consumers by phone. (PX309 at 33:6-34:17; PX301 at 31:5-11, 42:3-4, 50:5-6).   Defendants purchased leads that included the consumers' phone numbers from websites and then called them.   (PX309 at 36:13-17, 37:9-14; PX304 at 90:14-23).   The specific technology Defendants used to make these outbound calls entailed providing the phone numbers they had purchased to a dialing vendor. (PX309 at 34:18-35:5, 38:3-12, 39:7-12).   The vendor then dialed the consumers' phone

numbers for Defendants and connected consumers directly to Defendants' agents; no intervening company or agent spoke with consumers between when they answered their phones and when Defendants' agents came on the line. (PX309 at 35:22-36:4).

16. Defendants identified the purpose of their businesses in their corporate filings as "educational marketing services" or "educational services." (PX87 at 1 (EduTrek 4/20/10 Articles of Organization); PX112 at 1 (College Criteria/Day Pacer 9/25/15 Certificate of Organization); PX113 (name change of College Criteria LLC to Day Pacer LLC)). They also stated on their tax returns that their principal business activity was "EDU. MKTING SERVICES" and "MARKETING SERVICES." (PX125 (cover email for PX126); PX126 at 1 (attachment to PX125); PX138 at 7).

17. Defendants' contracts with schools, lead purchasers, and telemarketing partners ("IBT Partners") describe Defendants' business as providing marketing services to generate "qualified leads" for schools—people eligible for enrollment at those schools. (PX89 at 1, 3-4, 24 (contract between EduTrek and lead purchaser PlattForm operating on behalf of Education Management LLC ("EDMC") where EduTrek is "in the business of providing marketing and advertising services," also defining "qualified lead"); PX548 at 1 (contract between Day Pacer and lead purchaser Edufficient operating on behalf of Zenith Education Group that "Pursuant to the above, Media Company [Day Pacer] may also offer to Client [Zenith Education Group] other marketing tactics which may require the use of previously gathered list of prospects and their contact information (a "List") (e.g. E-mail and telemarketing campaigns)."); PX520 at 1 (contract with IBT Partner Anupam)).

18. The goal of Defendants' business, like all consumer lead generation businesses,

was to result in an eventual sale—here, a sale of post-secondary education (referred to by Defendants as a "conversion") that was considered by Defendants to be an important business metric, and was tracked by the schools, which set goals for Defendants. (PX301 at 30:5-12 (end goal of lead generation is to result in a sale), 175:3-14 (lead purchasers want "most bang for buck" and looking for "where they can source leads from places that would give them the most return on their investment"); PX300 at 52:13-53:12 (explaining why it was important that a certain percentage of consumers contacted would enroll), 45:18-24 ("EduTrek was in the business of helping prospective college students obtain information from colleges about college programs that they were looking to – to enroll in. So EduTrek's business model was one where the colleges would pay EduTrek money for – for those inquiries – that were produced by EduTrek."), 67:14-19 (school hired EduTrek so that it could find students to enroll); PX64 at 1-4 (Defendants tracking "conversions" for Double Positive and noting on page 4 that "we won't be at their goals for conversions"); PX309 at 25:21-26:3-4 ("[C]lients would pay us to generate interested prospects."); PX184 at 3 (questionnaire from potential lead purchaser EducationDynamics to Day Pacer asking "What kind of enrollment data, feedback, et cetera, have you received?"); PX545 at 1-3 (lead purchaser sending performance goals based in part on enrollments)). Defendants admit that the schools to whom they sold leads offered to provide education to consumers. (PX521 at Resp. No. 6).

19. Day Pacer stated on government documents that the company "solicits, promotes, or induces the sale of goods or services." (PX60 (cover email for PX61); PX61 at 1).

20. In emails with their vendors and in job ads posted for CSA positions, Defendants have stated their business is operating a "call center" that makes calls "around the country."

(PX579 at 1; PX580 at 1). The CSA Job Description also indicates that: "A College Search Advisor (CSA)'s job is to connect people interested in higher-education with colleges and universities that are actively looking to enrol [sic] students. To do this, you will access our dialing system (Five9) on which you will receive a blend of outbound and inbound calls." (PX120 at 16).

21. Defendants and their employees admit that they spoke with consumers nationwide (PX60; PX301 at 76:17-21), that they did not assign calls to their CSAs based on the location of the consumer (PX301 at 77:8-10), and that they did not have any policies or procedures in place to prevent the calling of telephone numbers outside of Utah (PX301 at 77:21-24; PX300 at 64:25-65:3 ("Q. Did agents in Sandy, Utah, call center make calls outside of Utah? A. Yes."); PX302 at 143:13-19 ("Q. Were calls assigned at all based on the location of the employee or the consumer? A. Not that I'm aware of. Q. Did employees in the Utah call center exclusively call Utah residents? A. I doubt it."), 144:16-20 ("Q. Did EduTrek have any policies and procedures in place for ensuring that it didn't make interstate phone calls? A. No.")).

22. Defendants' call records indicate that they made more than one interstate telephone call in conducting their telemarketing business; the vast majority were interstate calls. Using the methodology of comparing the area codes of the telephone numbers they used to place calls with the area codes of the telephone numbers call indicates that Defendants placed 5,697,230 interstate calls between 2014 and June 12, 2019. Using the methodology of identifying calls placed to telephone numbers with non-Utah area codes indicates that Defendants placed 17,637,108 interstate calls between 2014 and June 12, 2019, or 96.5% of all

calls that they placed.   (DX30 at ¶¶ 19-23 & Tables T.3 & T.4).

23.    Defendants also utilized "local presence" telephone numbers so that its outbound telephone calls to consumers would appear to come from the same locality, and consumers would be more likely to answer the calls.   (PX58 at 5-6; PX301 at 146:18-147:10; PX302 at 178:4-24).

24.    Defendants make phone calls to consumers who have submitted their contact information on websites that claim to help them apply for jobs and other matters unrelated to education, such as public benefits; many of these websites offer job opportunities, not education. (*See generally* PX403 & Atts. A-M (Omniangle reports); PX37 at 1 (email from Vice President of Operations to EduTrek employees:   "Many of our outbound leads come from job boards (or similar sites), these people may or may not have read/understood the statement asking if they would like a phone call from us regarding their education."); PX116 at 2 (websites from AdBrilliant are "itsmycareer.com" and "jobsbucket.com"); PX186 at 1 (March 22, 2019 email stating that a full list of data sources is attached); PX188 (attachment to PX186 listing only two education website sources with the remaining fifty-five website sources listed as job websites); PX309 at 28:12-19 (admitting job search websites were primary source of leads); DX30 at Table T.9 (indicating millions of calls generated from various job websites)).

25.    Consumers who received unwanted calls from Defendants have reported that, beyond merely wasting their time, the calls distracted them from their job searches and left them concerned about the security of their personal information.   (*See* PX406 (consumer Kyong Kim); PX407 (consumer Danielle Lock)).

26.    From March 22, 2014 through June 12, 2019, 25.5% of the outbound telephone

calls initiated by Defendants, or 3,669,914 calls, were made to telephone numbers on the

National Do-Not-Call Registry ("DNC Numbers").   (DX30 at ¶¶ 12, 16 & Table T.2.; DX125 at

¶¶ 6-11; PX401 at ¶¶ 5-10; PX402 at ¶¶ 4-10 (describing DNC Registry maintenance)).   The

breakdown of calls to DNC Numbers by date is:

| Period | DNC Hits |
|---|---|
| 3/22/14-7/31/16 | 2,363,721 |
| 8/1/16-1/23/17 | 328,929 |
| 1/24/17-1/21/18 | 450,423 |
| 1/22/18-2/13/19 | 404,766 |
| 2/14/19-6/12/19 | 122,075 |

(DX30 at Table T.2).   Defendants have been dialing numbers on the National Do-Not-Call

Registry ("DNC Registry" or "Registry") since at least March 2, 2010.   (DX125 at ¶ 13 & Att.

A).

27.     Defendants did not subscribe to the Registry and did not scrub their calling lists of

DNC Numbers.   (PX522 at Resp. No. 5; PX537 at Resp. No. 16; PX401 at ¶ 11; PX300 at

57:18-21; PX302 at 145:2-11 ("Q.   Did EduTrek have policies and procedures in place for

ensuring that it didn't call any telephone numbers on the do-not-call registry?   A.   Didn't need

to, no.   Q.   Did EduTrek check to make sure a phone number wasn't on the national do-not-call

registry before calling it?   A.   It also did not need to that so, no."); PX304 at 198:21-25 ("Q.

Did Day Pacer ever consult the National Do Not Call Registry when deciding what consumers to

speak with?   A.   No, not the National Do Not Call Registry.")).

28.     Defendants had a Do Not Call policy, where CSAs were directed to place a

9

consumer's telephone number on the Defendants' internal DNC list when requested.   (PX103;
PX120 at 15 (Day Pacer Do Not Call Policy, but falsely stating that Day Pacer consulted the
National Do-Not-Call Registry, *see supra* PSMF ¶ 27); PX302 at 149:2-8).

29.     Defendants instructed their CSAs to overcome the "objections" of consumers who
told Defendants they were not interested in speaking about educational opportunities and were
displeased about being called.   (PX106 (email from Lon Kennard to CSAs going over various
objections); PX119 at 3, 13; PX302 at 161:18-22 ("Q.   Were CSAs encouraged to continue the
call even though the consumers could not remember filling out information for schools?   A.
Yes."), 163:2-6 ("Q.   And were CSAs encouraged to continue the call even after the consumer
indicated they were only looking for a job and did not want to go back to school?   A.   Yes.");
PX304 at 156:13-157:7 ("I was just looking for a job" was a common objection from
consumers), 160:8-23 (CSAs instructed to try to overcome objections up to three times before
ending a call)).   Defendants also instructed their CSAs to not "over-use" call dispositions like
"Do Not Call Requested" and "Could Not Create Interest" when tracking the results of calls,
instead instructing the CSAs to use "a rebuttal" to try and generate consumers' interest in
education.   (PX67 at 2 ("Over-use [of "Do Not Call Requested" disposition] just burns up data
like fire in a furnace!"); PX119 at 13 (same – in CSA training document); PX120 at 5 (same);
PX591 at 2-4 (rebuttal example with consumer who said she was interested in finding a
housekeeping job and had no interest in education); PX592 at 2:13-17 (rebuttal to consumer who
said "I don't want to talk about furthering my education right now, I just want a job.")).

30.     Defendants received complaints from consumers and the websites from which
they had purchased data that they were initiating calls to DNC Numbers.   (*See, e.g.*, PX26 at

10-11 (Brown lawsuit); PX49 at 1-2 (Beyond.com complaint); PX50 at 1-2 & PX175 (Cameron complaint, involving Bluewater, an IBT Partner); PX161 (Witham complaint); PX521 at Resp. No. 17 (admitting that Day Pacer and EduTrek received complaints that they and their IBT Partners were calling DNC Numbers); PX172 (email discussing lawsuit for calling DNC Numbers); PX553 at 4 (Alan lawsuit). *See also* R. 153 at 8 (discovery order granting presumption that Day Pacer Defendants are deemed to have been aware of complaints identified by the FTC when complaints were made made)). For example, Beyond.com, a job website, informed EduTrek in March 2012 that it had received a complaint that "someone who is on the do not call list was contacted by a school." (PX49 at 1-2).

31. Defendants did not require the websites from which they purchased consumer data to list the name of the school or lead purchaser in their consent forms. (PX300 at 57:12-17; PX304 at 97:7-13).

32. Defendants call recordings also indicate that numerous consumers were not interested in education or in speaking with Defendants at all. (PX583 at 4:2-20, 5:17-21 (consumer just trying to fill out a job application to work at Target); PX584 at 3:21-4:11 (consumer looking at Medicare, not for education); PX585 at 2:18-3:10 (consumer looking for healthcare, not education); PX586 at 2:15-3:3 (consumer has terminal cancer and no interest in higher education); PX587 at 2:24-3:6 ("No sir, I'm looking for a job, not education."); PX588 at 2:20-3:5 (consumer never "signed up for trying to look for school" and is just looking for a job); PX589 at 2:12-20 (consumer not interested in education, has been called "like 15 times a day" about it); PX590 at 2:9-3:13 (consumer saying "you're like the sixth person that's called me, probably, from the past twenty minutes. I'm just trying to fill out job applications.")).

33.     Defendants also received complaints from schools and other lead purchasers and their compliance companies that they were initiating calls to consumers without collecting proper consent—express written authorization—to be contacted.   (*See generally* PX403 & Atts. A-M; PX179 (complaint involving IBT Partner Bluewater); PX222; PX225).   At least one major lead purchaser, EducationDynamics ("EDDY") refused to work with Defendants because they were concerned that Defendants' consumer data sources, such as websites, did not properly collect consumers' consent to be contacted.   (PX180; PX181 at 1-2; PX182 (Ian stating in a March 2019 email that EDDY representative, Bruce Douglas, "described his perception of Day Pacer as 'radioactive'"); PX307 at 214:3-20).   After receiving complaints about websites, EduTrek and Day Pacer continued to purchase consumer data generated from those websites.   (PX521 at Resp. No. 16).

34.     Defendants continued to purchase leads from some websites although they knew that those websites used an "opt-out" rather than "opt-in" form.   (PX598).   The Kathleen Brown DNC TCPA lawsuit against EduTrek involved such an "opt-out," or pre-checked box that a consumer would have to affirmatively uncheck if she did not want to receive a call.   (PX523 at 47 (email from 8/6/2015)).   Defendants knew that "opt-out" leads were problematic and did not indicate valid consent for a consumer to be contacted, but continued to buy from websites that used opt-out forms.   (PX302 at 79:19-80:3 ("Q.   And why did EduTrek tell Beyond.com to stop using pre-checked boxes?   A.   Because they wanted people who were truly interested in getting -- obtaining information about educational opportunities and not somebody who's just being sloppy about going through a website."); PX536 at 131 (9/15/2016 email in which Day Pacer tells Beyond.com "[t]he data must be opt-in.   TCPA case law is quite clear about pre-checked

boxes."); PX596 at 302-03 (9/7/2016 Beyond writes to DayPacer that opt-in lead is a different rate than opt-out leads, and instruction to change to opt-in leads constitutes a change from Chad (Tatton) and Nate (Clegg) with whom he has discussed opt-in/opt-out several times); PX597 at 1-2 (9/9/2016 Ian Fitzgerald tells MediaSpike "I do not plan to go back to Beyond.com" after receiving violation notice that Beyond was using opt-out form and further stating "I'm sure that you're removed from this feed because we're not working with them any more at all. . . ."); PX598 (12/22/2016 email from Beyond to Ian turning the data source back on "and just to confirm, per our conversation, these are Opt-Out (pre-checked box) leads.")).

## D. INBOUND TRANSFERS

35.     In addition to placing their own outbound telephone calls to telemarket post-secondary education, Defendants also contract with other telemarketing companies ("IBT Partners") to place outbound telephone calls to consumers, determine potential eligibility for enrollment in post-secondary education, and then transfer the telephone calls to Defendants for further telemarketing.   (PX300 at 77:4-78:11; PX309 at 31:19-32:5; PX10 at 1 (model inbound transfer agreement); PX18 at 2).

36.     Defendants' contracts with lead purchasers and schools hold them liable and responsible for any breaches of applicable laws, including the TSR, committed by any of Defendants' IBT Partners that generated leads that Defendants subsequently delivered to the lead purchasers and schools.   (PX122 at 3, 7 (requiring Defendants to use best efforts to ensure IBT Partners comply with applicable laws); PX89 at 11, 17 (representing and warranting that EduTrek and its subvendors will comply with applicable laws including TSR and agreeing to indemnify client for any liabilities stemming from a breach of the representations and

warranties); PX546 at 1, 3, 5, 8-9; PX548 at 1 ("For all purposes, any act or omission of any affiliate of the Media Company Network will be deemed to be the act or omission of the Media Company [Day Pacer].")).

37.     In some cases, Defendants have instructed their IBT Partners to use Defendants' d/b/a when speaking with consumers.   (PX503 at 2 (Ian Fitzgerald explaining to client Media Spike that for one of their campaigns IBT Partner Yodel uses "our DBA"); PX17 at 2 (EduTrek employee providing feedback to IBT Partner eStomes call representatives discusses how one of the areas representatives "get hung up on" is saying the name "Edsoup" over the phone, which EduTrek's CSAs struggle with as well); PX518 at 10-12 (instructing IBT Partner to say they are calling on behalf of "Our School Search" over the phone); PX519 at 1 (email from Day Pacer to IBT Partner Bluewater instructing them "[y]ou will need to use our DBA, Our School Search in the phone call.   That is the DBA that is in the TCPA.")).

38.     The IBT Partners' call scripts also indicate that the IBT Partners should make it appear to consumers as if they are speaking to the same or related companies when they are transferred from the IBT Partners to Defendants.   (*See, e.g.*, PX570 at 2-3 ("EDU Script" discussing transferring the consumer to an "advisor" and transferring the student to Day Pacer by saying "I have a qualified candidate on the line that I'd like you to help"); PX571 at 7-8 ("Membership Script" discussing transferring the call to an "education matching agent" with the same handoff script as PX570); PX510 at 1 (Jeff Davis tells IBT Partner "we don't require your agents to state your brand in the transfer").   *See also* PX560 at 2:7-12 (call recording where IBT Partner representative says "Hi, I have a qualified candidate on a recorded line that I would like you to help."); PX562 at 2:5-10 (call recording with similar transfer from IBT Partner); PX563 at

2:12-17 (same); PX564 at 2-7 ("Hi, Ms. Erica, I guess my associate [IBT Partner representative] fell off the line, I apologize about that."); PX565 at 2:8-10 ("Hey, I have a qualified candidate on a recorded line I'd like you to help here."); PX567 at 5-9 (similar); PX569 at 2:3-5 (similar); PX175 at 1 (IBT Partner transferred consumer to Defendants after consumer asked for a "supervisor")).

39.     Many IBT Partners are located outside of the United States, in the Philippines and India.   (PX174 at 3 ("Our agents primarily take inbound calls generated off-shore and transferred into us after being qualified for interest and eligibility (have a GED or Hight [sic] School diploma."); PX505 at 2 (Nate Clegg writing to Bluewater "we cannot be the easy scapegoat for your supervisors in the Philippines"); PX506 at 1 (Yodel had call centers in the Philippines and in India); PX507 (Boomsourcing sending tracking sheet with information in Mountain Time and "Philippine Time," and an email signature that shows their address as being in the Philippines); PX508 at 1 (XactCall Inc. referring to itself as a "Philippines Company"); PX509 at 1 (Axiom BPM discusses delivering leads from its "Philippines team"); PX520 at 1 (contract with IBT Partner Anupam, "a India private limited company")).

40.     Defendants' IBT Partners have made more than one interstate telephone call to consumers in conducting their business.   (PX400 at Table T.11 (showing interstate calls broken down by IBT Partner)).

41.     Defendants' call records directly document that the IBT Partners utilized by Defendants made 498,597 inbound transfers to Defendants between March 22, 2014, and June 12, 2019 that were the product of outbound telephone calls to DNC Numbers (20.0% of the total inbound transfers received from IBT Partners during that period).   (DX30 at ¶ 16 & Table T.2.).

The breakdown of calls to DNC Numbers by date is:

| Period | DNC Hits |
|---|---|
| 3/22/14-7/31/16 | 184,974 |
| 8/1/16-1/23/17 | 37,697 |
| 1/24/17-1/21/18 | 142,227 |
| 1/22/18-2/13/19 | 103,128 |
| 2/14/19-6/12/19 | 30,571 |

(DX30 at Table T.2).   Defendants' IBT Partners made an additional approximately 39,847,000 violative calls that are not directly reflected in the call records because those calls did not result in inbound transfers to Defendants.   (DX30 at ¶¶ 25-30 & Tables T.5, T.6, T.7, T.8.).

42.    Defendants continued to pay and work with IBT Partners even after receiving complaints from schools, consumers, and compliance monitoring companies that their IBT Partners were calling DNC Numbers without consent.   (PX521 at Resp. No. 15).   In one particular example, Defendants continued working with IBT Partner Bluewater despite repeated complaints and compliance notices.   (PX175 (April 2016 BBB complaint involving Bluewater and Defendants; Ian notes that "I'd also like to add a disposition that tracks how many completely ridiculous transfers he gives us.   We shouldn't be talking to 11 year olds.   We shouldn't be talking to people who are screaming 'no! no! no! no!'"); PX177 at 1 (August 2016 email chain indicating that Day Pacer continues to work with Bluewater, has received additional complaints related to Bluewater, and that "Do we believe Blue Water about their data sources? . . . We don't really know the extent of the Blue Water data path and we should not give them [the school] that URL they gave us."); PX178 at 1-2 (lead purchaser explaining that the problem is

that Defendants' IBT Partner used websites to source consumer data that were deceptive and did not collect proper consumer consent); PX179 at 1 (October 12, 2016, email chain with complaints regarding IBT Partners where Ian states "The BlueWater ones [leads] are an issue and they've been warned about this in the past.   My tolerance is waning by the minute."); DX30 at ¶ 34, Table T.10 (Defendants continued receiving leads from Bluewater until April 3, 2017)). The relationship did not end because Day Pacer terminated the relationship, rather Bluewater "just kind of disappeared one day."  (PX307 at 166:12-20).   A few months later, in August 2017, Day Pacer started a new relationship IBT Partner relationship with XactCall Inc., which is operated by the same individual, Paul Flannery.   (PX508; PX593 (complaint regarding Bluewater sourced lead, also identifies Paul Flannery as being with Bluewater)).

43.     EduTrek and Day Pacer paid the IBT Partners money for the leads that they called and then transferred to EduTrek and Day Pacer.   (PX521 at Resp. No. 12 ("Admit that the EduTrek L.L.C. and Day Pacer LLC paid inbound transfer companies to transfer calls with consumers regarding educational opportunities to EduTrek L.L.C. or Day Pacer LLC."); PX300 at 88:3-13, 94:9-14, 95:3-24 (discussing how inbound transfer partners were paid either a percentage of the revenue Defendants received from the transfers that they sent, or they were paid a dollar amount per transfer)).

44.     Defendants provided some of their IBT Partners with the consumer information for the IBT Partners to call.   (PX521 at Resp. No. 13 ("Day Pacer LLC admits that it provided consumer data to two inbound transfer companies for them to call regarding educational opportunities and then transfer such calls to Day Pacer LLC."); PX500 at 1 (Ian Fitzgerald writes to CEC (school) "[t]he second change is that we will only use data we have purchased from

17

websites we have vetted when we engage with inbound transfer companies."); PX307 at 102:13-24, 152:14-153:7, 241:25-243:1 (discussing how Day Pacer provided consumer information to some of its IBT partners including Yodel and Boomsourcing or Boom AI); PX501 (Ian Fitzgerald discusses setting new business arrangement with IBT Partner Bluewater using "our data"); PX502 at 1 (Keypath.edu asks "can you confirm if your Inbound partner-BlueWater- is getting data from your OB sources and your OB sources only?" to which Nate Clegg replies "Bluewater should only be dialing the data sources provided to them."); PX174 at 3 ("We can supply aged data for you guys to call and we would like to start around 100 transfers a day if that's possible.")).

45.     In some instances, Defendants either reviewed their IBT Partners' script or provided them with a script to use.   (PX11 at 1 (Inbound Transfer Onboarding Process:   step 2 is "Vendor submits script for approval."); PX500 at 1 (Ian Fitzgerald tells CEC that Day Pacer's IBT Partners "use a script we approve"); PX503 at 2 (Ian Fitzgerald writes to MediaSpike:   "We run two Yodel campaigns.   One is our data and custom script. . . ."); PX174 (Ian Fitzgerald emailing a potential new IBT Partner an "EDU script" and a "job script" for use over the phone)).

46.     Defendants also have provided their IBT Partners with business information and guidance in order to increase the number of transfers the IBT Partners can provide to Defendants. (PX300 at 114:10-115:13 (discussing providing IBT Partners feedback to help optimize their performance); PX17 (providing feedback to IBT Partner eStomes on their telemarketers using rebuttals during calls); PX539 (discussing providing reporting to IBT Partners); PX173 (email chain between Day Pacer and Yodel discussing call dispositions)).

47.     Defendants received complaints from their CSAs that many of the leads they received from IBT Partners were not interested in education.   (PX18 at 1 (in addressing CSA's complaints about transfers received from IBT Partners in July 2014, Chad Tatton tells the CSAs that management will "try and get rid of some of the worst of the worst transfers.   Not the ones where nobody was there, or they were not really interested in school, or they were confused.   I'm talking about the ones where the agent was completely dismissive of the person and/or rude."); PX84 at 3 (one of the questions Day Pacer's management received from CSAs in October 2018 was "I would like to know what is going [sic] IBT vendors?   They continually send over with either no prospects on the line, they're disqualified or have zero interest in pursuing their education.   These calls are becoming harder and harder to overcome.")).

48.     Defendants operated under the assumption that their IBT Partners did not scrub numbers against the DNC Registry.   (PX300 at 104:22-105:5 ("Q.   Do you have any reason to believe that the transfer partners were screening phone numbers against the do not call lists before making calls?   A.   I would say no, I wouldn't, for the same reason that we didn't.   My expectation of them was that they would not call people without consent.   As such, they did not – they would have not – you know, they would have not cross-referenced that.")).

49.     Defendants received complaints and threatened lawsuits from consumers on the DNC Registry that were called by Defendants' IBT Partners.   (PX175 at 1-2 (threatened lawsuit received from consumer on the DNC Registry who was transferred to Day Pacer by IBT Partner Bluewater); PX504 at 1 (consumer named Jill Dudley complains of having received 6 phone calls despite being on the Federal Do Not Call List); PX161 at p.2 (Raymond Fitzgerald discussing in an email chain with David Cumming and Ian Fitzgerald a "garden variety stick up"

from a consumer named Cliff Witham on a lead transferred by Bluewater)).   In each of those instances, emails exchanged internally by the Defendants confirmed that they did receive an IBT Partner transfer from the consumer who complained.   (PX175 at 1 (forwarding the call record information); PX504 at 1 ("She was transferred to us from a vendor named College Choice. . . ."); PX161 at p.2 ("Bluewater did call him and transferred him to Day Pacer.")).   Those consumers did not distinguish between the IBT Partners and Defendants.   (*See, e.g.*, PX175 at 1 (Bluewater employee said that he worked for "College Advisor" and transferred the call to his "supervisor" (Defendants)); PX504 at 1 (consumer complaining to Ian Fitzgerald "I received 6 spoofed phone calls from your company today")).

50.     Defendants' call recordings of transferred calls from IBT Partners also indicate that numerous consumers were not interested in education or in speaking with Defendants at all. (PX562 at 3:10-17 ("I don't want to go back to school."); PX563 at 7:14-8:1 ("Lady, I thought this was about jobs.   I didn't think this was about school. . . .We don't have to talk about this."); PX565 at 4:9-12 (consumer interested in a job, not education); PX567 at 3:2-4:5 (same); PX568 at 3:8-12 (consumer interested in "trade," not education), PX569 at 2:20-4:5 (consumer "need[s] a job, school is not helping me")).

51.     David Cumming acknowledged in an email chain sent to Ian Fitzgerald, Raymond Fitzgerald, and Nate Clegg that "[r]egrettably many Philippines operators routine[sic] violate the terms of US law, specifically the TCPA."   (PX162 at 2).

52.     Defendants did not monitor their IBT Partners' data sources or keep records of their purported consent.   (PX522 at Resp. No. 10 (Day Pacer reviewed some of the websites used by IBT Partners to generate leads but did not monitor the websites); PX109 at Resp. No. 10

(same with respect to EduTrek); PX521 at Resp. No. 10 ("Responding Defendants do not deny

that it was not the regular business practice of EduTrek L.L.C. or Day Pacer LLC to preserve

screen shots of websites used to generate consumer data. . . ."); PX307 at 145:16-22 ("Q.   Were

there screenshots retained of the websites?   A.   It wasn't common practice to store those.

Sometimes they were emailed, you know, if two people were involved in something, but it

wasn't common practice to store those anywhere."); PX302 at 77:7-14 ("Q.   So did the -- did

these records contain the contents of the consent form?   A,   Generally not.   Q.   Are you aware

of any instances where the consent of the web form was included in EduTrek's records?   A.

I'm not aware of any, but I can't say there are none.")).

     53.     Defendants admitted they had trouble keeping track of the websites used by their

IBT Partners, and generally did not trust the information they received from their IBT Partners.

(PX309 at 322:2-323:5 (discussing the difficulty in keeping track of where IBT Partners received

leads from, particularly if they changed sources); PX177 (Day Pacer Vice President Jeff Davis

writes "Do we believe [IBT Partner] BlueWater about their data sources?"); PX307 at 190:6-11

("Q:   But did you trust that [IBT Partner] BlueWater wasn't acquiring data from those websites.

. . .   A:   I had no reason to think that they were or they weren't."), 191:9-13 ("So we tried to be

as cautious as we could, but it was very difficult to verify everything.   So that's why it really

kind of came down to speculation more than fact a lot of times."), 197:24-198:7 ("The problem

is that, I believe, [IBT Partner] BlueWater bought data from data brokers, and so I think that that

was kind of my worry with them was that they didn't have enough oversight on what they were

doing.   But from what I can tell, it was not their intention to be using any sources that we didn't

know about."); PX593 (Ian discussing consumer lawsuit with Bluewater and indicating he does

not know Bluewater's data source—"If that happens [Day Pacer is forced to disclose Bluewater is the source for the call transfer], and you guys cannot identify your source, you will have to mount your own defense to the suit.")).  Defendants received numerous compliance reports pertaining to problematic websites that generated leads for Defendants' IBT Partners.  (PX403 at ¶¶ 4-5, 10.d, 10.g, 10.h, 10.i, 10.k, 10.l, 10.m, & Atts. D, G, H, I, K, L, M).

54.     Defendants helped two IBT Partners evade clients' compliance scrutiny by telling them how to identify themselves (or to not identify themselves) to consumers over the phone. (PX510 at 1 (Jeff Davis writes to IBT Partner B&C Interactive, with Ian Fitzgerald copied, regarding an Omniangle compliance report they received:   "Your agents state your DBA during the transfer when they introduce themselves.   This tips off Omni Angle to look for your DBA. On a side note, we don't require your agents to state your brand in the transfer."); PX511 at 1 (Jeff Davis writes to Emma Furman regarding an Omniangle report received for a Blue Water transfer:   "My guess, from my experience with Omni angle, is that they are doing some web-crawler search for the term 'College Advisor' because it is the call center business name that was used in the call recording as the transfer data source. . . .   One simple solution would be to have Blue Water change their call center name and to stop saying it during the transfer."); PX512 at 3 (Day Pacer subsequently receives another Omniangle report from a company identifying itself over the phone as "Horizons Unlimited"); PX513 at 1 (Ian Fitzgerald confirms in an email to Emma Furman and Jeff Davis that Blue Water was the source of that lead)).

## E.     CORPORATE LIABILITY

55.     Defendants' employee training documents emphasized compliance with the TCPA.  (PX119 at 9, 15-17; PX120 at 7-9, 12.   *See also* PX302 at 53:18-21 ("Q.   Did EduTrek

have policies or procedures in place for complying with the TCPA?   A.   Yes.")).

56.     Defendants' contracts with vendors, clients, and IBT Partners included explicit references to the FTC Act, TSR, and DNC regulations, and the contracts required Defendants and their IBT Partners to comply with the FTC Act, TSR, and DNC requirements.   (PX7 at 2; PX10 at 2; PX83 at 2; PX520 at 2; PX121 at 4; PX122 at 1, 5-6; PX89 at 11; PX93 at 4; PX95 at 3; PX97 at 4 (defining "Applicable Law" as, inter alia, the Telemarketing Act, TCPA, and regulations; requiring compliance with TSR); PX546 at 1, 3, 5, 8-9; PX547 at 6, 14; PX548 at 4, 6).   Some of these contracts were drafted or proposed by Defendants themselves, including a contract dated April 2, 2020, more than a year after the FTC filed this lawsuit.   (PX121 (contract on Day Pacer letterhead); *see also* PX549 (cover email for PX550); PX550 at 2 (warranting Day Pacer will comply with TSR and TCPA); PX551 at 1 (cover email for PX552); PX552 at 1-2)). Some entities explicitly confronted Defendants about telemarketing compliance concerns, as the company Five9 did in an email to Brett Larsen (Vice President of Finance at EduTrek and Day Pacer) on February 21, 2019 regarding abandoned calls that Brett then forwarded to Ian, advising Ian that "We probably need to feed them some BS, or tell them that their system sucks at balancing IB [inbound] and OB [outbound] calls."   (PX83 at 1; PX48 at 9).

57.     Defendants' contracts with its IBT Partners required the IBT Partner to indemnify Defendants for liabilities arising from the IBT Partners' TSR violations.   (PX6 (Chad Tatton discussing new IBT contract with Raymond Fitzgerald attached the "old agreement" (PX7) and the "new one" (PX10)); PX7 at 2-3, ¶ 1 (IBT Partner represents and warrants that its outbound calls shall be made in compliance with all applicable law, including the TSR), at 4, ¶ 6 (IBT Partner agrees to indemnify EduTrek for liabilities arising out of any breach of its representations

and warranties); PX10 at 2, ¶ 5 ("new" model agreement with same representations and
warranties by IBT Partner not to violate the TSR), at 4, ¶ 9 (IBT Partner agrees to indemnify
Defendants for liabilities arising out of any breach of its representations and warranties); PX520
at 2, 4 ¶¶ 5, 9 (contract with IBT Partner Anupam employing the "new" model agreement)).

58.     Defendants falsely denied purchasing leads from problematic websites.   For
example, in one instance they falsely claimed not to purchase leads from an IBT Partner that
used the name "Degree Needs" over the phone, despite their IBT Partner having previously told
them they were using that d/b/a.   (PX225 (Day Pacer responds to compliance notification
regarding a call transferred from "Degree Needs" by stating "[w]e also don't buy from whoever
this is."); PX226 (email from IBT Partner B&C Interactive "[w]e switched back to our old DBA
Degree Needs from Degree Services.   Can you please let your team know?"); PX309 at
233:22-234:5 ("Q.   And so does this refresh your recollection that, in fact, EduTrek was doing
business with a DBA called Degree Needs, a call center?   A.   It certainly looks like it.   We
probably just didn't remember or realize it.   It's probably just an internal communication
problem.")).   They also claimed not to buy data from Lead5 Media even though they received
invoices from that company during that period.   (PX100 (Defendants received Omniangle report
in October 2015 that lists Lead5 Media as the originating source of the lead); PX558 (Nate Clegg
claims "[w]e do not buy leads from this source"); PX559 (Defendants received a different
Omniangle report in October 2015 with Lead5 Media as the source of the lead); PX561
(Defendants again deny buying data from that source); PX302 at 127:5-20 (EduTrek admitting
that its records show they received invoices from Lead5 Media in October 2015)).

59.     Defendants told a prospective client that they were trying to establish a

relationship with that they were not subject to any legal proceedings when they knew that FTC was imminently about to file this lawsuit. (PX183 (March 20, 2019, Emma Furman asks Ian Fitzgerald, who forwards the email to Raymond Fitzgerald on March 21, 2019, for help filling out a client questionnaire, including question #5); PX184 at 3 (question #5 asks if the company has ever been "the subject of any civil or criminal proceeding initiated by a private individual or individuals, the Federal Trade Commission" or other government agencies regarding telemarketing); PX185 at 1 (March 20, 2019, Ian Fitzgerald sends Raymond Fitzgerald an email with the subject "New/large customer questionnaire" with the text of question #5, asking Raymond "[w]hat's the correct answer here? What qualifies as a 'proceeding'?"); PX186 at 1 (March 22, 2019, Emma Furman emails potential client Day Pacer's responses to the questionnaire); PX187 at 3 (attached questionnaire responds "no" to question #5); PX517 at 4 (email from FTC to Raymond Fitzgerald on March 18, 2019, informing Defendants that the FTC intends to file its Complaint); R. 1 (Complaint filed by FTC on March 22, 2019)).

60. When the FTC issued its Civil Investigative Demand to EduTrek L.L.C. in 2016, David Cumming told the FTC that EduTrek was dissolved, but did not mention that Day Pacer LLC was operating the same business out of the same location with most of the same employees. (PX524, PX525). When FTC attorney Brian Shull asked where each member was employed and "[w]hat other entities is each member currently associated with?" David Cumming omitted any responses that would identify the existence of Day Pacer. (PX524 ("I am retired and not employed. The Dalsnan Family LLC is a limited liability company. Joseph L. Oliva is a lawyer…. Blake Johnson is employed but is moving to a new job and I have no information where that might be.")). At the time, David Cumming, Dalsnan Family LLC, and Joseph Oliva

were all owners of the newly formed Day Pacer LLC (PX114 at 36) and Blake Johnson was then

employed by Day Pacer LLC (PX48 at 9).   When the FTC insisted on receiving records and

responses to its Civil Investigative Demand, David Cumming indicated that he believed he had

no personal obligation to comply with the CID and did not feel inclined to be helpful.   (PX525

at 1-3).

61.     After CEC decided to stop doing business with Defendants, they began to use

intermediaries to continue doing business with CEC without CEC's knowledge.   (PX530 at 3

(lgtechnet complains to Ian Fitzgerald that Day Pacer never told them they were on CEC's black

list, "[i]nstead you gladly accepted and fulfilled the allocation, knowing fully that CEC does not

want your leads directly or indirectly.   When we found out Day Pacer was on the list, on a May

20th phone call, Emma said not to worry and explained that it is really just an old thing from

2014 and has to do with your old company that has been dissolved since then.   She said all that

knowing that Day Pacer is indeed on the black list and should not be selling leads to CEC.");

PX531 (Ian Fitzgerald writes to Raymond Fitzgerald "I'm thinking Day Pacer should become

purely a middleman and create yet another company that rents agents from Allied to fill Day

Pacer's and other company's leads" and lists among the advantages "NewCo would have access

to all of Day Pacer's allocation as well as some things Day Pacer doesn't have access to since the

press release"); PX532 (Ian Fitzgerald writes to Raymond Fitzgerald and David Cumming on

October 31, 2019 that "Allied Contact Management was added to CEC's blacklist" which unless

CEC reverses their decision means Allied "will lose essentially all of our present clients and be

out of business by Monday"); PX533 at 4 (transcript of an online chat between Ian Fitzgerald,

Jeff Gerber, Frances Blickman, and Craig Rosenfeld discussing whether Allied should show its

data to CEC to try to get CEC to reverse its decision to blacklist Allied:

> Jeff:   I was just thinking about this.   If CEC sees allied books, I think that Cec will consider 100% of the leads generated by provide media and Path 56 to be Daypacer generated.   Allied bought the data trained the agents and employed the agents.

> Jeff:   They would likely say, allied is sending us leads currently

> Ian:   Allied doesn't buy any data[,] but is paid for by Day Pacer which is possibly just as bad."

> Jeff:   Yeah, I think it would really kill frances [Blickman] / provide [Media] if they saw that.

> Ian:   Okay so let's please not do that.

62.    Defendants lied to at least one potential client and one lead publisher about having procedures in place to check telephone numbers against the DNC Registry.   (PX566 at 6 (Day Pacer sends prospective client questionnaire responses including its DNC policy, which states:   "Day Pacer has established written procedures to honor consumers' requests that they not be called, and appropriate personnel have received training.   Procedures include consultation of both the National Do Not Call Registry and internal Do Not Call List prior to making any telephone solicitation."); PX49 (website publisher Beyond.com tells EduTrek they received a complaint that someone on the Do Not Call list was contacted by a school and asks if EduTrek has something in place to prevent that from happening again, to which Brett Larsen responds that they do have systems in place); PX301 at 88:3-6 (Brett Larsen was asked during his deposition if he knew "if EduTrek took any measures to prevent calling phone numbers on the National Do Not Call Registry?" and he responded that he did not know).   As discussed *supra* ¶¶ 27-28, Defendants did not consult the National Do Not Call Registry or have a procedure in place to prevent calls to DNC Numbers.

63. Defendants have identified equity in assets worth a total of $20,955,830.37. (PX405 at ¶¶ 11 (Day Pacer LLC's liabilities, $2,239,234.63, exceed its assets, $444,764.09), 15 (Raymond Fitzgerald's equity in assets is $12,803,143.92), 24 (David Cumming's equity in assets is $7,204,818.34), and 32 (Ian Fitzgerald's equity in assets is $947,868.11)).

64. Corporate Defendants' combined revenue from March 22, 2014 to June 12, 2019 was $28,681,863.88. (PX405 at ¶ 6 (summarizing, based on Defendants' accounting documents, EduTrek's revenue as $10,709,181.11 from March 22, 2014 to October 30, 2015 and showing Day Pacer's revenue as $17,972,682.77 from November 2, 2015 to June 12, 2019)).

## F. INDIVIDUAL LIABILITY

### 1. *Individual Defendants' Participation and Control*

65. The Individual Defendants controlled and directly participated in the regular affairs of the Corporate Defendants both individually and in concert. For example, Raymond reviewed contracts for EduTrek beginning as early as 2011 (PX302 at 229:11-13; PX308 at 25:13-26:8) and testified that he "would have given comments about the language" in agreements. (PX308 at 145:20-146:15).

66. Raymond also at times directed Day Pacer with respect to when to pay certain bills. (PX70; PX71; PX543 at 1). In one instance, he instructed Brett Larsen on April 17, 2016 to immediately pay his and David Cumming's company Thorpe/Sandy LLC late office rent that Day Pacer owed to them as landlords of their company and that "[i]f you have to pay someone late, choose someone else other than Thorpe/sandy LLC in the future." (PX70). He also instructed Brett Larsen on June, 3, 2016 to book his fees for legal services as payables to be paid "[i]f and when Day Pacer has enough money." (PX71).

67.     Raymond was also a signatory on College Criteria/Day Pacer's Zions First National Bank account, and also applied for the account.   (PX123 at 1; PX124 at 1).   Day Pacer also used Raymond's Dalsnan credit card to pay certain Day Pacer expenses.   (PX169; PX170).

68.     Analysis of Raymond's emails reflects that he exchanged more than 1,300 emails relating to EduTrek and Day Pacer between September 2015 and August 2019, including approximately 400 emails that Raymond personally sent.   (PX404 ¶ 13, Att. A, & Table T.3). Defendants produced few records of their emails from before September 2015, and thus, meaningful analysis of that period is not possible.   (PX404 ¶ 12).

69.     Ian directly participated in and controlled EduTrek and Day Pacer.   He served as President of Day Pacer beginning June 1, 2016.   (PX304 at 22:20-24).   In that role, he was responsible for the day-to-day operations of the company, including hiring and firing employees, signing contracts, and responding to compliance issues.   (PX307 at 98:2-99:14, 148:2-151:5 (discussing dealing with Omniangle violation reports)).   In addition, he was responsible for the company's profitability and had access to its bank accounts and accounting records.   (*Id.*)

70.     Before becoming President of Day Pacer, Ian had daily communications with the then-CEO of EduTrek and Day Pacer, and functioned as a liaison between the CEO and Raymond Fitzgerald and David Cumming.   (PX309 at 82:22-83:8).   Beginning in 2010, Raymond made him President of Dalsnan Family LLC, the holding company through which Raymond held his interest in EduTrek, and Ian was responsible to watch over Ray and David's investment interest in the company.   (PX307 at 45:20-48:12; 58:9-59:12; PX189 at D716-33; PX573 at Resp. No. 2).   Ian also worked directly for EduTrek, (PX307 at 84:4-86:7), then later for Day Pacer as Director of Human Resources, before finally becoming Day Pacer's President.

(PX307 at 87:4-9).

71.    Cumming controlled and directly participated in business of EduTrek and Day Pacer.  For example, he discussed Day Pacer's business model, sales tactics, strategic direction, as well as industry statistics, with Ian and Raymond.  (PX306 at 196:9-199:15; PX154 at 2-3). He provided them with feedback on strategy to get delinquent customers to pay.  (PX306 at 195:11-196:8; PX154 at 2).  And as beginning as early as 2011, he discussed with Chad Tatton the "cost in leads in order to get an application" that schools expected to have to pay, something he shared with Ian and Raymond.  (PX306 at 196:16-197:2).

72.    Cumming also requested financial updates from the Corporate Defendants, as indicated in a May 2, 2016 email to Brett Larsen, copying Raymond, Ian, and Nate Clegg from Day Pacer where he requested to view the "Quickbooks balance sheet and P&L" that day, without any "clean up [for] the month-end."  (PX80; PX81).

73.    Analysis of David's emails reflects that he exchanged more than 780 emails relating to the companies during the period September 1, 2015 to March 13, 2019, including approximately 125 that David personally sent.  (PX404 ¶ 14, Att. B, & Table T.4).  David also testified that he "spent somewhat less time on College Criteria/Day Pacer than I did on EduTrek."  (PX306 at 144:2-10).  Thus, it is reasonable to assume that if Defendants had produced complete records of their emails from before September 2015, there would have been even more emails from David relating to the companies.

74.    Raymond, David, and Ian also acted in concert to directly participate in and control the Corporate Defendants.  Raymond and David were the corporate managers of EduTrek L.L.C. and Day Pacer LLC.  (PX2 at 6 § 3.2 (EduTrek Operating Agreement stating

30

"[t]he number of Managers of the Company shall be two (2). David T. Cumming and Raymond Fitzgerald shall serve as the Managers"); PX114 at 6 § 3.2 (College Criteria operating agreement stating same but substituting Raymond's holding company, The Dalsnan Family LLC, for Raymond)). As the only corporate managers, Raymond and David each were required to "devote the time and effort as is reasonably required in the business of the Company." (PX2 at 5 § 2.9; PX114 at 5 at § 2.9; *see also* PX306 at 128:21-129:3). They also had broad authority "to do and perform all . . . acts as may be necessary to or appropriate to the conduct of the Company's business." (PX2 at 7 § 3.3(k); PX114 at 7 § 3.3(k); PX306 at 129:4-130:16). Moreover, they had exclusive, non-delegable authority dispose of EduTrek (PX2 at 7 §3.4, PX306 at 130:17-131:21), including the authority to hire and fire corporate officers. (PX2 at 11-12 § 3.11).

75. Raymond and David advised Ian and Day Pacer on contracts and business opportunities. (PX73; PX74; PX75; PX76; PX77, PX78; PX79; PX183 (Ian forwarding lead purchaser questionnaire to Raymond in March 2019); PX184 (questionnaire attached to PX183); PX185 (Ian asking Raymond in March 2019, related to the questionnaire forwarded in PX183 and PX184, "What qualifies as a 'proceeding'?" in response to an inquiry if Day Pacer has "ever been the subject of any civil or criminal proceeding")). Raymond and David came into Day Pacer's offices in May 2016 to discuss a contract with InContact, a cloud telephone systems provider. (PX73). In April 2016, they also discussed forming a related company, Summit Home Security LLC, and obtaining a State of Utah telemarketing license for that company. (PX74, PX75, PX76, PX77, PX78, PX79). Similarly, Ian also provided Raymond and David with financial and business performance updates, and business plans. (PX195 at 108-09 (Allied

Contact Management financial modeling); PX595 (management report)).

76.    Raymond and David regularly loaned money to the Corporate Defendants and had the ability to foreclose on the Corporate Defendants on account of their debt holdings.   (PX516 (showing loans paid by Raymond Fitzgerald and David Cumming and their demands for immediate payment and proposing to accept collateral)).   Raymond and David also helped the Corporate Defendants obtain business financing from banks.   (PX137, PX534).

77.    Raymond and David exercised their authority and illustrated their roles as controlling owners by "foreclosing" on EduTrek.   They did this by mailing themselves letters demanding payment of loans they had made to the company, and then responding to their own letters agreeing to the foreclosure of EduTrek's assets as payment to themselves.   (PX516; PX306 at 148:13-16; 150:5-9; 151:23-155:8).   Raymond and David then converted these "foreclosed" assets into their "new" company, Day Pacer.   (PX302 at 232:22-235:23).

78.    Raymond and David also provided advice and direction to Ian and the Corporate Defendants about how to respond to government inquiries.   (PX62; PX301 at 162:6-13; PX555 at 1).   For example, in August 2016 they advised Ian and Day Pacer not to respond to an inquiry from the State of Nevada regarding potential taxpayer liability in Nevada.   (PX62 at 1).

79.    On April 13, 2016, Raymond and David informed Ian and other Day Pacer executives (Nate Clegg and Brett Larsen) that EduTrek had been administratively dissolved by the State of Utah, and instructed Ian, Nate, and Brett to contact them "[i]f anything in the future occurs relating to EduTrek L.L.C. . . . so that we can advise you of the effect of the dissolution on whatever occurs."   (PX72).

## 2. *Individual Defendants' Knowledge*

80.     Raymond, David, and Ian have long understood the laws and regulations applicable to their businesses, and understood that their companies were engaged in practices that would violate those rules.   (PX158; PX161; PX544).   Ian wrote an email to Brett Larsen and Nate Clegg on October 13, 2015 regarding a lawsuit filed by a consumer against EduTrek saying:   "We should sit down with Blake this Friday and talk about how this could have happened if it did. We need to make sure our system is not calling DNC numbers ever." (PX172).   Similarly, David sent Raymond and Ian an email in early 2016 that included a link to the TSR itself.   (PX158 (4/25/2016)).   He advised them to "review the FTC's Telephone Sales Rule [sic] which implements the Telemarketing and Consumer Fraud and Abuse Prevention Act 15 USC 6101 et seq."   (PX82; *see also* PX575 at Resp. No. 2 (David admitting he knew of the DNC Registry before March 22, 2014 and had registered his own telephone numbers on it)). Raymond responded with an attachment from the State of Utah regarding Utah state telemarketing regulations.   (PX82).

81.     Cumming explicitly raised with Raymond and Ian what he called the issue of "conditional consent," in which he asked, "[b]y opting in on a site advertising at home business opportunities, is the opter consenting to a call about further education?"   (PX162 at 1).   He then stated, "it is unfortunate that we have the potential conditional consent issue but oh, well. . . ." (*Id.*)   Raymond Fitzgerald acknowledged the email by circulating Utah's version of the TSR. After receiving a separate link to Utah's version of the TSR from Utah's Division of Consumer Protection, Ian Fitzgerald wrote to Raymond and David, "[t]he state wants a reason why we shouldn't be considered a telemarketing company.   Can you guys do some legaling around?"

(PX555 at 1).

82.     On April 27, 2016, Ian stated in an email to Raymond that copied Cumming, Brett Larsen, and Nate Clegg from Day Pacer: "I think it is probably a good idea to invest in the Telemarking permit down the road. As long as you're okay with it being in Day Pacer's name, I'm happy to go forward as you suggest."   (PX79).

83.     On November 28, 2016, Cumming sent an email to Raymond and Ian providing some analysis regarding the TSR and TCPA in response to Raymond's email regarding a consumer complaining he was called by Day Pacer IBT Partner Bluewater and then transferred to Day Pacer.   (PX161 at 1).   Cumming stated that, "if Blue Water was determined to be an agent," an FTC "provision" (the TSR) may apply to Day Pacer, and that "[l]ess likely but more scary is the FTC telemarketing sales rule which requires the same initial identity [of the telemarketer] to be disclosed [on a call]" and civil penalties could apply for TSR violations. (PX161 at 1).   And on February 27, 2017, Raymond emailed Ian with language from a portion of the TSR regarding a requirement for the name of telemarketers to be displayed on call recipients' caller identification service, 16 C.F.R. § 310.4(a)(8).   (PX544).

84.     The FTC issued CIDs to EduTrek L.L.C. in April 2016 and to EduTrek L.L.C. and Day Pacer LLC in February 2017 seeking information about the companies' compliance with the Telemarketing Sales Rule.   (PX537 at pp. 14-19 (requesting information about Day Pacer's call records, whether it accessed the National Do Not Call Registry, and whether it had an established business relationship with or express written authorization from consumers it called); PX538 at pp. 14-19 (same with respect to EduTrek); PX156 at pp. 10-13 (requesting information on websites EduTrek purchased consumer data from, telephone numbers used by the

company, call recordings, software used to call consumers, etc.)).

85.　　The Individual Defendants knew that the Corporate Defendants did not access the National Do Not Call Registry.　(PX537 at 14 (CID response indicating that Day Pacer did not have a SAN used by or on behalf of the company to access the National Do Not Call Registry), 24-25 (David Cumming and Raymond Fitzgerald were the only individuals involved in preparing Day Pacer's response to the CID); PX304 at 200:11-25 (Ian Fitzgerald testified that as a manager of Day Pacer he did not feel the company needed to subscribe to the National Do Not Call Registry)).

86.　　Raymond, Ian, and David discussed consumer complaints and potential lawsuits from consumers, and how to respond to such matters.　Raymond and David also provided other legal guidance regarding EduTrek and Day Pacer's operation.　(PX50 (emails regarding Cameron BBB complaint); PX161 (Witham complaint); PX162 (additional emails regarding Cameron complaint); PX176 (indicating complaint forwarded to Raymond and David); PX542 (providing guidance on terms of service on websites and directing employees to make changes)). For example, in an April 2016 email thread, they discussed a response to a BBB complaint from a consumer ("Cameron") against EduTrek who stated he was on the Registry and was called without his consent at least four times in March 2016 by Defendants or their IBT Partner (a company "located in the Philippines") who transferred Cameron to the Defendants.　(PX50; PX162).　David suggested telling the BBB that "EduTrek has never made a telephone call to Cameron."　(PX50 at 3; PX162).　In another email, Raymond instructed Defendants' employee, Brett Larsen, not to send a planned response to the BBB but that "I will address this in another way[.]" (PX50 at 2).

87.     Ian was also aware of concerns expressed by Day Pacer's CSAs that the consumers they were calling were not interested in educational opportunities and did not want to be called.   (PX84).   In an October 31, 2018 email chain, Day Pacer management made fun of questions asked by CSAs that management would answer on a company-wide conference call, including:

> I would like to know what is going IBT vendors? They continually send over with either no prospects on the line, they're disqualified or have zero interest in pursuing their education. These calls are becoming harder and harder to overcome. Also, is the company doing well overall with the very low allocation that all of October had? There's been a huge shortage in schools to offer any prospects.
>
> how can we be evaluated on outbound calls when 99.99% of the time they are a answering machine or a hang up?

(PX84 at 2-4).

88.     Raymond Fitzgerald and David Cumming were both familiar with a Huffington Post article written by David Halperin about EduTrek.   (PX36; PX300 at 248:20-249:4).   The article alleged that EduTrek obtained consumer information from jobs and benefits websites using fine print disclosures.   (PX36 at 1-2).   EduTrek employees interviewed said that "about 95 to 97 percent of those called reject the pitch to discuss education opportunities."   (*Id.* at 3). The article also cites specific examples of a website that routed leads to EduTrek even if the consumer failed to check the box expressing an interest in education, and a consumer who asked to be put on the DNC list complained that they were called 14 times.   (*Id.*)   The article also noted that EduTrek "may well be in violation of federal statutes prohibiting deceptive marketing and unwanted telephone sales calls," (*Id*. at 1) and that "schools sometimes expressed concern that the reps not violate the FTC's Do Not Call Rules," (*Id*. at 4).   Neither Raymond Fitzgerald

nor David Cumming asked Chad Tatton to investigate any of the allegations in the article. (PX300 at 249:9-23).

89.    Raymond testified that he was personally familiar with the National Do Not Call Registry even before his involvement with any of the Defendants.    (PX308 at 26:9-16; PX521 at Resp. No. 19 (admitting knowledge of the existence of the DNC Registry prior to March 22, 2014)).    During his involvement with Defendants, he was also familiar with the Telemarketing Sales Rule and the requirement that a telemarketer obtain consent before calling a consumer whose number is listed on the Registry.    Raymond testified that "I do complex commercial litigation, and when I do, depending on the area, I become more knowledgeable about an area than everybody else in the case."    (PX308 at 172:17-21).    He testified he had knowledge of telemarketing or telecommunications law before the FTC filed this lawsuit by virtue of representing Defendants in "a few cases that were brought against EduTrek . . . one case that was brought against EduTrek and Day Pacer," and "several threats of cases, all of which involved telecommunications law."    (PX308 at 19:6-20:13).    Raymond testified that "some or all" of these cases involved allegations relating to the Do Not Call Registry.    (PX308 at 19:24-21:19).

90.    Many of the contracts Raymond reviewed for "for legal purposes," (PX302 at 229:11-13), including those EduTrek entered as early as 2011, referenced the TSR, (PX308 at 25:13-26:8)).    Corporate email produced by Defendants (*e.g.*, PX6 at 1) reflects that, no later than the fourth quarter of 2014, EduTrek's president Chad Tatton and Mr. Fitzgerald collaborated to revise Edutrek's existing agreement that required the company's IBT Partners to "comply with . . . the Federal Trade Commission's Telemarketing Sales Rule" and prohibited them from "call[ing] any individuals whose numbers appear on a federal or state Do Not Call

("DNC") list, unless it meets a valid exemption." (PX7 at 2 (1/1/2014 Agreement with Bluewater LLC also referencing compliance with the TCPA); PX308 at 130:24-147:9). The revised agreement included the same language as the original but renumbered and reformatted the provision. (PX10 at 2). Mr. Fitzgerald testified that he "would have given comments about the language" in agreements, that "my tendency is to read entire documents," (PX308 at 145:20-146:15), and that "I'm the type who would probably review it all." (PX308 at 135:13-136:2).

91. Nate Clegg, the CEO of EduTrek and later Day Pacer testified that he would go to Raymond Fitzgerald if a consumer complained that either company had violated the TCPA. (PX309 at 84:24-85:5). Defendants also have been sued repeatedly for calling consumers on the DNC Registry, and actively resisted an investigation by the State of Utah into violations of its TSR analog. (PX555 at 1). Raymond represented EduTrek in these lawsuits and consulted with the company regarding such lawsuits. (PX302 at 229:17-19; 230:3-231:2). For example, a plaintiff named Kathleen Brown sued Defendants in July 2015, alleging that EduTrek had called her repeatedly despite her number being listed on the National Do No Call Registry. (PX26 at pp.4-5, ¶¶ 9-10). Ms. Brown alleged that she had no existing business relationship with EduTrek and that the company called without her consent. (*Id*. ¶¶ 7, 14). On Sunday, July 26, 2015, Defendant Raymond Fitzgerald emailed the other Defendants acknowledging that EduTrek had been served on July 23, 2015. (PX27 at 1). He further indicated that EduTrek's president Chad Tatton was "trying to ascertain whether Brown consented to the calls." *Id.* Tatton responded the next day that he was waiting on a response from the lead generator that had sent EduTrek Ms. Brown's contact information. *Id.* A month later, on August 20, 2015, Tatton

forwarded an email to Raymond Fitzgerald showing EduTrek's receipt of Ms. Brown as a lead, but stating, "I'm still working on getting something indicating that the opt-in box was checked. The problem is that it just doesn't exist."   (PX31 at 1).   Tatton testified that Raymond Fitzgerald had represented EduTrek in the lawsuit by Brown (PX300 at 204:17-22), and that he normally brought lawsuits to the attention of both Raymond Fitzgerald and David Cumming. (PX300 at 202:14-24).   Raymond Fitzgerald also testified that he was consulted regarding lawsuits filed against EduTrek, and that David was also consulted about lawsuits for "[l]egal thinking input."   (PX302 at 229:17-230:2).

92.     Raymond Fitzgerald also represented EduTrek in a suit filed by a plaintiff named Alan, which was filed October 13, 2016, and alleged that Defendants had repeatedly called a consumer on the DNC Registry.   (PX553 at ¶¶ 1, 17, D428, D430).   Raymond was aware that the lawsuit alleged TCPA violations and understood it involved allegations that EduTrek was calling consumers on the DNC Registry.   He discussed the suit in detail with David Cumming. (PX302 at 230:3-231:2).

## G.     TRANSITION FROM EDUTREK TO DAY PACER

93.     Day Pacer and EduTrek have shared the same offices in Sandy, Utah at 1333 E 9400 S, Sandy, Utah 84093, (PX309 at 32:6-33:18; PX304 at 81:14-18), a building owned by Raymond Fitzgerald and David Cumming through their Utah company, Thorpe/Sandy LLC. (PX70; PX142; PX143 at 1, 12, 14; PX302 at 29:23-30:9; PX306 at 89:12-90:16.   *See also* PX109 at Resp. No. 1; PX522 at Resp. No. 1 (stating that Day Pacer and EduTrek have operated from 498 N. Kays Drive, Kaysville, UT 84037)).   Defendants continued to operate uninterrupted in this same Sandy, Utah location after changing their name from EduTrek to College Criteria,

and from College Criteria to Day Pacer.   (PX309 at 56:9-20).

94.     Nate Clegg, the CEO of EduTrek who remained CEO of College Criteria, and

after it was renamed, Day Pacer, (PX309 at 49:23-50:2), approved a message to EduTrek's

employees telling them that "[o]ur corporate name is changing from Edutrek LLC to College

Criteria LLC," but "[f]or you[r] day to day life and job functions this change will not matter one

bit.   Still do everything the exact way you have been doing so.   It just means that twice per

month your check will have a different name on it."   (PX211; PX309 at 55:24-56:5; PX51

(EduTrek notifying its CSAs after Day Pacer was formed that there was a "new name change"

for the company and that they were now working for Day Pacer ("College Criteria") and should

use the d/b/a "Our School Search" on calls with consumers)).

95.     Defendants admit that all or nearly all of the employees of Day Pacer after it

formed were also employed by EduTrek; and these employees had the same job responsibilities

at both companies.   (PX521 at Resp. No. 5; PX48 at 9-11 (employee list for employees that

worked for both EduTrek and Day Pacer); PX211; PX301 at 69:10-17 (listing employees with

the title "manager" or "director" that worked for both EduTrek and Day Pacer), 108:25-109:5

(accurate to say that "there were a lot of employees that were one moment working for EduTrek

and then the next moment they're working for Day Pacer"); PX309 at 55:24-56:5).   EduTrek

and Day Pacer also shared employee policies.   (PX117 (cover email for PX118); PX118 at 1

(EduTrek employee compensation policy that was also used for Day Pacer employees—"This

should be the most current one for current employees.")).

96.     Day Pacer employees continued to use "edutrek.com" email addresses well after

Day Pacer was formed in the fall of 2015.   (*See, e.g.*, PX58 at 5-6; PX72; PX73; PX175 at 1;

PX556 at 1).

97.     Day Pacer took over the EduTrek name as a d/b/a; told its clients that the change from EduTrek to Day Pacer was merely a "rebranding"; and downplayed the change from EduTrek to Day Pacer to their vendors, reassuring them it would be "business as usual."   (PX55 (proposed email to customers and vendors notifying them of "name change" from EduTrek to College Criteria LLC); PX56 at 3-4 (email to React2Media notifying company of rebranding); PX115 (College Criteria LLC acquiring EduTrek as a d/b/a); PX116 at 3 (AdBrilliant remains Day Pacer client); PX515 at 1 (rebranding email sent to Keypath); PX309 at 74:10-75:6 (downplaying change and saying it would be "business as usual").   *See also* PX535 (Ian Fitzgerald telling a potential Day Pacer data partner—a former EduTrek data partner— that "[y]ou may be more familiar with our former name of EduTrek"); PX184 at 2 (March 2019 draft questionnaire to EducationDynamics filled out by Emma Furman stating that "We [Day Pacer] have been selling leads since 2008"; responding "Yes" to the question "Have you worked under any other business names?"; and further stating: "EduTrek, EdSoup – However, both of these businesses were completely dissolved and shut down.   DayPacer is a 'successor company' and an entirely new entity, with a completely different equity structure and very different senior management and values.   The entity DayPacer has never operated under a different business name."); PX183 (cover email for PX184, with Ian sending PX184 to Raymond and Emma asking for feedback on answering the question about previous business names); PX186 (cover email for PX187, sending new version of questionnaire to EducationDynamics); PX187 (changed to state that Day Pacer has been selling leads only since 2015)).

98.     Day Pacer and EduTrek continued serving the same clients, using the same lead

generators and vendors; shared the same computer and telephone systems; and continued using the Individual Defendants' company Call Criteria to provide compliance monitoring.   (PX54 at 2 (Veracity Networks account statement requesting name change on account from EduTrek to Day Pacer on 6/13/2016); PX116 at 3 (AdBrilliant remains client); DX30 at ¶ 8 ("Roy" database contained call records from January 25, 2010 through September 11, 2016, nearly a year after EduTrek purportedly ceased doing business); PX301 at 109:6-10 (same accounts with vendors); PX309 at 57:6-14, 58:20-59:3 (same clients, using the same lead generators); PX309 at 58:8-12, 59:4-6 (continued using Call Criteria)).   Some clients continued to send invoices to Day Pacer in EduTrek's name after EduTrek's supposed dissolution.   (PX551 at 3, 9-11 (EduTrek invoices sent to Day Pacer in 2016)).

99.     Day Pacer took over the financial accounts of EduTrek.   (PX52 (cover email for PX53 and noting that accounts are being brought over from Day Pacer); PX53 at 1 (A/R line items for EduTrek); PX81 at 1 (Day Pacer financials "Balance Sheet" showing EduTrek bank and credit card accounts); PX301 at 111:11-19, 113:5-17, 237:10-21; PX516 at 8-12 (Assignment and Assumption Agreement transferring all of EduTrek's assets to College Criteria LLC (Day Pacer))).

100.     Although Defendants claimed to some that they were changing their name to Day Pacer to facilitate marketing in other industries, or "verticals," (PX212 at 1), the first name of the company was "College Criteria LLC."   (*See, e.g.*, PX309 at 58:20-24 (College Criteria changed its name to Day Pacer and kept the same clients)).   Day Pacer's CEO estimated that only 2-5% of Day Pacer's business was ever outside of education.   (PX309 at 64:13-65:8; 68:7-16). However, Defendants changed EduTrek's name because their business practices had attracted

bad publicity, which had caused the company to lose business.   (PX309 at 68:24-70:17; PX36

(article in Huffington Post); PX50 at 1-2 (BBB complaint filed against EduTrek; Raymond

Fitzgerald says that Day Pacer will respond, "but who cares EduTrek is already daed [sic]")).

To avoid further scrutiny and loss of business, Defendants decided it would be "prudent to start

fresh with a new name."   (PX212 at 1; PX515 at 1).   EduTrek changed its name before it

informed its clients.   (PX306 at 71:16-72:7).

    101.    Having changed the company name, Defendants then used the fact to defend

against private lawsuits and inquiries from government regulators that inquired into similar

issues.   Cumming responded to a consumer's claim that EduTrek had called repeatedly without

permission by claiming, for example, with respect to the fictitious business names "Our School

Search" and "College Advisor" used by the telemarketer that "[n]either of these names has been

used by EduTrek and neither has any authority to make representations on behalf of EduTrek."

In reality, the names belonged to Day Pacer and Defendants' IBT Partner.   (PX162 at 2; PX50 at

1-2; PX554 at 2-3 (consumer called by IBT Partner Bluewater and transferred to Day Pacer)).

## H.    ALLIED CONTACT MANAGEMENT AND ENTROPY LEADS

    102.    Allied Contact Management LLC and Entropy Leads LLC were created after the

filing of the Complaint to conduct telemarketing operations using Day Pacer employees.   (R.

153 at 6 (Raymond is "deemed to have formed Entropy Leads LLC for the purpose of continuing

the business practices of Day Pacer after the government filed this lawsuit."); R. 140-9 at 2

(Allied Contact Management was organized on April 4, 2019—less than two weeks after the

filing of the Complaint—for the purpose of "manag[ing] other businesses in the contact

business"), 5 (Entropy Leads was organized on June 18, 2019, for the purpose of "[s]elling

leads"), 17 (Day Pacer's Director of Client Service Emma Furman writes to Inquir, the lead purchaser: "[w]e do, however, have 2 other groups of agents through Allied that fill leads for all of our other Day Pacer campaigns"); PX307 at 74:1-6, 75:2-76:7 (Allied "manag[ed] call center agents" for education lead generation campaigns); PX526 at Resp. No. 7 (admitting that there was a period when the company had "communications directly or indirectly with consumers"); PX540 at 1 (informing Day Pacer CSAs they will now have acmagent.com email addresses); PX541 ("[W]e will be branding a new company name. . .Ian took about 35 seconds to come up with 'Allied Contact Management' for the new name.")).

103.    When the FTC submitted discovery requests for "[d]ocuments sufficient to identify any entity in which you had any ownership… that was paid for calling consumers, called consumers to sell products, or was paid for providing the information of consumers who might be interested in a good or service" Defendants Raymond Fitzgerald and Ian Fitzgerald initially responded that there were no such documents.    (PX528 at Resp. No. 11; PX529 at Resp. No. 11).    The FTC independently discovered the existence of Allied Contact Management LLC and Entropy Leads LLC, and sent a deficiency letter to Defendants.    (R. 140-4 at 3).    Only after receiving the deficiency letter did Defendants admit that they should have included the documents for at least Allied Contact Management.    (R. 144-1 at ¶ 20).    The Court entered an adverse finding against Defendant Raymond Fitzgerald that he "is deemed to have formed Entropy for the purpose of continuing the business practices of Day Pacer after the government filed this lawsuit."    (R. 153 at 6).

104.    Allied Contact Management LLC and Entropy Leads LLC both failed to produce any phone records in response to the FTC's subpoenas, nor did they produce any evidence that

they scrubbed telephone numbers against the DNC Registry, or that consumers provided their authorization to receive calls, made inquiries or applications regarding educational programs, or initiated phone calls in response to an advertisement. (PX526 at Resp. No. 9-12, 19, 20; PX527 at Resp. No. 9-12, 19, 20).

## I.   MISCELLANEOUS

105.    The FTC has complied with 15 U.S.C. § 6155(b), a requirement in the Telemarketing Act for the FTC to "periodically check telephone numbers" on the National DNC Registry and remove those that have been disconnected and reassigned. (PX401 ¶ 4; PX402 at ¶ 6.b).

106.    The only evidence that Defendants claim constitutes proof of any established business relationship ("EBR") and express written authorization ("EWA") affirmative defense are their call records, which they claim identify URLs—or website locations—where the consumers entered their phone numbers. (PX302 at 204:25-205:7; PX304 at 269:13-270:19; PX521 at Resp. No. 9 (not the regular business practice of EduTrek or Day Pacer to preserve screenshots of websites)).

107.    FTC economist Dr. Kenneth Kelly created a statistically valid random sample of EduTrek and Day Pacer's call records that contained 750 records that was then reviewed by FTC paralegal Laura Alan to see if the URL records contained therin were complete and that the URLs linked to websites that indicated evidence of EBR or EWR. (DX7 at ¶¶ 2-10; DX30 at ¶ 35; DX99 at ¶¶ 5-7).

108.    Ms. Alan's review indicated that in nearly all cases, the URL records:   were blank, contained text that was not a web page, or did not point to an active web page, and even

when they did point to an active web page, did not contain any language about telephone calls. (DX7 at ¶ 10 & Table).

109.     Based on Ms. Alan's review, Dr. Kelly concluded that none of the 750 call records identified a URL containing language regarding telephone calls to consumers that included language indicating that calls would be coming from Defendants.   (DX99 at ¶¶ 7, 8.a). 98.7% of the records in the sample either had a URL field that was blank, contained text that was not a valid URL, didn't link to an active webpage, or linked to a web page that did not include language regarding telephone calls to consumers.   (DX99 at ¶ 8.b).   The sample mean for the 750 call record sample for records linked to a URL containing language regarding telephone calls to consumers that included language that calls would be coming from the defendants is 0%, with a 95% confidence interval of 0.00% to 0.49%.   (DX99 at ¶¶ 4 (explaining sample mean and confidence interval), 9, & Table T.1).

110.     On March 8, 2019, pursuant to the provisions of Section 16(a)(1) of the FTC Act, 15 U.S.C. § 56(a)(1), the FTC gave written notice to the Attorney General of its intention to commence an action against Defendants for civil penalties under Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), for violations of the TSR.   (PX581 at 1).   On March 13, 2019, the Acting Director of the Consumer Protection Branch of the Department of Justice responded that it did not intend to commence or intervene in the action and that the FTC could commence the action in its own name.   (PX582).

111.     On January 3, 2021, Day Pacer Defendants sent their Third Supplemental MIDPP Disclosures to the FTC, which includes information about the affirmative defenses they pled in their Amended Answer (R. 33).   (PX594).

Dated: August 2, 2021

*/s/ Adam M. Wesolowski*

Adam M. Wesolowski
Patrick Roy
Mark L. Glassman
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, D.C. 20580
(202) 326-3020 [telephone]
(202) 326-3768 [facsimile]
awesolowski@ftc.gov [e-mail]
Attorney for Plaintiff
FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2021, I filed Plaintiff's Statement of Material Facts as

to Which There Is No Genuine Issue via ECF, through which the documents are being served to

all other parties, directly or through counsel, at the foregoing email addresses via ECF:

Raymond Fitzgerald
rfitzgerald@bffmlaw.com
*Attorney for Day Pacer LLC, EduTrek, L.L.C., Raymond Fitzgerald, and Ian Fitzgerald*


David Cumming
dcomyn@gmail.com
*Pro se*

/s/ Adam M. Wesolowski
Adam M. Wesolowski
Federal Trade Commission
600 Pennsylvania Avenue, NW
Mail Stop CC-10232
Washington, D.C. 20580
(202) 326-3020 [telephone]
(202) 326-3768 [facsimile]
awesolowski@ftc.gov [e-mail]
Attorney for Plaintiff
FEDERAL TRADE COMMISSION
