## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 1:19-cv-01984 |
| Plaintiff, | |
| | Judge: Edmond E. Chang |
| v. | |
| | Magistrate Judge: Young B. Kim |
| DAY PACER LLC, et al. | |
| Defendants. | |

**AMENDED RESPONSE OF DEFENDANTS EUTREK L.L.C., DAY PACER LLC, RAYMOND FITZGERALD AND IAN FITZGERALD TO PLAINTIFF FEDERAL TRADE COMMISSION'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendants EduTrek L.L.C., Day Pacer LLC, Raymond Fitzgerald and Ian Fitzgerald

("Defendnats") respond to Plaintiff Federal Trade Commission ("FTC" or

"Commission") Statement of Material Facts as to Which There Is No

Genuine Issue ("Plaintiff's Statement of Material Facts" or "PSMF").[1]

## A. OBJECTIONS

Defendants object to Plaintiff's Statement of Material Facts because the plaintiff did not

comply with the Court's May 27, 2021 order ("Order") concerning the length of its 56.1

---

[1] The exhibits cited in this PSMF are numbered and described in the Declaration of Elena Hoffman, included as PX404.

1

statement (R. 210) or with Local Rule 56.1(d) that requires 56.1 statements to be concise. This Court's Order increased the normal 80 paragraph limitation of 56.1 statements to 120 paragraphs. The Order, however, did not give the FTC permission to set forth as many facts as possible and group them into multi-sentence, multi-facts paragraphs of up to 23 lines. In any event, the Plaintiff's Statement of Material Facts is anything but concise.

Plaintiff's Statement of Material Facts cosmetically complies with this Court's Order by numbering the paragraphs of its 56.1 statement from 1 through 111, but those 111 paragraphs, the vast majority of which are multi-sentence, multi-fact paragraphs, contain well in excess of 120 paragraphs of purported facts that the Defendants and Defendant Cumming had to address. Superficial compliance is not substantive compliance. The general practice is that paragraphs in 56.1 statements be one sentence addressed to one fact. The FTC did not do that. Instead, it's 48-page 56.1 statement has up to 18 facts in multiple sentences in up to 23 lines in each paragraph.

Plaintiff's Statement of Material Facts did not make any effort to even cosmetically comply with Local Rule 56.1(d) that the statements of material facts be concise. The vast majority of the FTC's 56.1 statement paragraphs are not concise and not limited to one material fact statement. They range from three lines to twenty-three lines. They range from the innocuous such as paragraph 1 that contains at least three different issues of material fact (as well as unnecessary quotes from cited evidence that have to be addressed) to the more important such as paragraph 15 that contains at least six different issues of material fact, paragraph 54 that contains at least five different issues of material fact (as well as out of context partial quotes from several different exhibits that need to be addressed), paragraph 56 that contains at least six

different issues of material fact and paragraph 91 that contains at least eighteen different issues of material fact. If the FTC had complied with the normal and required practice of one material fact to a paragraph, the Defendants calculate that Plaintiff's Statement of Material Facts would well in excess of 120 paragraphs long. That is sufficient ground for this Court to deny plaintiff's motion for summary judgment.

In addition, plaintiff has, unnecessarily, made it more difficult and vastly more time consuming to respond to, and for this Court to consider, plaintiff's motion for summary judgment. Plaintiff has submitted two hundred twenty-one exhibits comprised of 2067 pages. The number of exhibits and the length of the exhibits is not the problem. The problem is the arrangement of the exhibits. The FTC has not submitted segregated individual exhibits. The FTC has grouped the exhibits into eight "Volumes" which are comprised of 52 exhibits – 304 pages (Volume 1), 13 exhibits – 127 pages (Volume 2), 1 exhibit – 20 pages (Volume 3), 37 exhibits – 226 pages (Volume 4), 8 exhibits – 252 pages (Volume 5), 11 exhibits – 228 pages (Volume 6), 46 exhibits – 356 pages (Volume 7) and 52 exhibits – 388 pages (Volume 8). Inside each volume the exhibits are presented as one document that at various pages reflects an exhibit number. If, for example, the Court wants to access PX 100, it cannot go to PX 100, the Court first has to determine in which volume PX 100 is located (Volume 1) and then scroll through forty-seven exhibits, comprised of more than a couple of hundred pages, to locate PX100 every time the Court wants to access it. That has proven to be extremely time consuming for Defendants, and Defendants expect it will be equally time consuming for the Court, especially in light of plaintiff's non-compliance with the 56.1 limitations. Again, that is sufficient ground to deny plaintiff's motion for summary judgment.

3

The FTC also has intentionally conflated all of the Defendants when the FTC knows that certain statements do not apply to all Defendants. The FTC further has failed to specify, and has conflated, time periods in its statements that may render such statements untrue, irrelevant or inadmissible. To the extent it refers to matters outside the scope of the applicable statute of limitations, any statement by plaintiff is objected to and barred. Defendants object to, and dispute, all statements on these grounds ("Conflation Objections").

## B. BACKGROUND

1. Corporate Defendant Day Pacer LLC ("Day Pacer"), previously known as College Criteria LLC, also d/b/a EduTrek, EdSoup, Our School Search, College Info, and Degree Spots, is a Utah limited liability company with its principal place of business at 1333 East 9400 South, Second Floor, Sandy, Utah 84093. At one point, EduTrek also operated from 498 N. Kays Drive, Kaysville, Utah 84037. Day Pacer transacts or has transacted business in this district and throughout the United States. (R. 1 (FTC Complaint) ¶ 6; R. 33 (Amended Answer of Day Pacer Defendants[2]) ¶ 6 (admitting that College Criteria LLC was the former name of Day Pacer, that Day Pacer "has used various d/b/as; and that its principal place of business is at 1333 East 9400 South, Second Floor, Sandy, Utah 84093"); R. 81-1 (Amended Answer of Defendant David Cumming) ¶ 7 (admiting "that Day Pacer LLC's name prior to it being changed was College Criteria LLC; that it has used the names EduTrek, as d/b/as; and that its principal place of business is at 1333 East 9400 South, Second Floor, Sandy, Utah 84093"); PX112 at 1; PX113; PX115 at 1-2; PX116 at 1 (Our School Search, College Info, and Degree Spots are all Day Pacer

---

[2] The Day Pacer Defendants are Day Pacer, EduTrek, Raymond Fitzgerald, and Ian Fitzgerald.

d/b/as); PX60; DX30 at ¶¶ 19-23, Tables T.3 & T.4, & App'x B (listing calls to Illinois area codes); PX522 at Resp. No. 1 (business locations)).

### RESPONSE TO STATEMENT #1

Defendants do not dispute the first sentence except they dispute that Day Pacer is a corporation. Plaintiff's statement shows that it is a limited liability company which it, and its members, have different rights and obligations than a corporation.

Day Pacer's principal place of business formerly was 1333 East 9400 South Sandy Utah.

Defendants do not dispute the second sentence.

Defendants do not dispute Day Pacer transacted business within the Northern District of Illinois and through some, but not all, other districts in the United States.

2.      Corporate Defendant EduTrek L.L.C. ("EduTrek") also d/b/a EdSoup, is a dissolved Utah limited liability company with its principal place of business at 1333 East 9400 South, Second Floor, Sandy, Utah 84093.   At one point, EduTrek also operated from 498 N. Kays Drive, Kaysville, Utah 84037.   EduTrek transacts or has transacted business in this district and throughout the United States.   (R. 1 ¶ 7; R. 33 ¶ 7 (admitting EduTrek is a dissolved Utah limited liability company); R. 81-1 ¶ 8 (same); PX87 at 1-2 (EduTrek formed in April 2010); PX133 (EdSoup d/b/a Application); PX572 at 1 (EduTrek administrative dissolution on March 31, 2016); PX301 at 76:17-21 (EduTrek spoke with consumers nationwide); DX30 at ¶¶ 19-23, Tables T.3 & T.4, & App'x B (listing calls to Illinois area codes); PX109 at Resp. No. 1 (business locations)).

### RESPONSE TO STATEMENT #2

First sentence:   Defendants dispute that EduTrek was a corporation. Defendants dispute

that EduTrek currently has any place of business because it is out of business and dissolved, but does not dispute that, at one time, EduTrek had its principal place of business at that address in Sandy, Utah. 4DX5

Second sentence: Do not dispute.

Third sentence: Defendants do not dispute EduTrek transacted business within the Northern District of Illinois and in some, but not all, other districts in the United States.

    3.     Individual Defendant Raymond Fitzgerald ("Raymond") owns a primary interest in EduTrek and Day Pacer directly and through his company, The Dalsnan Family LLC ("Dalsnan"). Raymond transacts or has transacted business in this district and throughout the United States. (R. 1 ¶ 9; PX114 at 33, 35 (College Criteria LLC Operating Agreement); PX125; PX126 at 6-12 (attachment to PX125); PX2 at 7, 15, 33-35 (EduTrek LLC Operating Agreement); PX189 at 10, 31-33 (The Dalsnan Family LLC Operating Agreement); PX574 at Resp. No. 2).

**RESPONSE TO STATEMENT #3**

First Sentence: Defendants dispute that Raymond Fitzgerald owned an interest in EduTrek or Day Pacer but do not dispute that The Dalsnan Family LLC owned an interest in EduTrek and owns an interest in Day Pacer.

Second sentence: Defendants do not dispute Raymond Fitzgerald transacted business within the Northern District of Illinois and in some, but not all, other districts in the United States.

    4.     Raymond is a managing member, manager, and registered agent of EduTrek and Day Pacer. (R. 1 ¶ 9; PX87 at 1-2; PX112 at 1-2; PX113; PX114 at 7-9, 33, 35; PX115 at 1-2;

6

PX2 at 7, 15, 33-35; PX574 at Resp. No. 1).

**RESPONSE TO STATEMENT #4**

First sentence, first half: Defendants dispute that Raymond Fitzgerald is a managing member, manager and registered agent of EduTrek but does not dispute that he formerly was a managing member, and registered agent of EduTrek. 4DX5

First sentence, second half: Defendants dispute that Raymond Fitzgerald is a managing member or manager of Day Pacer but does not dispute that he is the registered agent of Day Pacer. 4DX5

5.      Individual Defendant Ian Fitzgerald ("Ian") has been the President of Day Pacer since approximately June 2016 and owns a substantial interest in Day Pacer, individually and through his company, Crystal Peak I LLC.   (R. 1 ¶ 10; R. 33 ¶ 10 (admitting Ian is the President of Day Pacer and that Crystal Peak I owns an interest in Day Pacer); PX114 at 33, 35; PX116 at 3-4; PX119 at 2; PX125; PX126 at 6, 17-18 (attachment to PX125); PX304 at 94:22-24; PX307 at 82:2-15, 97:4-11; PX573 at Resp. No. 1-2).   As President his responsibilities include, *inter alia*, identifying business opportunities and responding to compliance issues.   (PX307 at 98:14-99:7; PX573 at Resp. No. 8).

**RESPONSE TO STATEMENT #5**

First sentence:   Defendants do not dispute the first sentence except that Ian Fitzgerald does not own any interest in Day Pacer and the interest of Crystal Peak I LLC is not substantial and is less than 10%. 4DX5

Second sentence:   Defendants do not dispute the second sentence.

6.      Ian was employed by EduTrek since at least December 2010 and told vendors

7

that: "I have been involved in the company [EduTrek/Day Pacer] since 2009 while working for the investment group that owns it." (PX48 at 9; PX116 at 3-4; PX573 at Resp. No. 1).

### RESPONSE TO STATEMENT #6

Defendants do not dispute statement 6.

7.     Individual Defendant David Cumming ("David" or "Cumming") owns a substantial interest in EduTrek and Day Pacer. (R. 1 ¶ 11; R. 81-1 ¶ 12 (admitting owning an interest in EduTrek and Day Pacer); PX2 at 35; PX114 at 35; PX125; PX126 at 13-14 (attachment to PX125); PX306 at 22:5-11, 120:23-121:4, 131:19-21, 156:23-157:2).

### RESPONSE TO STATEMENT #7

Defendants do not dispute that David Cumming owned an interest in EduTrek and owns an interest in Day Pacer but disputes that either of which was, or is, substantial. 4DX5

8.     Cumming is a corporate manager of EduTrek and Day Pacer. (R. 1 ¶ 11; R. 81-1 ¶ 12 (admitting being identified as a manager in EduTrek and Day Pacer's corporate filings); PX2 at 7, 33; PX87 at 2; PX112 at 2; PX113; PX114 at 7-9, 33, 35; PX306 at 38:18-20, 65:24-66:3, 128:21-129:3).

### RESPONSE TO STATEMENT #8

Defendants dispute that David Cumming was a corporate manager of either EduTrek or Day Pacer but do not dispute that he was a managing member of both. 4DX5

9.     At all times material to the FTC's Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44. (R. 1 ¶ 13; R. 33 ¶ 13; R. 81-1 ¶ 14; DX30 at ¶ 22 & App'x B (listing calls to all states)).

**RESPONSE TO STATEMENT #9**

Defendants do not dispute statement 9.

### C.    EVIDENTIARY MATTERS

10.    The emails produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).  (PX521 at Resp. No. 1 (admitting that "overwhelming majority" of the emails produced are business records); PX309 at 49:23-52:3; 61:14-62:9; PX307 at 49:21-50:23).

**RESPONSE TO STATEMENT #10**

Defendants dispute statement 10.   PX521 Response to Request #1 in its entirety.

11.    The call records produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).  (PX521 at Resp. No. 2).

**RESPONSE TO STATEMENT #11**

Defendants do not dispute that the call database records produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6) and otherwise dispute statement 11.   PX521 Response to Request #2.

12.    The QuickBooks financial reports produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).  (PX521 at Resp. No. 3).

**RESPONSE TO STATEMENT #12**

Defendants do not dispute statement 12.

13.    The call recordings produced to the FTC by Defendants are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).  (PX521 at Resp. No. 4).

**RESPONSE TO STATEMENT #13**

9

Defendants do not dispute statement 13.

14.     The documents produced to the FTC by recipients of Civil Investigative Demands ("CIDs") are records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).   (PX576; PX577; PX578).

### RESPONSE TO STATEMENT #14

Defendants do not dispute that certain documents produced by Veracity Networks LLC, Zions Bank, and Zions First National Bank are records of regularly conducted activity and otherwise dispute statement 14.

### D.  OUTBOUND CALLS

15.     Defendants operated a 100-200 seat call center from which they employed agents called "College Search Advisors" ("CSAs") who communicated with consumers by phone. (PX309 at 33:6-34:17; PX301 at 31:5-11, 42:3-4, 50:5-6).   Defendants purchased leads that included the consumers' phone numbers from websites and then called them.   (PX309 at 36:13-17, 37:9-14; PX304 at 90:14-23).   The specific technology Defendants used to make these outbound calls entailed providing the phone numbers they had purchased to a dialing vendor. (PX309 at 34:18-35:5, 38:3-12, 39:7-12).   The vendor then dialed the consumers' phone numbers for Defendants and connected consumers directly to Defendants' agents; no intervening company or agent spoke with consumers between when they answered their phones and when Defendants' agents came on the line.   (PX309 at 35:22-36:4).

### RESPONSE TO STATEMENT #15

First sentence: Subject to the Conflation Objections, Defendants do not dispute the first sentence of statement 15 except do dispute the words "communicated with consumers by phone"

10

and dispute that the individual defendants operated a call center. 4DX3¶32. (PX309 at 33:6-34:17; PX301 at 31:5-11, 42:3-4, 50:5-6).

Second sentence: Subject to the Conflation Objections, do not dispute except dispute that the individual defendants purchased leads made outbound calls. (PX309 at 36:13-17, 37:9-14; PX304 at 90:14-23).

Third sentence: Subject to the Conflation Objections, do not dispute except dispute that the individual defendants made outbound calls. (PX309 at 34:18-35:5, 38:3-12, 39:7-12).

Fourth sentence: Subject to the Conflation Objections, do not dispute.

16.    Defendants identified the purpose of their businesses in their corporate filings as "educational marketing services" or "educational services."  (PX87 at 1); PX112 at 1 (College Criteria/Day Pacer 9/25/15 Certificate of Organization); PX113 (name change of College Criteria LLC to Day Pacer LLC)).  They also stated on their tax returns that their principal business activity was "EDU. MKTING SERVICES" and "MARKETING SERVICES." (PX125 (cover email for PX126); PX126 at 1 (attachment to PX125); PX138 at 7).

**RESPONSE TO STATEMENT #16**

First sentence: Subject to the Conflation Objections, do not dispute except dispute that the individual defendants had corporate filings. (PX87 at 1 (EduTrek 4/20/10 Articles of Organization); PX112 at 1 (College Criteria/Day Pacer 9/25/15 Certificate of Organization); PX113 (name change of College Criteria LLC to Day Pacer LLC)).

Second sentence: Subject to the Conflation Objections, do not dispute as to the LLC Defendants but do dispute as to the individual defendants.  (PX125 (cover email for PX126); PX126 at 1 (attachment to PX125); PX138 at 7).

11

17.    Defendants' contracts with schools, lead purchasers, and telemarketing partners

("IBT Partners") describe Defendants' business as providing marketing services to generate

"qualified leads" for schools—people eligible for enrollment at those schools.    (PX89 at 1, 3-4,

24 (contract between EduTrek and lead purchaser PlattForm operating on behalf of Education

Management LLC ("EDMC") where EduTrek is "in the business of providing marketing and

advertising services," also defining "qualified lead"); PX548 at 1 (contract between Day Pacer

and lead purchaser Edufficient operating on behalf of Zenith Education Group that "Pursuant to

the above, Media Company [Day Pacer] may also offer to Client [Zenith Education Group] other

marketing tactics which may require the use of previously gathered list of prospects and their

contact information (a "List") (e.g. E-mail and telemarketing campaigns)."); PX520 at 1

(contract with IBT Partner Anupam)).

**RESPONSE TO STATEMENT #17**

Subject to the Conflation Objections, do not dispute except dispute that the individual

defendants had any of the contracts referred to in statement 17. (PX89 at 1, 3-4, 24 (contract

between EduTrek and lead purchaser PlattForm operating on behalf of Education Management

LLC ("EDMC") where EduTrek is "in the business of providing marketing and advertising

services," also defining "qualified lead"); PX548 at 1 (contract between Day Pacer and lead

purchaser Edufficient operating on behalf of Zenith Education Group that "Pursuant to the

above, Media Company [Day Pacer] may also offer to Client [Zenith Education Group] other

marketing tactics which may require the use of previously gathered list of prospects and their

contact information (a "List") (e.g. E-mail and telemarketing campaigns)."); PX520 at 1 (contract with IBT Partner Anupam)).

18.     The goal of Defendants' business, like all consumer lead generation businesses, was to result in an eventual sale—here, a sale of post-secondary education (referred to by Defendants as a "conversion") that was considered by Defendants to be an important business metric, and was tracked by the schools, which set goals for Defendants.   (PX301 at 30:5-12 (end goal of lead generation is to result in a sale), 175:3-14 (lead purchasers want "most bang for buck" and looking for "where they can source leads from places that would give them the most return on their investment"); PX300 at 52:13-53:12 (explaining why it was important that a certain percentage of consumers contacted would enroll), 45:18-24 ("EduTrek was in the business of helping prospective college students obtain information from colleges about college programs that they were looking to – to enroll in.   So EduTrek's business model was one where the colleges would pay EduTrek money for – for those inquiries – that were produced by EduTrek."), 67:14-19 (school hired EduTrek so that it could find students to enroll); PX64 at 1-4 (Defendants tracking "conversions" for Double Positive and noting on page 4 that "we won't be at their goals for conversions"); PX309 at 25:21-26:3-4 ("[C]lients would pay us to generate interested prospects."); PX184 at 3 (questionnaire from potential lead purchaser EducationDynamics to Day Pacer asking "What kind of enrollment data, feedback, et cetera, have you received?"); PX545 at 1-3 (lead purchaser sending performance goals based in part on enrollments)).   Defendants admit that the schools to whom they sold leads offered to provide education to consumers.   (PX521 at Resp. No. 6).

        **RESPONSE TO STATEMENT #18**

First sentence:   Subject to the Conflation Objections, defendants dispute this sentence. (PX301 at 30:5-12, 175:3-14; PX300 at 52:13-53:12, 45:18-24, 67:14-19; PX64 at 1-4 ; PX309 at 25:21-26:3-4; PX184 at 3; PX545 at 1-3. Defendants also object on hearsay and authentication grounds.

Second sentence: Subject to the Conflation Objections, Defendants do not dispute that the schools to whom the LLC Defendants sold leads offered to provide education to consumers except dispute that the individual defendants did not sell leads to anyone.   (PX521 at Resp. No. 6).

19.     Day Pacer stated on government documents that the company "solicits, promotes, or induces the sale of goods or services."   (PX60 (cover email for PX61); PX61 at 1).

**RESPONSE TO STATEMENT #19**

Defendants dispute that Day Pacer stated on government documents that the company "solicits, promotes, or induces the sale of goods or services." (PX60)

20.     In emails with their vendors and in job ads posted for CSA positions, Defendants have stated their business is operating a "call center" that makes calls "around the country." (PX579 at 1; PX580 at 1).   The CSA Job Description also indicates that:   "A College Search Advisor (CSA)'s job is to connect people interested in higher-education with colleges and universities that are actively looking to enrol [sic] students.   To do this, you will access our dialing system (Five9) on which you will receive a blend of outbound and inbound calls." (PX120 at 16).

**RESPONSE TO STATEMENT #20**

First sentence:   Subject to the Conflation Objections, Defendants object on hearsay and

14

authentication grounds and dispute that the individual defendants stated their business is operating a "call center" that makes calls "around the country." (PX579 at 1; PX580 at 1).

Second sentence: Defendants do not dispute.

21. Defendants and their employees admit that they spoke with consumers nationwide (PX60; PX301 at 76:17-21), that they did not assign calls to their CSAs based on the location of the consumer (PX301 at 77:8-10), and that they did not have any policies or procedures in place to prevent the calling of telephone numbers outside of Utah (PX301 at 77:21-24; PX300 at 64:25-65:3 ("Q. Did agents in Sandy, Utah, call center make calls outside of Utah? A. Yes."); PX302 at 143:13-19 ("Q. Were calls assigned at all based on the location of the employee or the consumer? A. Not that I'm aware of. Q. Did employees in the Utah call center exclusively call Utah residents? A. I doubt it."), 144:16-20 ("Q. Did EduTrek have any policies and procedures in place for ensuring that it didn't make interstate phone calls? A. No.")).

**RESPONSE TO STATEMENT #21**

Subject to the Conflation Objections, Defendants do not dispute except they dispute that the individual defendants spoke with consumers nationwide (PX60; PX301 at 76:17-21), that they did not assign calls to CSAs (PX301 at 77:8-10).

22. Defendants' call records indicate that they made more than one interstate telephone call in conducting their telemarketing business; the vast majority were interstate calls. Using the methodology of comparing the area codes of the telephone numbers they used to place calls with the area codes of the telephone numbers call indicates that Defendants placed 5,697,230 interstate calls between 2014 and June 12, 2019. Using the methodology of

identifying calls placed to telephone numbers with non-Utah area codes indicates that Defendants placed 17,637,108 interstate calls between 2014 and June 12, 2019, or 96.5% of all calls that they placed.   (DX30 at ¶¶ 19-23 & Tables T.3 & T.4).

**RESPONSE TO STATEMENT #22**

First sentence:   Subject to the Conflation Objections, Defendants dispute that the LLC Defendants call records indicate that they made more than one interstate telephone call in conducting their telemarketing business; the vast majority were interstate calls. See the call records to which the FTC makes reference.

Second sentence: Subject to the Conflation Objections, do not dispute.

Third sentence: Subject to the Conflation Objections, do not dispute.

23.    Defendants also utilized "local presence" telephone numbers so that its outbound telephone calls to consumers would appear to come from the same locality, and consumers would be more likely to answer the calls.   (PX58 at 5-6; PX301 at 146:18-147:10; PX302 at 178:4-24).

**RESPONSE TO STATEMENT #23**

Subject to Conflation Objections, do not dispute.

24.    Defendants make phone calls to consumers who have submitted their contact information on websites that claim to help them apply for jobs and other matters unrelated to education, such as public benefits; many of these websites offer job opportunities, not education. (*See generally* PX403 & Atts. A-M (Omniangle reports); PX37 at 1 (email from Vice President of Operations to EduTrek employees:   "Many of our outbound leads come from job boards (or similar sites), these people may or may not have read/understood the statement asking if they

16

would like a phone call from us regarding their education."); PX116 at 2 (websites from AdBrilliant are "itsmycareer.com" and "jobsbucket.com"); PX186 at 1 (March 22, 2019 email stating that a full list of data sources is attached); PX188 (attachment to PX186 listing only two education website sources with the remaining fifty-five website sources listed as job websites); PX309 at 28:12-19 (admitting job search websites were primary source of leads); DX30 at Table T.9 (indicating millions of calls generated from various job websites)).

### RESPONSE TO STATEMENT #24

Subject to Conflation Objections, Defendants dispute on the basis of hearsay and authentication.

25.     Consumers who received unwanted calls from Defendants have reported that, beyond merely wasting their time, the calls distracted them from their job searches and left them concerned about the security of their personal information.   (*See* PX406 (consumer Kyong Kim); PX407 (consumer Danielle Lock)).

### RESPONSE TO STATEMENT #25

Subject to the Conflation Objections, Defendants dispute statement #25 and its relevancy. In addition, plaintiff failed to disclose the identities of Kyong Kim and Danielle Lock, as they were required under MIDPP, until the day of the fact discovery deadline (R. 154) thereby precluding Defendants from deposing Kyong Kim and Danielle Lock.   Compare 4DX10 pp. 11-12 to 4DX11 pp.11-12.

26.     From March 22, 2014 through June 12, 2019, 25.5% of the outbound telephone calls initiated by Defendants, or 3,669,914 calls, were made to telephone numbers on the National Do-Not-Call Registry ("DNC Numbers").   (DX30 at ¶¶ 12, 16 & Table T.2.; DX125 at

¶¶ 6-11; PX401 at ¶¶ 5-10; PX402 at ¶¶ 4-10 (describing DNC Registry maintenance)).   The

breakdown of calls to DNC Numbers by date is:

| Period | DNC Hits |
|---|---|
| 3/22/14-7/31/16 | 2,363,721 |
| 8/1/16-1/23/17 | 328,929 |
| 1/24/17-1/21/18 | 450,423 |
| 1/22/18-2/13/19 | 404,766 |
| 2/14/19-6/12/19 | 122,075 |

(DX30 at Table T.2).   Defendants have been dialing numbers on the National Do-Not-Call

Registry ("DNC Registry" or "Registry") since at least March 2, 2010.   (DX125 at ¶ 13 & Att.

A).

**RESPONSE TO STATEMENT #26**

First sentence: Subject to the Conflation Objections, Defendants dispute the relevancy.

Second sentence: Subject to the Conflation Objections, Defendants dispute the relevancy.

Third sentence: Subject to the Conflation Objections, Defendants dispute the relevancy.

27.     Defendants did not subscribe to the Registry and did not scrub their calling lists of

DNC Numbers.   (PX522 at Resp. No. 5; PX537 at Resp. No. 16; PX401 at ¶ 11; PX300 at

57:18-21; PX302 at 145:2-11 ("Q.   Did EduTrek have policies and procedures in place for

ensuring that it didn't call any telephone numbers on the do-not-call registry?   A.   Didn't need

to, no.   Q.   Did EduTrek check to make sure a phone number wasn't on the national do-not-call

registry before calling it?   A.   It also did not need to that so, no."); PX304 at 198:21-25 ("Q.

Did Day Pacer ever consult the National Do Not Call Registry when deciding what consumers to

18

speak with?   A.   No, not the National Do Not Call Registry.")).

### RESPONSE TO STATEMENT #27

Subject to the Conflation Objections, Defendants do not dispute statement 27.

28.     Defendants had a Do Not Call policy, where CSAs were directed to place a consumer's telephone number on the Defendants' internal DNC list when requested.   (PX103; PX120 at 15 (Day Pacer Do Not Call Policy, but falsely stating that Day Pacer consulted the National Do-Not-Call Registry, *see supra* PSMF ¶ 27); PX302 at 149:2-8).

### RESPONSE TO STATEMENT #28

Subject to Conflation Objections, statement 28 is irrelevant and contains hearsay, but otherwise is not disputed.

29.     Defendants instructed their CSAs to overcome the "objections" of consumers who told Defendants they were not interested in speaking about educational opportunities and were displeased about being called.   (PX106 (email from Lon Kennard to CSAs going over various objections); PX119 at 3, 13; PX302 at 161:18-22 ("Q.   Were CSAs encouraged to continue the call even though the consumers could not remember filling out information for schools?   A. Yes."), 163:2-6 ("Q.   And were CSAs encouraged to continue the call even after the consumer indicated they were only looking for a job and did not want to go back to school?   A.   Yes."); PX304 at 156:13-157:7 ("I was just looking for a job" was a common objection from consumers), 160:8-23 (CSAs instructed to try to overcome objections up to three times before ending a call)).   Defendants also instructed their CSAs to not "over-use" call dispositions like "Do Not Call Requested" and "Could Not Create Interest" when tracking the results of calls, instead instructing the CSAs to use "a rebuttal" to try and generate consumers' interest in

education. (PX67 at 2 ("Over-use [of "Do Not Call Requested" disposition] just burns up data like fire in a furnace!"); PX119 at 13 (same – in CSA training document); PX120 at 5 (same); PX591 at 2-4 (rebuttal example with consumer who said she was interested in finding a housekeeping job and had no interest in education); PX592 at 2:13-17 (rebuttal to consumer who said "I don't want to talk about furthering my education right now, I just want a job.")).

### RESPONSE TO STATEMENT #29

First sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute.

Second sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute.

30. Defendants received complaints from consumers and the websites from which they had purchased data that they were initiating calls to DNC Numbers. (*See, e.g.*, PX26 at 10-11 (Brown lawsuit); PX49 at 1-2 (Beyond.com complaint); PX50 at 1-2 & PX175 (Cameron complaint, involving Bluewater, an IBT Partner); PX161 (Witham complaint); PX521 at Resp. No. 17 (admitting that Day Pacer and EduTrek received complaints that they and their IBT Partners were calling DNC Numbers); PX172 (email discussing lawsuit for calling DNC Numbers); PX553 at 4 (Alan lawsuit). *See also* R. 153 at 8 (discovery order granting presumption that Day Pacer Defendants are deemed to have been aware of complaints identified by the FTC when complaints were made made)). For example, Beyond.com, a job website, informed EduTrek in March 2012 that it had received a complaint that "someone who is on the do not call list was contacted by a school." (PX49 at 1-2).

### RESPONSE TO STATEMENT #29

First sentence:  Subject to the Conflation Objections and hearsay objections, Defendants do not dispute.

Second sentence: Subject to the Conflation Objections and hearsay objections, Defendants do not dispute.

31.     Defendants did not require the websites from which they purchased consumer data to list the name of the school or lead purchaser in their consent forms.   (PX300 at 57:12-17; PX304 at 97:7-13).

**RESPONSE TO STATEMENT #31**

Subject to the Conflation Objections and relevancy objections, Defendants do not dispute.

32.     Defendants call recordings also indicate that numerous consumers were not interested in education or in speaking with Defendants at all.   (PX583 at 4:2-20, 5:17-21 (consumer just trying to fill out a job application to work at Target); PX584 at 3:21-4:11 (consumer looking at Medicare, not for education); PX585 at 2:18-3:10 (consumer looking for healthcare, not education); PX586 at 2:15-3:3 (consumer has terminal cancer and no interest in higher education); PX587 at 2:24-3:6 ("No sir, I'm looking for a job, not education."); PX588 at 2:20-3:5 (consumer never "signed up for trying to look for school" and is just looking for a job); PX589 at 2:12-20 (consumer not interested in education, has been called "like 15 times a day" about it); PX590 at 2:9-3:13 (consumer saying "you're like the sixth person that's called me, probably, from the past twenty minutes.   I'm just trying to fill out job applications.")).

**RESPONSE TO STATEMENT #32**

21

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute.

33. Defendants also received complaints from schools and other lead purchasers and their compliance companies that they were initiating calls to consumers without collecting proper consent—express written authorization—to be contacted. (*See generally* PX403 & Atts. A-M; PX179 (complaint involving IBT Partner Bluewater); PX222; PX225). At least one major lead purchaser, EducationDynamics ("EDDY") refused to work with Defendants because they were concerned that Defendants' consumer data sources, such as websites, did not properly collect consumers' consent to be contacted. (PX180; PX181 at 1-2; PX182 (Ian stating in a March 2019 email that EDDY representative, Bruce Douglas, "described his perception of Day Pacer as 'radioactive'"); PX307 at 214:3-20). After receiving complaints about websites, EduTrek and Day Pacer continued to purchase consumer data generated from those websites. (PX521 at Resp. No. 16).

**RESPONSE TO STATEMENT #33**

First sentence: Subject to Conflation Objections and hearsay and relevancy objections, Defendants dispute this sentence. (See generally PX403 & Atts. A-M; PX179; PX222; PX225).

Second sentence: Subject to Conflation Objections and hearsay and relevancy objections, Defendants dispute this sentence. (PX180; PX181 at 1-2; PX182)

Third sentence: Subject to Conflation Objections and hearsay objections, Defendants dispute this sentence. (PX521 at Resp. No. 16).

34. Defendants continued to purchase leads from some websites although they knew that those websites used an "opt-out" rather than "opt-in" form. (PX598). The Kathleen

Brown DNC TCPA lawsuit against EduTrek involved such an "opt-out," or pre-checked box that a consumer would have to affirmatively uncheck if she did not want to receive a call. (PX523 at 47 (email from 8/6/2015)). Defendants knew that "opt-out" leads were problematic and did not indicate valid consent for a consumer to be contacted, but continued to buy from websites that used opt-out forms. (PX302 at 79:19-80:3 ("Q. And why did EduTrek tell Beyond.com to stop using pre-checked boxes? A. Because they wanted people who were truly interested in getting -- obtaining information about educational opportunities and not somebody who's just being sloppy about going through a website."); PX536 at 131 (9/15/2016 email in which Day Pacer tells Beyond.com "[t]he data must be opt-in. TCPA case law is quite clear about pre-checked boxes."); PX596 at 302-03 (9/7/2016 Beyond writes to DayPacer that opt-in lead is a different rate than opt-out leads, and instruction to change to opt-in leads constitutes a change from Chad (Tatton) and Nate (Clegg) with whom he has discussed opt-in/opt-out several times); PX597 at 1-2 (9/9/2016 Ian Fitzgerald tells MediaSpike "I do not plan to go back to Beyond.com" after receiving violation notice that Beyond was using opt-out form and further stating "I'm sure that you're removed from this feed because we're not working with them any more at all. . . ."); PX598 (12/22/2016 email from Beyond to Ian turning the data source back on "and just to confirm, per our conversation, these are Opt-Out (pre-checked box) leads.")).

**RESPONSE TO STATEMENT #34**

First sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute.

Second sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute this sentence. (PX523 at 47; 4DX5)

23

Third sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute this sentence. (PX302 at 79:19-80:3;PX536 at 131; PX596 at 302-03; PX597 at 1-2; PX598.

### E. INBOUND TRANSFERS

35.    In addition to placing their own outbound telephone calls to telemarket post-secondary education, Defendants also contract with other telemarketing companies ("IBT Partners") to place outbound telephone calls to consumers, determine potential eligibility for enrollment in post-secondary education, and then transfer the telephone calls to Defendants for further telemarketing.   (PX300 at 77:4-78:11; PX309 at 31:19-32:5; PX10 at 1 (model inbound transfer agreement); PX18 at 2).

### RESPONSE TO STATEMENT #35

Subject to the Conflation Objections, defendants dispute this statement.   PX300; PX18.

36.    Defendants' contracts with lead purchasers and schools hold them liable and responsible for any breaches of applicable laws, including the TSR, committed by any of Defendants' IBT Partners that generated leads that Defendants subsequently delivered to the lead purchasers and schools.   (PX122 at 3, 7 (requiring Defendants to use best efforts to ensure IBT Partners comply with applicable laws); PX89 at 11, 17 (representing and warranting that EduTrek and its subvendors will comply with applicable laws including TSR and agreeing to indemnify client for any liabilities stemming from a breach of the representations and warranties); PX546 at 1, 3, 5, 8-9; PX548 at 1 ("For all purposes, any act or omission of any affiliate of the Media Company Network will be deemed to be the act or omission of the Media Company [Day Pacer].")).

**RESPONSE TO STATEMENT #36**

Subject to the Conflating Objections, Defendants dispute this statement.   PX122; PX89;

PX546; PX548

37.     In some cases, Defendants have instructed their IBT Partners to use Defendants'

d/b/a when speaking with consumers.   (PX503 at 2 (Ian Fitzgerald explaining to client Media

Spike that for one of their campaigns IBT Partner Yodel uses "our DBA"); PX17 at 2 (EduTrek

employee providing feedback to IBT Partner eStomes call representatives discusses how one of

the areas representatives "get hung up on" is saying the name "Edsoup" over the phone, which

EduTrek's CSAs struggle with as well); PX518 at 10-12 (instructing IBT Partner to say they are

calling on behalf of "Our School Search" over the phone); PX519 at 1 (email from Day Pacer to

IBT Partner Bluewater instructing them "[y]ou will need to use our DBA, Our School Search in

the phone call.   That is the DBA that is in the TCPA.")).

**RESPONSE TO STATEMENT #37**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants

do not dispute this statement.

38.     The IBT Partners' call scripts also indicate that the IBT Partners should make it

appear to consumers as if they are speaking to the same or related companies when they are

transferred from the IBT Partners to Defendants.   *(See, e.g.,* PX570 at 2-3 ("EDU Script"

discussing transferring the consumer to an "advisor" and transferring the student to Day Pacer by

saying "I have a qualified candidate on the line that I'd like you to help"); PX571 at 7-8

("Membership Script" discussing transferring the call to an "education matching agent" with the

same handoff script as PX570); PX510 at 1 (Jeff Davis tells IBT Partner "we don't require your

agents to state your brand in the transfer"). *See also* PX560 at 2:7-12 (call recording where IBT Partner representative says "Hi, I have a qualified candidate on a recorded line that I would like you to help."); PX562 at 2:5-10 (call recording with similar transfer from IBT Partner); PX563 at 2:12-17 (same); PX564 at 2-7 ("Hi, Ms. Erica, I guess my associate [IBT Partner representative] fell off the line, I apologize about that."); PX565 at 2:8-10 ("Hey, I have a qualified candidate on a recorded line I'd like you to help here."); PX567 at 5-9 (similar); PX569 at 2:3-5 (similar); PX175 at 1 (IBT Partner transferred consumer to Defendants after consumer asked for a "supervisor")).

### RESPONSE TO STATEMENT #38

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

39.    Many IBT Partners are located outside of the United States, in the Philippines and India. (PX174 at 3 ("Our agents primarily take inbound calls generated off-shore and transferred into us after being qualified for interest and eligibility (have a GED or Hight [sic] School diploma."); PX505 at 2 (Nate Clegg writing to Bluewater "we cannot be the easy scapegoat for your supervisors in the Philippines"); PX506 at 1 (Yodel had call centers in the Philippines and in India); PX507 (Boomsourcing sending tracking sheet with information in Mountain Time and "Philippine Time," and an email signature that shows their address as being in the Philippines); PX508 at 1 (XactCall Inc. referring to itself as a "Philippines Company"); PX509 at 1 (Axiom BPM discusses delivering leads from its "Philippines team"); PX520 at 1 (contract with IBT Partner Anupam, "a India private limited company")).

### RESPONSE TO STATEMENT #39

Defendants object to this statement based on the Conflation Objections and relevancy objections and on the obvious xenophobic reaction it seeks to engender.

40.     Defendants' IBT Partners have made more than one interstate telephone call to consumers in conducting their business.   (PX400 at Table T.11 (showing interstate calls broken down by IBT Partner)).

**RESPONSE TO STATEMENT #40**

Subject to the Conflation Objections, Defendants do not dispute that IBT Partners likely made more than one interstate call to in the aggregate to consumers but also likely did not make more than one interstate call to each consumer.

41.     Defendants' call records directly document that the IBT Partners utilized by Defendants made 498,597 inbound transfers to Defendants between March 22, 2014, and June 12, 2019 that were the product of outbound telephone calls to DNC Numbers (20.0% of the total inbound transfers received from IBT Partners during that period).   (DX30 at ¶ 16 & Table T.2.). The breakdown of calls to DNC Numbers by date is:

| Period | DNC Hits |
|---|---|
| 3/22/14-7/31/16 | 184,974 |
| 8/1/16-1/23/17 | 37,697 |
| 1/24/17-1/21/18 | 142,227 |
| 1/22/18-2/13/19 | 103,128 |
| 2/14/19-6/12/19 | 30,571 |

(DX30 at Table T.2).   Defendants' IBT Partners made an additional approximately 39,847,000 violative calls that are not directly reflected in the call records because those calls did not result

27

in inbound transfers to Defendants.   (DX30 at ¶¶ 25-30 & Tables T.5, T.6, T.7, T.8.).

**RESPONSE TO STATEMENT #41**

First sentence:   Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

Second sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute this statement. (DX30)

42.      Defendants continued to pay and work with IBT Partners even after receiving complaints from schools, consumers, and compliance monitoring companies that their IBT Partners were calling DNC Numbers without consent.   (PX521 at Resp. No. 15).   In one particular example, Defendants continued working with IBT Partner Bluewater despite repeated complaints and compliance notices.   (PX175 (April 2016 BBB complaint involving Bluewater and Defendants; Ian notes that "I'd also like to add a disposition that tracks how many completely ridiculous transfers he gives us.   We shouldn't be talking to 11 year olds.   We shouldn't be talking to people who are screaming 'no! no! no! no!'"); PX177 at 1 (August 2016 email chain indicating that Day Pacer continues to work with Bluewater, has received additional complaints related to Bluewater, and that "Do we believe Blue Water about their data sources? . . . We don't really know the extent of the Blue Water data path and we should not give them [the school] that URL they gave us."); PX178 at 1-2 (lead purchaser explaining that the problem is that Defendants' IBT Partner used websites to source consumer data that were deceptive and did not collect proper consumer consent); PX179 at 1 (October 12, 2016, email chain with complaints regarding IBT Partners where Ian states "The BlueWater ones [leads] are an issue and they've been warned about this in the past.   My tolerance is waning by the minute."); DX30

at ¶ 34, Table T.10 (Defendants continued receiving leads from Bluewater until April 3, 2017)). The relationship did not end because Day Pacer terminated the relationship, rather Bluewater "just kind of disappeared one day." (PX307 at 166:12-20). A few months later, in August 2017, Day Pacer started a new relationship IBT Partner relationship with XactCall Inc., which is operated by the same individual, Paul Flannery. (PX508; PX593 (complaint regarding Bluewater sourced lead, also identifies Paul Flannery as being with Bluewater)).

**RESPONSE TO STATEMENT #42**

First sentence: Subject to the Conflation Objections, Defendants dispute this statement. (PX521 at Resp. No. 15).

Second sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

Third sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

Fourth sentence: Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

43. EduTrek and Day Pacer paid the IBT Partners money for the leads that they called and then transferred to EduTrek and Day Pacer. (PX521 at Resp. No. 12 ("Admit that the EduTrek L.L.C. and Day Pacer LLC paid inbound transfer companies to transfer calls with consumers regarding educational opportunities to EduTrek L.L.C. or Day Pacer LLC."); PX300 at 88:3-13, 94:9-14, 95:3-24 (discussing how inbound transfer partners were paid either a percentage of the revenue Defendants received from the transfers that they sent, or they were paid a dollar amount per transfer)).

29

**RESPONSE TO STATEMENT #43**

Subject to Relevancy objections, Defendants do not dispute this statement.

44. Defendants provided some of their IBT Partners with the consumer information for the IBT Partners to call. (PX521 at Resp. No. 13 ("Day Pacer LLC admits that it provided consumer data to two inbound transfer companies for them to call regarding educational opportunities and then transfer such calls to Day Pacer LLC."); PX500 at 1 (Ian Fitzgerald writes to CEC (school) "[t]he second change is that we will only use data we have purchased from websites we have vetted when we engage with inbound transfer companies."); PX307 at 102:13-24, 152:14-153:7, 241:25-243:1 (discussing how Day Pacer provided consumer information to some of its IBT partners including Yodel and Boomsourcing or Boom AI); PX501 (Ian Fitzgerald discusses setting new business arrangement with IBT Partner Bluewater using "our data"); PX502 at 1 (Keypath.edu asks "can you confirm if your Inbound partner- BlueWater- is getting data from your OB sources and your OB sources only?" to which Nate Clegg replies "Bluewater should only be dialing the data sources provided to them."); PX174 at 3 ("We can supply aged data for you guys to call and we would like to start around 100 transfers a day if that's possible.")).

**RESPONSE TO STATEMENT #44**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

45. In some instances, Defendants either reviewed their IBT Partners' script or provided them with a script to use. (PX11 at 1 (Inbound Transfer Onboarding Process: step 2 is "Vendor submits script for approval."); PX500 at 1 (Ian Fitzgerald tells CEC that Day Pacer's

IBT Partners "use a script we approve"); PX503 at 2 (Ian Fitzgerald writes to MediaSpike: "We run two Yodel campaigns. One is our data and custom script. . . ."); PX174 (Ian Fitzgerald emailing a potential new IBT Partner an "EDU script" and a "job script" for use over the phone)).

### RESPONSE TO STATEMENT #45

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

46.     Defendants also have provided their IBT Partners with business information and guidance in order to increase the number of transfers the IBT Partners can provide to Defendants. (PX300 at 114:10-115:13 (discussing providing IBT Partners feedback to help optimize their performance); PX17 (providing feedback to IBT Partner eStomes on their telemarketers using rebuttals during calls); PX539 (discussing providing reporting to IBT Partners); PX173 (email chain between Day Pacer and Yodel discussing call dispositions)).

### RESPONSE TO STATEMENT #46

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

47.     Defendants received complaints from their CSAs that many of the leads they received from IBT Partners were not interested in education. (PX18 at 1 (in addressing CSA's complaints about transfers received from IBT Partners in July 2014, Chad Tatton tells the CSAs that management will "try and get rid of some of the worst of the worst transfers. Not the ones where nobody was there, or they were not really interested in school, or they were confused. I'm talking about the ones where the agent was completely dismissive of the person and/or

31

rude."); PX84 at 3 (one of the questions Day Pacer's management received from CSAs in October 2018 was "I would like to know what is going [sic] IBT vendors? They continually send over with either no prospects on the line, they're disqualified or have zero interest in pursuing their education. These calls are becoming harder and harder to overcome.")).

### RESPONSE TO STATEMENT #47

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

48. Defendants operated under the assumption that their IBT Partners did not scrub numbers against the DNC Registry. (PX300 at 104:22-105:5 ("Q. Do you have any reason to believe that the transfer partners were screening phone numbers against the do not call lists before making calls? A. I would say no, I wouldn't, for the same reason that we didn't. My expectation of them was that they would not call people without consent. As such, they did not – they would have not – you know, they would have not cross-referenced that.")).

### RESPONSE TO STATEMENT #48

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute this statement.

49. Defendants received complaints and threatened lawsuits from consumers on the DNC Registry that were called by Defendants' IBT Partners. (PX175 at 1-2 (threatened lawsuit received from consumer on the DNC Registry who was transferred to Day Pacer by IBT Partner Bluewater); PX504 at 1 (consumer named Jill Dudley complains of having received 6 phone calls despite being on the Federal Do Not Call List); PX161 at p.2 (Raymond Fitzgerald discussing in an email chain with David Cumming and Ian Fitzgerald a "garden variety stick up"

from a consumer named Cliff Witham on a lead transferred by Bluewater)). In each of those instances, emails exchanged internally by the Defendants confirmed that they did receive an IBT Partner transfer from the consumer who complained. (PX175 at 1 (forwarding the call record information); PX504 at 1 ("She was transferred to us from a vendor named College Choice. . .."); PX161 at p.2 ("Bluewater did call him and transferred him to Day Pacer.")). Those consumers did not distinguish between the IBT Partners and Defendants. (*See, e.g.*, PX175 at 1 (Bluewater employee said that he worked for "College Advisor" and transferred the call to his "supervisor" (Defendants)); PX504 at 1 (consumer complaining to Ian Fitzgerald "I received 6 spoofed phone calls from your company today")).

### RESPONSE TO STATEMENT #49

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute these statements but avers the claims were false. 4DX5 ¶¶10-13

50. Defendants' call recordings of transferred calls from IBT Partners also indicate that numerous consumers were not interested in education or in speaking with Defendants at all. (PX562 at 3:10-17 ("I don't want to go back to school."); PX563 at 7:14-8:1 ("Lady, I thought this was about jobs. I didn't think this was about school. . . .We don't have to talk about this."); PX565 at 4:9-12 (consumer interested in a job, not education); PX567 at 3:2-4:5 (same); PX568 at 3:8-12 (consumer interested in "trade," not education), PX569 at 2:20-4:5 (consumer "need[s] a job, school is not helping me")).

### RESPONSE TO STATEMENT #50

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute these statements.

51.     David Cumming acknowledged in an email chain sent to Ian Fitzgerald, Raymond Fitzgerald, and Nate Clegg that "[r]egrettably many Philippines operators routine[sic] violate the terms of US law, specifically the TCPA."   (PX162 at 2).

**RESPONSE TO STATEMENT #51**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute these statements.

52.     Defendants did not monitor their IBT Partners' data sources or keep records of their purported consent.   (PX522 at Resp. No. 10 (Day Pacer reviewed some of the websites used by IBT Partners to generate leads but did not monitor the websites); PX109 at Resp. No. 10 (same with respect to EduTrek); PX521 at Resp. No. 10 ("Responding Defendants do not deny that it was not the regular business practice of EduTrek L.L.C. or Day Pacer LLC to preserve screen shots of websites used to generate consumer data. . . ."); PX307 at 145:16-22 ("Q.   Were there screenshots retained of the websites?   A.   It wasn't common practice to store those. Sometimes they were emailed, you know, if two people were involved in something, but it wasn't common practice to store those anywhere."); PX302 at 77:7-14 ("Q.   So did the -- did these records contain the contents of the consent form?   A,   Generally not.   Q.   Are you aware of any instances where the consent of the web form was included in EduTrek's records?   A. I'm not aware of any, but I can't say there are none.")).

**RESPONSE TO STATEMENT #52**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute these statements. PX522 at Resp. No. 10; PX109; PX521 at Resp. No. 10; PX307 at 145; PX302 at 77

34

53.     Defendants admitted they had trouble keeping track of the websites used by their

IBT Partners, and generally did not trust the information they received from their IBT Partners.

(PX309 at 322:2-323:5 (discussing the difficulty in keeping track of where IBT Partners received

leads from, particularly if they changed sources); PX177 (Day Pacer Vice President Jeff Davis

writes "Do we believe [IBT Partner] BlueWater about their data sources?"); PX307 at 190:6-11

("Q: But did you trust that [IBT Partner] BlueWater wasn't acquiring data from those websites.

. . . A: I had no reason to think that they were or they weren't."), 191:9-13 ("So we tried to be

as cautious as we could, but it was very difficult to verify everything. So that's why it really

kind of came down to speculation more than fact a lot of times."), 197:24-198:7 ("The problem

is that, I believe, [IBT Partner] BlueWater bought data from data brokers, and so I think that that

was kind of my worry with them was that they didn't have enough oversight on what they were

doing. But from what I can tell, it was not their intention to be using any sources that we didn't

know about."); PX593 (Ian discussing consumer lawsuit with Bluewater and indicating he does

not know Bluewater's data source—"If that happens [Day Pacer is forced to disclose Bluewater

is the source for the call transfer], and you guys cannot identify your source, you will have to

mount your own defense to the suit.")). Defendants received numerous compliance reports

pertaining to problematic websites that generated leads for Defendants' IBT Partners. (PX403

at ¶¶ 4-5, 10.d, 10.g, 10.h, 10.i, 10.k, 10.l, 10.m, & Atts. D, G, H, I, K, L, M).

**RESPONSE TO STATEMENT #53**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants

dispute these statements. (PX309 at 322; PX177; PX307 at 190, 191, 197; PX593; PX403)

54. Defendants helped two IBT Partners evade clients' compliance scrutiny by telling them how to identify themselves (or to not identify themselves) to consumers over the phone. (PX510 at 1 (Jeff Davis writes to IBT Partner B&C Interactive, with Ian Fitzgerald copied, regarding an Omniangle compliance report they received: "Your agents state your DBA during the transfer when they introduce themselves. This tips off Omni Angle to look for your DBA. On a side note, we don't require your agents to state your brand in the transfer."); PX511 at 1 (Jeff Davis writes to Emma Furman regarding an Omniangle report received for a Blue Water transfer: "My guess, from my experience with Omni angle, is that they are doing some web-crawler search for the term 'College Advisor' because it is the call center business name that was used in the call recording as the transfer data source. . . . One simple solution would be to have Blue Water change their call center name and to stop saying it during the transfer."); PX512 at 3 (Day Pacer subsequently receives another Omniangle report from a company identifying itself over the phone as "Horizons Unlimited"); PX513 at 1 (Ian Fitzgerald confirms in an email to Emma Furman and Jeff Davis that Blue Water was the source of that lead)).

**RESPONSE TO STATEMENT #54**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute these statements. (PX510; PX511; PX512; PX513)

**F. CORPORATE LIABILITY**

55. Defendants' employee training documents emphasized compliance with the TCPA. (PX119 at 9, 15-17; PX120 at 7-9, 12. *See also* PX302 at 53:18-21 ("Q. Did EduTrek have policies or procedures in place for complying with the TCPA? A. Yes.")).

36

**RESPONSE TO STATEMENT #55**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute these statements.

56.     Defendants' contracts with vendors, clients, and IBT Partners included explicit references to the FTC Act, TSR, and DNC regulations, and the contracts required Defendants and their IBT Partners to comply with the FTC Act, TSR, and DNC requirements.   (PX7 at 2; PX10 at 2; PX83 at 2; PX520 at 2; PX121 at 4; PX122 at 1, 5-6; PX89 at 11; PX93 at 4; PX95 at 3; PX97 at 4 (defining "Applicable Law" as, inter alia, the Telemarketing Act, TCPA, and regulations; requiring compliance with TSR); PX546 at 1, 3, 5, 8-9; PX547 at 6, 14; PX548 at 4, 6).   Some of these contracts were drafted or proposed by Defendants themselves, including a contract dated April 2, 2020, more than a year after the FTC filed this lawsuit.   (PX121 (contract on Day Pacer letterhead); *see also* PX549 (cover email for PX550); PX550 at 2 (warranting Day Pacer will comply with TSR and TCPA); PX551 at 1 (cover email for PX552); PX552 at 1-2)). Some entities explicitly confronted Defendants about telemarketing compliance concerns, as the company Five9 did in an email to Brett Larsen (Vice President of Finance at EduTrek and Day Pacer) on February 21, 2019 regarding abandoned calls that Brett then forwarded to Ian, advising Ian that "We probably need to feed them some BS, or tell them that their system sucks at balancing IB [inbound] and OB [outbound] calls."   (PX83 at 1; PX48 at 9).

**RESPONSE TO STATEMENT #56**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants do not dispute these statements.

57.     Defendants' contracts with its IBT Partners required the IBT Partner to indemnify

Defendants for liabilities arising from the IBT Partners' TSR violations. (PX6 (Chad Tatton discussing new IBT contract with Raymond Fitzgerald attached the "old agreement" (PX7) and the "new one" (PX10)); PX7 at 2-3, ¶ 1 (IBT Partner represents and warrants that its outbound calls shall be made in compliance with all applicable law, including the TSR), at 4, ¶ 6 (IBT Partner agrees to indemnify EduTrek for liabilities arising out of any breach of its representations and warranties); PX10 at 2, ¶ 5 ("new" model agreement with same representations and warranties by IBT Partner not to violate the TSR), at 4, ¶ 9 (IBT Partner agrees to indemnify Defendants for liabilities arising out of any breach of its representations and warranties); PX520 at 2, 4 ¶¶ 5, 9 (contract with IBT Partner Anupam employing the "new" model agreement)).

### RESPONSE TO STATEMENT #57

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute these statements.

58. Defendants falsely denied purchasing leads from problematic websites. For example, in one instance they falsely claimed not to purchase leads from an IBT Partner that used the name "Degree Needs" over the phone, despite their IBT Partner having previously told them they were using that d/b/a. (PX225 (Day Pacer responds to compliance notification regarding a call transferred from "Degree Needs" by stating "[w]e also don't buy from whoever this is."); PX226 (email from IBT Partner B&C Interactive "[w]e switched back to our old DBA Degree Needs from Degree Services. Can you please let your team know?"); PX309 at 233:22-234:5 ("Q. And so does this refresh your recollection that, in fact, EduTrek was doing business with a DBA called Degree Needs, a call center? A. It certainly looks like it. We probably just didn't remember or realize it. It's probably just an internal communication problem.")). They

38

also claimed not to buy data from Lead5 Media even though they received invoices from that company during that period. (PX100 (Defendants received Omniangle report in October 2015 that lists Lead5 Media as the originating source of the lead); PX558 (Nate Clegg claims "[w]e do not buy leads from this source"); PX559 (Defendants received a different Omniangle report in October 2015 with Lead5 Media as the source of the lead); PX561 (Defendants again deny buying data from that source); PX302 at 127:5-20 (EduTrek admitting that its records show they received invoices from Lead5 Media in October 2015)).

**RESPONSE TO STATEMENT #58**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute these statements. (PX225; PX226; PX309 at 233:22-234:5; PX100; PX558;PX559; PX561; PX 302 at 127.)

59.    Defendants told a prospective client that they were trying to establish a relationship with that they were not subject to any legal proceedings when they knew that FTC was imminently about to file this lawsuit. (PX183 (March 20, 2019, Emma Furman asks Ian Fitzgerald, who forwards the email to Raymond Fitzgerald on March 21, 2019, for help filling out a client questionnaire, including question #5); PX184 at 3 (question #5 asks if the company has ever been "the subject of any civil or criminal proceeding initiated by a private individual or individuals, the Federal Trade Commission" or other government agencies regarding telemarketing); PX185 at 1 (March 20, 2019, Ian Fitzgerald sends Raymond Fitzgerald an email with the subject "New/large customer questionnaire" with the text of question #5, asking Raymond "[w]hat's the correct answer here? What qualifies as a 'proceeding'?"); PX186 at 1 (March 22, 2019, Emma Furman emails potential client Day Pacer's responses to the

questionnaire); PX187 at 3 (attached questionnaire responds "no" to question #5); PX517 at 4 (email from FTC to Raymond Fitzgerald on March 18, 2019, informing Defendants that the FTC intends to file its Complaint); R. 1 (Complaint filed by FTC on March 22, 2019)).

**RESPONSE TO STATEMENT #59**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute these statements. (PX183, PX184, PX185, PX186, PX187, PX517).

60.     When the FTC issued its Civil Investigative Demand to EduTrek L.L.C. in 2016, David Cumming told the FTC that EduTrek was dissolved, but did not mention that Day Pacer LLC was operating the same business out of the same location with most of the same employees. (PX524, PX525).   When FTC attorney Brian Shull asked where each member was employed and "[w]hat other entities is each member currently associated with?" David Cumming omitted any responses that would identify the existence of Day Pacer.   (PX524 ("I am retired and not employed.   The Dalsnan Family LLC is a limited liability company.   Joseph L. Oliva is a lawyer....   Blake Johnson is employed but is moving to a new job and I have no information where that might be.")).   At the time, David Cumming, Dalsnan Family LLC, and Joseph Oliva were all owners of the newly formed Day Pacer LLC (PX114 at 36) and Blake Johnson was then employed by Day Pacer LLC (PX48 at 9).   When the FTC insisted on receiving records and responses to its Civil Investigative Demand, David Cumming indicated that he believed he had no personal obligation to comply with the CID and did not feel inclined to be helpful.   (PX525 at 1-3).

**RESPONSE TO STATEMENT #60**

40

First sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.   It is a non sequitur.

Second sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.   It is a non sequitur.

Third sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants do not dispute this statement.

Fourth sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants do not dispute this statement.

61.      After CEC decided to stop doing business with Defendants, they began to use intermediaries to continue doing business with CEC without CEC's knowledge.   (PX530 at 3 (lgtechnet complains to Ian Fitzgerald that Day Pacer never told them they were on CEC's black list, "[i]nstead you gladly accepted and fulfilled the allocation, knowing fully that CEC does not want your leads directly or indirectly.   When we found out Day Pacer was on the list, on a May 20th phone call, Emma said not to worry and explained that it is really just an old thing from 2014 and has to do with your old company that has been dissolved since then.   She said all that knowing that Day Pacer is indeed on the black list and should not be selling leads to CEC."); PX531 (Ian Fitzgerald writes to Raymond Fitzgerald "I'm thinking Day Pacer should become purely a middleman and create yet another company that rents agents from Allied to fill Day Pacer's and other company's leads" and lists among the advantages "NewCo would have access to all of Day Pacer's allocation as well as some things Day Pacer doesn't have access to since the press release"); PX532 (Ian Fitzgerald writes to Raymond Fitzgerald and David Cumming on October 31, 2019 that "Allied Contact Management was added to CEC's blacklist" which unless

CEC reverses their decision means Allied "will lose essentially all of our present clients and be out of business by Monday"); PX533 at 4 (transcript of an online chat between Ian Fitzgerald, Jeff Gerber, Frances Blickman, and Craig Rosenfeld discussing whether Allied should show its data to CEC to try to get CEC to reverse its decision to blacklist Allied:

> Jeff: I was just thinking about this. If CEC sees allied books, I think that Cec will consider 100% of the leads generated by provide media and Path 56 to be Daypacer generated. Allied bought the data trained the agents and employed the agents.

> Jeff: They would likely say, allied is sending us leads currently

> Ian: Allied doesn't buy any data[,] but is paid for by Day Pacer which is possibly just as bad."

> Jeff: Yeah, I think it would really kill frances [Blickman] / provide [Media] if they saw that.

> Ian: Okay so let's please not do that.

62.     Defendants lied to at least one potential client and one lead publisher about having procedures in place to check telephone numbers against the DNC Registry. (PX566 at 6 (Day Pacer sends prospective client questionnaire responses including its DNC policy, which states: "Day Pacer has established written procedures to honor consumers' requests that they not be called, and appropriate personnel have received training. Procedures include consultation of both the National Do Not Call Registry and internal Do Not Call List prior to making any telephone solicitation."); PX49 (website publisher Beyond.com tells EduTrek they received a complaint that someone on the Do Not Call list was contacted by a school and asks if EduTrek has something in place to prevent that from happening again, to which Brett Larsen responds that they do have systems in place); PX301 at 88:3-6 (Brett Larsen was asked during his deposition if he knew "if EduTrek took any measures to prevent calling phone numbers on the National Do

42

Not Call Registry?" and he responded that he did not know).   As discussed *supra* ¶¶ 27-28, Defendants did not consult the National Do Not Call Registry or have a procedure in place to prevent calls to DNC Numbers.

**RESPONSE TO STATEMENT #62**

First sentence: Second sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.   PX566; PX49; PX301 at 88)

Second sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants do not dispute this statement.

63.      Defendants have identified equity in assets worth a total of $20,955,830.37. (PX405 at ¶¶ 11 (Day Pacer LLC's liabilities, $2,239,234.63, exceed its assets, $444,764.09), 15 (Raymond Fitzgerald's equity in assets is $12,803,143.92), 24 (David Cumming's equity in assets is $7,204,818.34), and 32 (Ian Fitzgerald's equity in assets is $947,868.11)).

**RESPONSE TO STATEMENT #63**

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.

64.      Corporate Defendants' combined revenue from March 22, 2014 to June 12, 2019 was $28,681,863.88.   (PX405 at ¶ 6 (summarizing, based on Defendants' accounting documents, EduTrek's revenue as $10,709,181.11 from March 22, 2014 to October 30, 2015 and showing Day Pacer's revenue as $17,972,682.77 from November 2, 2015 to June 12, 2019)).

**RESPONSE TO STATEMENT #64**

Subject to hearsay and relevancy objections, Defendants dispute this statement.   There are no corporate defendants.

## G. INDIVIDUAL LIABILITY

### 1. *Individual Defendants' Participation and Control*

65.     The Individual Defendants controlled and directly participated in the regular affairs of the Corporate Defendants both individually and in concert.   For example, Raymond reviewed contracts for EduTrek beginning as early as 2011 (PX302 at 229:11-13; PX308 at 25:13-26:8) and testified that he "would have given comments about the language" in agreements.  (PX308 at 145:20-146:15).

### RESPONSE TO STATEMENT #65

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement. 4DX5 ¶¶5-8.

66.     Raymond also at times directed Day Pacer with respect to when to pay certain bills.  (PX70; PX71; PX543 at 1).   In one instance, he instructed Brett Larsen on April 17, 2016 to immediately pay his and David Cumming's company Thorpe/Sandy LLC late office rent that Day Pacer owed to them as landlords of their company and that "[i]f you have to pay someone late, choose someone else other than Thorpe/sandy LLC in the future."  (PX70).  He also instructed Brett Larsen on June, 3, 2016 to book his fees for legal services as payables to be paid "[i]f and when Day Pacer has enough money."  (PX71).

### RESPONSE TO STATEMENT #66

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.

67.     Raymond was also a signatory on College Criteria/Day Pacer's Zions First National Bank account, and also applied for the account.  (PX123 at 1; PX124 at 1).   Day Pacer

also used Raymond's Dalsnan credit card to pay certain Day Pacer expenses. (PX169; PX170).

### RESPONSE TO STATEMENT #67

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.

68. Analysis of Raymond's emails reflects that he exchanged more than 1,300 emails relating to EduTrek and Day Pacer between September 2015 and August 2019, including approximately 400 emails that Raymond personally sent. (PX404 ¶ 13, Att. A, & Table T.3). Defendants produced few records of their emails from before September 2015, and thus, meaningful analysis of that period is not possible. (PX404 ¶ 12).

### 69. RESPONSE TO STATEMENT #67

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants can neither dispute nor not dispute this statement because plaintiff has chosen to use the ambiguous word "exchanged" and plaintiff does not distinguish between the pre-March 22, 2016 period and other periods and does not distinguish between the pre-late August 2018 period and other periods.

70. Ian directly participated in and controlled EduTrek and Day Pacer. He served as President of Day Pacer beginning June 1, 2016. (PX304 at 22:20-24). In that role, he was responsible for the day-to-day operations of the company, including hiring and firing employees, signing contracts, and responding to compliance issues. (PX307 at 98:2-99:14, 148:2-151:5 (discussing dealing with Omniangle violation reports)). In addition, he was responsible for the company's profitability and had access to its bank accounts and accounting records. (*Id.*)

### RESPONSE TO STATEMENT #70

First sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.   CDX2; CDX3

Second sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.   CDX2; CDX3

Third sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement in part because of the use of the ambiguous word "company".

71.     Before becoming President of Day Pacer, Ian had daily communications with the then-CEO of EduTrek and Day Pacer, and functioned as a liaison between the CEO and Raymond Fitzgerald and David Cumming.   (PX309 at 82:22-83:8).   Beginning in 2010, Raymond made him President of Dalsnan Family LLC, the holding company through which Raymond held his interest in EduTrek, and Ian was responsible to watch over Ray and David's investment interest in the company.   (PX307 at 45:20-48:12; 58:9-59:12; PX189 at D716-33; PX573 at Resp. No. 2).   Ian also worked directly for EduTrek, (PX307 at 84:4-86:7), then later for Day Pacer as Director of Human Resources, before finally becoming Day Pacer's President. (PX307 at 87:4-9).

**RESPONSE TO STATEMENT #71**

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants do not dispute this statement.

72.     Cumming controlled and directly participated in business of EduTrek and Day Pacer.   For example, he discussed Day Pacer's business model, sales tactics, strategic direction, as well as industry statistics, with Ian and Raymond.   (PX306 at 196:9-199:15; PX154 at 2-3).

46

He provided them with feedback on strategy to get delinquent customers to pay. (PX306 at 195:11-196:8; PX154 at 2). And as beginning as early as 2011, he discussed with Chad Tatton the "cost in leads in order to get an application" that schools expected to have to pay, something he shared with Ian and Raymond. (PX306 at 196:16-197:2).

### RESPONSE TO STATEMENT #72

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement. CDX2; CDX3: Cumming Affidavit in Support of his cross-motion.

73. Cumming also requested financial updates from the Corporate Defendants, as indicated in a May 2, 2016 email to Brett Larsen, copying Raymond, Ian, and Nate Clegg from Day Pacer where he requested to view the "Quickbooks balance sheet and P&L" that day, without any "clean up [for] the month-end." (PX80; PX81).

### RESPONSE TO STATEMENT #73

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement. There were no corporate defendants.

74. Analysis of David's emails reflects that he exchanged more than 780 emails relating to the companies during the period September 1, 2015 to March 13, 2019, including approximately 125 that David personally sent. (PX404 ¶ 14, Att. B, & Table T.4). David also testified that he "spent somewhat less time on College Criteria/Day Pacer than I did on EduTrek." (PX306 at 144:2-10). Thus, it is reasonable to assume that if Defendants had produced complete records of their emails from before September 2015, there would have been even more emails from David relating to the companies.

### RESPONSE TO STATEMENT #74

47

Subject to the Conflation Objections, and hearsay and relevancy objections, and the express invitation to engage in speculation, Defendants dispute this statement.

75.     Raymond, David, and Ian also acted in concert to directly participate in and control the Corporate Defendants.   Raymond and David were the corporate managers of EduTrek L.L.C. and Day Pacer LLC.   (PX2 at 6 § 3.2 (EduTrek Operating Agreement stating "[t]he number of Managers of the Company shall be two (2).   David T. Cumming and Raymond Fitzgerald shall serve as the Managers"); PX114 at 6 § 3.2 (College Criteria operating agreement stating same but substituting Raymond's holding company, The Dalsnan Family LLC, for Raymond)).   As the only corporate managers, Raymond and David each were required to "devote the time and effort as is reasonably required in the business of the Company."   (PX2 at 5 § 2.9; PX114 at 5 at § 2.9; *see also* PX306 at 128:21-129:3).   They also had broad authority "to do and perform all . . . acts as may be necessary to or appropriate to the conduct of the Company's business."   (PX2 at 7 § 3.3(k); PX114 at 7 § 3.3(k); PX306 at 129:4-130:16).   Moreover, they had exclusive, non-delegable authority dispose of EduTrek (PX2 at 7 §3.4, PX306 at 130:17-131:21), including the authority to hire and fire corporate officers.   (PX2 at 11-12 § 3.11).

**RESPONSE TO STATEMENT #75**

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement. CDX2; CDX3; Cumming Affidavit in Support of Cross-Motion for summary judgment; 4DX5 ¶¶5-8

76.     Raymond and David advised Ian and Day Pacer on contracts and business opportunities.   (PX73; PX74; PX75; PX76, PX77, PX78; PX79; PX183 (Ian forwarding lead

purchaser questionnaire to Raymond in March 2019); PX184 (questionnaire attached to PX183); PX185 (Ian asking Raymond in March 2019, related to the questionnaire forwarded in PX183 and PX184, "What qualifies as a 'proceeding'?" in response to an inquiry if Day Pacer has "ever been the subject of any civil or criminal proceeding")). Raymond and David came into Day Pacer's offices in May 2016 to discuss a contract with InContact, a cloud telephone systems provider. (PX73). In April 2016, they also discussed forming a related company, Summit Home Security LLC, and obtaining a State of Utah telemarketing license for that company. (PX74, PX75, PX76, PX77, PX78, PX79). Similarly, Ian also provided Raymond and David with financial and business performance updates, and business plans. (PX195 at 108-09 (Allied Contact Management financial modeling); PX595 (management report)).

**RESPONSE TO STATEMENT #76**

First sentence: Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement. Cumming Affidavit in Support of Cross-Motion for summary judgment; 4DX5 ¶¶5-8

Second sentence: Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants do not dispute this statement.

Third sentence: Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement.

Fourth sentence: Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants do not dispute this statement.

77. Raymond and David regularly loaned money to the Corporate Defendants and had the ability to foreclose on the Corporate Defendants on account of their debt holdings. (PX516

(showing loans paid by Raymond Fitzgerald and David Cumming and their demands for immediate payment and proposing to accept collateral)). Raymond and David also helped the Corporate Defendants obtain business financing from banks. (PX137, PX534).

**RESPONSE TO STATEMENT #77**

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement. There were no corporate defendants.

78. Raymond and David exercised their authority and illustrated their roles as controlling owners by "foreclosing" on EduTrek. They did this by mailing themselves letters demanding payment of loans they had made to the company, and then responding to their own letters agreeing to the foreclosure of EduTrek's assets as payment to themselves. (PX516; PX306 at 148:13-16; 150:5-9; 151:23-155:8). Raymond and David then converted these "foreclosed" assets into their "new" company, Day Pacer. (PX302 at 232:22-235:23).

**RESPONSE TO STATEMENT #78**

Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement. The foreclosure was exercised by Mr. Cumming and Mr. Fitzgerald as creditors. (PX516; PX306 at 148:13-16; 150:5-9; 151:23-155:8).

79. Raymond and David also provided advice and direction to Ian and the Corporate Defendants about how to respond to government inquiries. (PX62; PX301 at 162:6-13; PX555 at 1). For example, in August 2016 they advised Ian and Day Pacer not to respond to an inquiry from the State of Nevada regarding potential taxpayer liability in Nevada. (PX62 at 1).

**RESPONSE TO STATEMENT #79**

50

First sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants dispute this statement. There were no corporate defendants.

Second sentence:   Subject to the Conflation Objections, and hearsay and relevancy objections, Defendants do not dispute this statement.

80.     On April 13, 2016, Raymond and David informed Ian and other Day Pacer executives (Nate Clegg and Brett Larsen) that EduTrek had been administratively dissolved by the State of Utah, and instructed Ian, Nate, and Brett to contact them "[i]f anything in the future occurs relating to EduTrek L.L.C. . . . so that we can advise you of the effect of the dissolution on whatever occurs."  (PX72).

**RESPONSE TO STATEMENT #80**

Subject to hearsay and relevancy objections, Defendants do not dispute this statement.

**2.     *Individual Defendants' Knowledge***

81.     Raymond, David, and Ian have long understood the laws and regulations applicable to their businesses, and understood that their companies were engaged in practices that would violate those rules.  (PX158; PX161; PX544).   Ian wrote an email to Brett Larsen and Nate Clegg on October 13, 2015 regarding a lawsuit filed by a consumer against EduTrek saying:  "We should sit down with Blake this Friday and talk about how this could have happened if it did. We need to make sure our system is not calling DNC numbers ever." (PX172).   Similarly, David sent Raymond and Ian an email in early 2016 that included a link to the TSR itself.  (PX158 (4/25/2016)).   He advised them to "review the FTC's Telephone Sales Rule [sic] which implements the Telemarketing and Consumer Fraud and Abuse Prevention Act 15 USC 6101 et seq."  (PX82; *see also* PX575 at Resp. No. 2 (David admitting he knew of the

51

DNC Registry before March 22, 2014 and had registered his own telephone numbers on it)).

Raymond responded with an attachment from the State of Utah regarding Utah state

telemarketing regulations. (PX82).

**RESPONSE TO STATEMENT #81**

First sentence: Subject to hearsay and relevancy objections, Defendants dispute this

statement. (PX158; PX161; PX544) 4DX3 ¶¶19-24; David Cumming Affidavit in support of his

cross-motion for summary judgment; 4DX5 ¶¶14-19.

Second sentence: Subject to hearsay and relevancy objections, Defendants do not dispute

this statement.

Third sentence: Subject to hearsay and relevancy objections, Defendants do not dispute

this statement.

Fourth sentence: Subject to hearsay and relevancy objections, Defendants do not dispute

this statement.

Fifth sentence: Subject to hearsay and relevancy objections, Defendants do not dispute

this statement.

82.     Cumming explicitly raised with Raymond and Ian what he called the issue of

"conditional consent," in which he asked, "[b]y opting in on a site advertising at home business

opportunities, is the opter consenting to a call about further education?" (PX162 at 1). He then

stated, "it is unfortunate that we have the potential conditional consent issue but oh, well. . . ."

(*Id.*) Raymond Fitzgerald acknowledged the email by circulating Utah's version of the TSR.

After receiving a separate link to Utah's version of the TSR from Utah's Division of Consumer

Protection, Ian Fitzgerald wrote to Raymond and David, "[t]he state wants a reason why we

shouldn't be considered a telemarketing company. Can you guys do some legaling around?"
(PX555 at 1).

**RESPONSE TO STATEMENT #82**

First sentence: Subject to hearsay and relevancy objections, Defendants do not dispute
this statement.

Second sentence: Subject to hearsay and relevancy objections, Defendants do not dispute
this statement.

Third sentence: Subject to hearsay and relevancy objections, Defendants do not dispute
this statement.

Fourth sentence: Subject to hearsay and relevancy objections, Defendants do not dispute
this statement.

83. On April 27, 2016, Ian stated in an email to Raymond that copied Cumming, Brett
Larsen, and Nate Clegg from Day Pacer: "I think it is probably a good idea to invest in the
Telemarking permit down the road. As long as you're okay with it being in Day Pacer's name,
I'm happy to go forward as you suggest." (PX79).

**RESPONSE TO STATEMENT #83**

Subject to hearsay and relevancy objections, Defendants do not dispute this statement.

84. On November 28, 2016, Cumming sent an email to Raymond and Ian providing
some analysis regarding the TSR and TCPA in response to Raymond's email regarding a
consumer complaining he was called by Day Pacer IBT Partner Bluewater and then transferred
to Day Pacer. (PX161 at 1). Cumming stated that, "if Blue Water was determined to be an
agent," an FTC "provision" (the TSR) may apply to Day Pacer, and that "[l]ess likely but more

53

scary is the FTC telemarketing sales rule which requires the same initial identity [of the telemarketer] to be disclosed [on a call]" and civil penalties could apply for TSR violations. (PX161 at 1). And on February 27, 2017, Raymond emailed Ian with language from a portion of the TSR regarding a requirement for the name of telemarketers to be displayed on call recipients' caller identification service, 16 C.F.R. § 310.4(a)(8). (PX544).

**RESPONSE TO STATEMENT #84**

First sentence: Subject to hearsay and relevancy objections, Defendants do not dispute this statement.

Second sentence: Subject to hearsay and relevancy objections, Defendants do not dispute this statement.

Third sentence: Subject to hearsay and relevancy objections, Defendants do not dispute this statement.

85. The FTC issued CIDs to EduTrek L.L.C. in April 2016 and to EduTrek L.L.C. and Day Pacer LLC in February 2017 seeking information about the companies' compliance with the Telemarketing Sales Rule. (PX537 at pp. 14-19 (requesting information about Day Pacer's call records, whether it accessed the National Do Not Call Registry, and whether it had an established business relationship with or express written authorization from consumers it called); PX538 at pp. 14-19 (same with respect to EduTrek); PX156 at pp. 10-13 (requesting information on websites EduTrek purchased consumer data from, telephone numbers used by the company, call recordings, software used to call consumers, etc.)).

**RESPONSE TO STATEMENT #85**

Subject to hearsay and relevancy objections, Defendants dispute this statement. PX537; PX538; PX 156.

86.     The Individual Defendants knew that the Corporate Defendants did not access the

National Do Not Call Registry.   (PX537 at 14 (CID response indicating that Day Pacer did not

have a SAN used by or on behalf of the company to access the National Do Not Call Registry),

24-25 (David Cumming and Raymond Fitzgerald were the only individuals involved in preparing

Day Pacer's response to the CID); PX304 at 200:11-25 (Ian Fitzgerald testified that as a manager

of Day Pacer he did not feel the company needed to subscribe to the National Do Not Call

Registry)).

**RESPONSE TO STATEMENT #86**

Subject to hearsay and relevancy objections, Defendants dispute this statement.   There

are, and were, no corporate defendants.

87.     Raymond, Ian, and David discussed consumer complaints and potential lawsuits

from consumers, and how to respond to such matters.   Raymond and David also provided other

legal guidance regarding EduTrek and Day Pacer's operation.   (PX50 (emails regarding

Cameron BBB complaint); PX161 (Witham complaint); PX162 (additional emails regarding

Cameron complaint); PX176 (indicating complaint forwarded to Raymond and David); PX542

(providing guidance on terms of service on websites and directing employees to make changes)).

For example, in an April 2016 email thread, they discussed a response to a BBB complaint from

a consumer ("Cameron") against EduTrek who stated he was on the Registry and was called

without his consent at least four times in March 2016 by Defendants or their IBT Partner (a

company "located in the Philippines") who transferred Cameron to the Defendants.   (PX50;

PX162).   David suggested telling the BBB that "EduTrek has never made a telephone call to

Cameron."   (PX50 at 3; PX162).   In another email, Raymond instructed Defendants' employee,

Brett Larsen, not to send a planned response to the BBB but that "I will address this in another way[.]" (PX50 at 2).

### RESPONSE TO STATEMENT #87

Subject to hearsay and relevancy objections, Defendants do not dispute this stamen buth see 4DX5 ¶11.

88.     Ian was also aware of concerns expressed by Day Pacer's CSAs that the consumers they were calling were not interested in educational opportunities and did not want to be called.  (PX84).  In an October 31, 2018 email chain, Day Pacer management made fun of questions asked by CSAs that management would answer on a company-wide conference call, including:

> I would like to know what is going IBT vendors? They continually send over with either no prospects on the line, they're disqualified or have zero interest in pursuing their education. These calls are becoming harder and harder to overcome. Also, is the company doing well overall with the very low allocation that all of October had? There's been a huge shortage in schools to offer any prospects.
>
> how can we be evaluated on outbound calls when 99.99% of the time they are a answering machine or a hang up?

(PX84 at 2-4).

### RESPONSE TO STATEMENT #88

Subject to hearsay and relevancy objections, Defendants dispute these statements.

89.     Raymond Fitzgerald and David Cumming were both familiar with a Huffington Post article written by David Halperin about EduTrek.  (PX36; PX300 at 248:20-249:4).  The article alleged that EduTrek obtained consumer information from jobs and benefits websites using fine print disclosures.  (PX36 at 1-2).  EduTrek employees interviewed said that "about 95 to 97 percent of those called reject the pitch to discuss education opportunities."  (*Id.* at 3).

The article also cites specific examples of a website that routed leads to EduTrek even if the consumer failed to check the box expressing an interest in education, and a consumer who asked to be put on the DNC list complained that they were called 14 times. (*Id.*) The article also noted that EduTrek "may well be in violation of federal statutes prohibiting deceptive marketing and unwanted telephone sales calls," (*Id.* at 1) and that "schools sometimes expressed concern that the reps not violate the FTC's Do Not Call Rules," (*Id.* at 4). Neither Raymond Fitzgerald nor David Cumming asked Chad Tatton to investigate any of the allegations in the article. (PX300 at 249:9-23).

**RESPONSE TO STATEMENT #89**

Subject to hearsay and relevancy objections, Defendants dispute these statements.

90.    Raymond testified that he was personally familiar with the National Do Not Call Registry even before his involvement with any of the Defendants. (PX308 at 26:9-16; PX521 at Resp. No. 19 (admitting knowledge of the existence of the DNC Registry prior to March 22, 2014)). During his involvement with Defendants, he was also familiar with the Telemarketing Sales Rule and the requirement that a telemarketer obtain consent before calling a consumer whose number is listed on the Registry. Raymond testified that "I do complex commercial litigation, and when I do, depending on the area, I become more knowledgeable about an area than everybody else in the case." (PX308 at 172:17-21). He testified he had knowledge of telemarketing or telecommunications law before the FTC filed this lawsuit by virtue of representing Defendants in "a few cases that were brought against EduTrek . . . one case that was brought against EduTrek and Day Pacer," and "several threats of cases, all of which involved telecommunications law." (PX308 at 19:6-20:13). Raymond testified that "some or all" of these cases involved allegations relating to the Do Not Call Registry. (PX308 at 19:24-21:19).

**RESPONSE TO STATEMENT #90**

Subject to relevancy objections, Defendants do not dispute these statements.

91.     Many of the contracts Raymond reviewed for "for legal purposes," (PX302 at

229:11-13), including those EduTrek entered as early as 2011, referenced the TSR, (PX308 at

25:13-26:8)).   Corporate email produced by Defendants (*e.g.*, PX6 at 1) reflects that, no later

than the fourth quarter of 2014, EduTrek's president Chad Tatton and Mr. Fitzgerald

collaborated to revise Edutrek's existing agreement that required the company's IBT Partners to

"comply with . . . the Federal Trade Commission's Telemarketing Sales Rule" and prohibited

them from "call[ing] any individuals whose numbers appear on a federal or state Do Not Call

("DNC") list, unless it meets a valid exemption."   (PX7 at 2 (1/1/2014 Agreement with

Bluewater LLC also referencing compliance with the TCPA); PX308 at 130:24-147:9).   The

revised agreement included the same language as the original but renumbered and reformatted

the provision.   (PX10 at 2).   Mr. Fitzgerald testified that he "would have given comments about

the language" in agreements, that "my tendency is to read entire documents," (PX308 at 145:20-

146:15), and that "I'm the type who would probably review it all."   (PX308 at 135:13-136:2).

**RESPONSE TO STATEMENT #92**

Subject to hearsay, relevance and statute of limitations objections, Defendants do not

dispute.

92.     Nate Clegg, the CEO of EduTrek and later Day Pacer testified that he would go to

Raymond Fitzgerald if a consumer complained that either company had violated the TCPA.

(PX309 at 84:24-85:5).   Defendants also have been sued repeatedly for calling consumers on the

DNC Registry, and actively resisted an investigation by the State of Utah into violations of its

TSR analog.   (PX555 at 1).   Raymond represented EduTrek in these lawsuits and consulted

with the company regarding such lawsuits. (PX302 at 229:17-19; 230:3-231:2). For example, a plaintiff named Kathleen Brown sued Defendants in July 2015, alleging that EduTrek had called her repeatedly despite her number being listed on the National Do No Call Registry. (PX26 at pp.4-5, ¶¶ 9-10). Ms. Brown alleged that she had no existing business relationship with EduTrek and that the company called without her consent. (*Id.* ¶¶ 7, 14). On Sunday, July 26, 2015, Defendant Raymond Fitzgerald emailed the other Defendants acknowledging that EduTrek had been served on July 23, 2015. (PX27 at 1). He further indicated that EduTrek's president Chad Tatton was "trying to ascertain whether Brown consented to the calls." *Id.* Tatton responded the next day that he was waiting on a response from the lead generator that had sent EduTrek Ms. Brown's contact information. *Id.* A month later, on August 20, 2015, Tatton forwarded an email to Raymond Fitzgerald showing EduTrek's receipt of Ms. Brown as a lead, but stating, "I'm still working on getting something indicating that the opt-in box was checked. The problem is that it just doesn't exist." (PX31 at 1). Tatton testified that Raymond Fitzgerald had represented EduTrek in the lawsuit by Brown (PX300 at 204:17-22), and that he normally brought lawsuits to the attention of both Raymond Fitzgerald and David Cumming. (PX300 at 202:14-24). Raymond Fitzgerald also testified that he was consulted regarding lawsuits filed against EduTrek, and that David was also consulted about lawsuits for "[l]egal thinking input." (PX302 at 229:17-230:2).

**RESPONSE TO STATEMENT #92**

Subject to hearsay objections, Defendants do not dispute but see 4DX5 ¶10

93.     Raymond Fitzgerald also represented EduTrek in a suit filed by a plaintiff named Alan, which was filed October 13, 2016, and alleged that Defendants had repeatedly called a

consumer on the DNC Registry. (PX553 at ¶¶ 1, 17, D428, D430). Raymond was aware that the lawsuit alleged TCPA violations and understood it involved allegations that EduTrek was calling consumers on the DNC Registry. He discussed the suit in detail with David Cumming. (PX302 at 230:3-231:2).

**RESPONSE TO STATEMENT #93**

Subject to hearsay objections, Defendants do not dispute but see 4DX5 ¶20 and 4DX15.

**H. TRANSITION FROM EDUTREK TO DAY PACER**

94.    Day Pacer and EduTrek have shared the same offices in Sandy, Utah at 1333 E 9400 S, Sandy, Utah 84093, (PX309 at 32:6-33:18; PX304 at 81:14-18), a building owned by Raymond Fitzgerald and David Cumming through their Utah company, Thorpe/Sandy LLC. (PX70; PX142; PX143 at 1, 12, 14; PX302 at 29:23-30:9; PX306 at 89:12-90:16. *See also* PX109 at Resp. No. 1; PX522 at Resp. No. 1 (stating that Day Pacer and EduTrek have operated from 498 N. Kays Drive, Kaysville, UT 84037)). Defendants continued to operate uninterrupted in this same Sandy, Utah location after changing their name from EduTrek to College Criteria, and from College Criteria to Day Pacer. (PX309 at 56:9-20).

**RESPONSE TO STATEMENT #94**

Subject to the Conflation Objections and hearsay and relevance objections, do not dispute.

95.    Nate Clegg, the CEO of EduTrek who remained CEO of College Criteria, and after it was renamed, Day Pacer, (PX309 at 49:23-50:2), approved a message to EduTrek's employees telling them that "[o]ur corporate name is changing from Edutrek LLC to College Criteria LLC," but "[f]or you[r] day to day life and job functions this change will not matter one

60

bit. Still do everything the exact way you have been doing so. It just means that twice per month your check will have a different name on it." (PX211; PX309 at 55:24-56:5; PX51 (EduTrek notifying its CSAs after Day Pacer was formed that there was a "new name change" for the company and that they were now working for Day Pacer ("College Criteria") and should use the d/b/a "Our School Search" on calls with consumers)).

**RESPONSE TO STATEMENT #95**

Subject to hearsay objections, Defendants dispute this.

96. Defendants admit that all or nearly all of the employees of Day Pacer after it formed were also employed by EduTrek; and these employees had the same job responsibilities at both companies. (PX521 at Resp. No. 5; PX48 at 9-11 (employee list for employees that worked for both EduTrek and Day Pacer); PX211; PX301 at 69:10-17 (listing employees with the title "manager" or "director" that worked for both EduTrek and Day Pacer), 108:25-109:5 (accurate to say that "there were a lot of employees that were one moment working for EduTrek and then the next moment they're working for Day Pacer"); PX309 at 55:24-56:5). EduTrek and Day Pacer also shared employee policies. (PX117 (cover email for PX118); PX118 at 1 (EduTrek employee compensation policy that was also used for Day Pacer employees—"This should be the most current one for current employees.")).

**RESPONSE TO STATEMENT #96**

Subject to the Conflation Objections, Defendants do not dispute 96.

97. Day Pacer employees continued to use "edutrek.com" email addresses well after Day Pacer was formed in the fall of 2015. (*See, e.g.*, PX58 at 5-6; PX72; PX73; PX175 at 1; PX556 at 1).

61

**RESPONSE TO STATEMENT #97**

Defendants do not dispute 97.

98.    Day Pacer took over the EduTrek name as a d/b/a; told its clients that the change

from EduTrek to Day Pacer was merely a "rebranding"; and downplayed the change from

EduTrek to Day Pacer to their vendors, reassuring them it would be "business as usual."   (PX55

(proposed email to customers and vendors notifying them of "name change" from EduTrek to

College Criteria LLC); PX56 at 3-4 (email to React2Media notifying company of rebranding);

PX115 (College Criteria LLC acquiring EduTrek as a d/b/a); PX116 at 3 (AdBrilliant remains

Day Pacer client); PX515 at 1 (rebranding email sent to Keypath); PX309 at 74:10-75:6

(downplaying change and saying it would be "business as usual").   *See also* PX535 (Ian

Fitzgerald telling a potential Day Pacer data partner—a former EduTrek data partner— that

"[y]ou may be more familiar with our former name of EduTrek"); PX184 at 2 (March 2019 draft

questionnaire to EducationDynamics filled out by Emma Furman stating that "We [Day Pacer]

have been selling leads since 2008"; responding "Yes" to the question "Have you worked under

any other business names?"; and further stating: "EduTrek, EdSoup – However, both of these

businesses were completely dissolved and shut down.   DayPacer is a 'successor company' and

an entirely new entity, with a completely different equity structure and very different senior

management and values.   The entity DayPacer has never operated under a different business

name."); PX183 (cover email for PX184, with Ian sending PX184 to Raymond and Emma asking

for feedback on answering the question about previous business names); PX186 (cover email for

PX187, sending new version of questionnaire to EducationDynamics); PX187 (changed to state

that Day Pacer has been selling leads only since 2015)).

**RESPONSE TO STATEMENT #98**

Subject to hearsay objections, Defendants do not dispute 98.

99.     Day Pacer and EduTrek continued serving the same clients, using the same lead generators and vendors; shared the same computer and telephone systems; and continued using the Individual Defendants' company Call Criteria to provide compliance monitoring.  (PX54 at 2 (Veracity Networks account statement requesting name change on account from EduTrek to Day Pacer on 6/13/2016); PX116 at 3 (AdBrilliant remains client); DX30 at ¶ 8 ("Roy" database contained call records from January 25, 2010 through September 11, 2016, nearly a year after EduTrek purportedly ceased doing business); PX301 at 109:6-10 (same accounts with vendors); PX309 at 57:6-14, 58:20-59:3 (same clients, using the same lead generators); PX309 at 58:8-12, 59:4-6 (continued using Call Criteria)).   Some clients continued to send invoices to Day Pacer in EduTrek's name after EduTrek's supposed dissolution.   (PX551 at 3, 9-11 (EduTrek invoices sent to Day Pacer in 2016)).

**RESPONSE TO STATEMENT #99**

Defendants do not dispute 99.

100.     Day Pacer took over the financial accounts of EduTrek.   (PX52 (cover email for PX53 and noting that accounts are being brought over from Day Pacer); PX53 at 1 (A/R line items for EduTrek); PX81 at 1 (Day Pacer financials "Balance Sheet" showing EduTrek bank and credit card accounts); PX301 at 111:11-19, 113:5-17, 237:10-21; PX516 at 8-12 (Assignment and Assumption Agreement transferring all of EduTrek's assets to College Criteria LLC (Day Pacer))).

**RESPONSE TO STATEMENT #100**

Defendants dispute 100. PX52, PX301, PX516.

101. Although Defendants claimed to some that they were changing their name to Day Pacer to facilitate marketing in other industries, or "verticals," (PX212 at 1), the first name of the company was "College Criteria LLC." (*See, e.g.*, PX309 at 58:20-24 (College Criteria changed its name to Day Pacer and kept the same clients)). Day Pacer's CEO estimated that only 2-5% of Day Pacer's business was ever outside of education. (PX309 at 64:13-65:8; 68:7-16). However, Defendants changed EduTrek's name because their business practices had attracted bad publicity, which had caused the company to lose business. (PX309 at 68:24-70:17; PX36 (article in Huffington Post); PX50 at 1-2 (BBB complaint filed against EduTrek; Raymond Fitzgerald says that Day Pacer will respond, "but who cares EduTrek is already daed [sic]")). To avoid further scrutiny and loss of business, Defendants decided it would be "prudent to start fresh with a new name." (PX212 at 1; PX515 at 1). EduTrek changed its name before it informed its clients. (PX306 at 71:16-72:7).

**RESPONSE TO STATEMENT #101**

Subject to the Conflation Objections and hearsay objections, Defendants dispute 101. PX309, PX306.

102. Having changed the company name, Defendants then used the fact to defend against private lawsuits and inquiries from government regulators that inquired into similar issues. Cumming responded to a consumer's claim that EduTrek had called repeatedly without permission by claiming, for example, with respect to the fictitious business names "Our School Search" and "College Advisor" used by the telemarketer that "[n]either of these names has been used by EduTrek and neither has any authority to make representations on behalf of EduTrek."

64

In reality, the names belonged to Day Pacer and Defendants' IBT Partner. (PX162 at 2; PX50 at 1-2; PX554 at 2-3 (consumer called by IBT Partner Bluewater and transferred to Day Pacer)).

**RESPONSE TO STATEMENT #102**

Subject to the Conflation Objections and hearsay objections, Defendants dispute 102. PX162; PX554.

## I. ALLIED CONTACT MANAGEMENT AND ENTROPY LEADS

103. Allied Contact Management LLC and Entropy Leads LLC were created after the filing of the Complaint to conduct telemarketing operations using Day Pacer employees. (R. 153 at 6 (Raymond is "deemed to have formed Entropy Leads LLC for the purpose of continuing the business practices of Day Pacer after the government filed this lawsuit."); R. 140-9 at 2 (Allied Contact Management was organized on April 4, 2019—less than two weeks after the filing of the Complaint—for the purpose of "manag[ing] other businesses in the contact business"), 5 (Entropy Leads was organized on June 18, 2019, for the purpose of "[s]elling leads"), 17 (Day Pacer's Director of Client Service Emma Furman writes to Inquir, the lead purchaser: "[w]e do, however, have 2 other groups of agents through Allied that fill leads for all of our other Day Pacer campaigns"); PX307 at 74:1-6, 75:2-76:7 (Allied "manag[ed] call center agents" for education lead generation campaigns); PX526 at Resp. No. 7 (admitting that there was a period when the company had "communications directly or indirectly with consumers"); PX540 at 1 (informing Day Pacer CSAs they will now have acmagent.com email addresses); PX541 ("[W]e will be branding a new company name. . .Ian took about 35 seconds to come up with 'Allied Contact Management' for the new name.")).

**RESPONSE TO STATEMENT #103**

Subject to the Conflation Objections and the hearsay and relevancy objections, Defendants dispute 104. R. 153, R. 140-9, PX307, PX540, PX541.

104.    When the FTC submitted discovery requests for "[d]ocuments sufficient to identify any entity in which you had any ownership... that was paid for calling consumers, called consumers to sell products, or was paid for providing the information of consumers who might be interested in a good or service" Defendants Raymond Fitzgerald and Ian Fitzgerald initially responded that there were no such documents. (PX528 at Resp. No. 11; PX529 at Resp. No. 11). The FTC independently discovered the existence of Allied Contact Management LLC and Entropy Leads LLC, and sent a deficiency letter to Defendants. (R. 140-4 at 3). Only after receiving the deficiency letter did Defendants admit that they should have included the documents for at least Allied Contact Management. (R. 144-1 at ¶ 20). The Court entered an adverse finding against Defendant Raymond Fitzgerald that he "is deemed to have formed Entropy for the purpose of continuing the business practices of Day Pacer after the government filed this lawsuit." (R. 153 at 6).

**RESPONSE TO STATEMENT 104**

Subject to hearsay objections, Defendants dispute 104.

105.    Allied Contact Management LLC and Entropy Leads LLC both failed to produce any phone records in response to the FTC's subpoenas, nor did they produce any evidence that they scrubbed telephone numbers against the DNC Registry, or that consumers provided their authorization to receive calls, made inquiries or applications regarding educational programs, or initiated phone calls in response to an advertisement. (PX526 at Resp. No. 9-12, 19, 20; PX527 at Resp. No. 9-12, 19, 20).

66

**RESPONSE TO STATEMENT 105**

Subject to hearsay and relevancy objections, Defendants dispute 105. (PX526 at Resp. No. 9-12, 19, 20; PX527 at Resp. No. 9-12, 19, 20).

### J. MISCELLANEOUS

106. The FTC has complied with 15 U.S.C. § 6155(b), a requirement in the Telemarketing Act for the FTC to "periodically check telephone numbers" on the National DNC Registry and remove those that have been disconnected and reassigned. (PX401 ¶ 4; PX402 at ¶ 6.b).

**RESPONSE TO STATEMENT 106**

Defendants have no basis to dispute 106.

107. The only evidence that Defendants claim constitutes proof of any established business relationship ("EBR") and express written authorization ("EWA") affirmative defense are their call records, which they claim identify URLs—or website locations—where the consumers entered their phone numbers. (PX302 at 204:25-205:7; PX304 at 269:13-270:19; PX521 at Resp. No. 9 (not the regular business practice of EduTrek or Day Pacer to preserve screenshots of websites)).

**RESPONSE TO STATEMENT 107**

Subject to the Conflation Objections and hearsay objections, Defendants dispute 107.

108. FTC economist Dr. Kenneth Kelly created a statistically valid random sample of EduTrek and Day Pacer's call records that contained 750 records that was then reviewed by FTC paralegal Laura Alan to see if the URL records contained therein were complete and that the URLs linked to websites that indicated evidence of EBR or EWR. (DX7 at ¶¶ 2-10; DX30 at ¶

35; DX99 at ¶¶ 5-7).

**RESPONSE TO STATEMENT 108**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute 108. DX9 et seq; 4DX18, p. 19, l. 6 to p. 27 l. 6, p. 29 l. 13 to p. 32 l.8, p. 32 l. 21 to p. 35 l. 7, p. 35 l. 22 to p. 39 l. 21, p. 42 l. 4 to l. 7, p. 43 l. 3 to p. 45 l.6, p. 47 l. 13-15, p. 48 l. 17 to p. 49 l. 8, p. 50 l. 12 to p. 53 l. 9, p. 58 l. 15 to p. 81 l. 24.

109.    Ms. Alan's review indicated that in nearly all cases, the URL records:   were blank, contained text that was not a web page, or did not point to an active web page, and even when they did point to an active web page, did not contain any language about telephone calls. (DX7 at ¶ 10 & Table).

**RESPONSE TO STATEMENT 109**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute 108. DX9 et seq; 4DX18, p. 19, l. 6 to p. 27 l. 6, p. 29 l. 13 to p. 32 l.8, p. 32 l. 21 to p. 35 l. 7, p. 35 l. 22 to p. 39 l. 21, p. 42 l. 4 to l. 7, p. 43 l. 3 to p. 45 l.6, p. 47 l. 13-15, p. 48 l. 17 to p. 49 l. 8, p. 50 l. 12 to p. 53 l. 9, p. 58 l. 15 to p. 81 l. 24.

110.    Based on Ms. Alan's review, Dr. Kelly concluded that none of the 750 call records identified a URL containing language regarding telephone calls to consumers that included language indicating that calls would be coming from Defendants.   (DX99 at ¶¶ 7, 8.a). 98.7% of the records in the sample either had a URL field that was blank, contained text that was not a valid URL, didn't link to an active webpage, or linked to a web page that did not include language regarding telephone calls to consumers.   (DX99 at ¶ 8.b).   The sample mean for the 750 call record sample for records linked to a URL containing language regarding telephone

calls to consumers that included language that calls would be coming from the defendants is 0%, with a 95% confidence interval of 0.00% to 0.49%. (DX99 at ¶¶ 4 (explaining sample mean and confidence interval), 9, & Table T.1).

**RESPONSE TO STATEMENT 110**

Subject to the Conflation Objections and hearsay and relevancy objections, Defendants dispute 108. DX9 et seq; 4DX18, p. 19, l. 6 to p. 27 l. 6, p. 29 l. 13 to p. 32 l.8, p. 32 l. 21 to p. 35 l. 7, p. 35 l. 22 to p. 39 l. 21, p. 42 l. 4 to l. 7, p. 43 l. 3 to p. 45 l.6, p. 47 l. 13-15, p. 48 l. 17 to p. 49 l. 8, p. 50 l. 12 to p. 53 l. 9, p. 58 l. 15 to p. 81 l. 24.

111. On March 8, 2019, pursuant to the provisions of Section 16(a)(1) of the FTC Act, 15 U.S.C. § 56(a)(1), the FTC gave written notice to the Attorney General of its intention to commence an action against Defendants for civil penalties under Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), for violations of the TSR. (PX581 at 1). On March 13, 2019, the Acting Director of the Consumer Protection Branch of the Department of Justice responded that it did not intend to commence or intervene in the action and that the FTC could commence the action in its own name. (PX582).

**RESPONSE TO STATEMENT 111**

Defendants do not dispute 111.

112. On January 3, 2021, Day Pacer Defendants sent their Third Supplemental MIDPP Disclosures to the FTC, which includes information about the affirmative defenses they pled in their Amended Answer (R. 33). (PX594).

**RESPONSE TO STATEMENT 112**

Defendants do not dispute 112.

October 8, 2021

Butler, Fitzgerald, Fiveson & McCarthy
A Professional Corporation

By: _____
     Raymond Fitzgerald

65 East Monroe Street, Ste 4422
Chicago, IL 60603

9 East 45th Street, Ninth Floor
New York, NY 10017

(212) 615-2222
(212) 615 -2215 (fax)
rfitzgerald@bffmlaw.com

70

## CERTIFICATE OF SERVICE

I certify that on October 8, 2021 I filed the Amended Response of Defendants Day Pacer LLC, EduTrek L.L.C. Raymond Fitzgerald and Ian Fitzgerald to Plaintiff's Rule 56.1 Statement with the Clerk of the Court via ECF. I also certify that this Amended Response is being served on counsel for all other parties at their respective email addresses via ECF.

To:   Adam Wesolowski, Esq.
       awesolowski@ftc.gov
       Attorney for Plaintiff Federal Trade Commission

       David Cumming
       dcomyn@gmail.com
       Pro se

                                        Butler Fitzgerald Fiveson & McCarthy PC

                                        By: _____
                                            Raymond Fitzgerald

                                        65 East Monroe Street, Ste 4422
                                        Chicago, IL 60603

                                        9 East 45th Street, Ninth Flr
                                        New York, NY 10017

                                        (212) 615-2222
                                        (212) 615 -2215 (fax)
                                        rfitzgerald@bffmlaw.com

71