UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Federal Trade Commission,

    *Plaintiff,*

v.

Day Pacer LLC, Edutrek L.L.C., Raymond
Fitzgerald, Ian Fitzgerald, and David
Cumming,

    *Defendants.*

No. 19 CV 1984

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

In March 2019, the Federal Trade Commission ("FTC") filed this consumer-protection action against Day Pacer LLC ("Day Pacer"), a telemarketing company that makes calls to generate consumer leads to sell to for-profit education companies. [Dkt. 1, ¶ 1.] The FTC also brings suit against Day Pacer's successor in interest, EduTrek L.L.C. ("EduTrek," and together with Day Pacer, the "LLC Defendants"), and its former President Ian Fitzgerald, managing member Raymond Fitzgerald, and partial owner and manager David Cumming. In Count I, the FTC alleges that Defendants initiated or caused others to initiate telephone calls to phone numbers on the federal Do Not Call List in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(b)(1)(iii)(B), which is promulgated under the Telemarketing Act, 15 U.S.C. §§ 6101–6108. Count I is based on both (1) calls initiated by the LLC Defendants and (2) calls initiated by other telemarketers that were allegedly acting as the LLC Defendants' agents (the "IBT Partners"). Count II alleges that Defendants violated 16 C.F.R. § 310.3(b) by providing substantial assistance and support to the IBT Partners even though Defendants knew or

consciously avoided knowing that those telemarketers were calling numbers on the Do Not Call List in violation of the TSR.

The FTC has moved for summary judgment against all Defendants. [See Dkt. 211.] Day Pacer, EduTrek, and the Fitzgeralds oppose summary judgment and have also cross-moved for summary judgment against the FTC. [See Dkt. 227.] Cumming filed a separate opposition to summary judgment and also cross-moved for summary judgment. [See Dkt. 230.] The two sets of Defendants have also adopted one another's summary judgment arguments. [See Dkt. 227 at 58; Dkt. 230 at 6.] Shortly after summary judgment briefing concluded, Cumming passed away. [See Dkt. 244, Statement Noting Party's Death.] The FTC timely filed a motion to substitute the personal representative of Cumming's estate (the "Estate") as a defendant in this action. [See Dkt. 247.] The Estate opposes the motion. [See Dkt. 263.]

For the reasons discussed below, the FTC's motion for substitution [Dkt. 247] is granted. The Estate is substituted as a defendant in this action. The FTC's motion for summary judgment [Dkt. 211] is granted in part and denied in part. The FTC has demonstrated as a matter of law that Defendants are liable for violating the TSR because the LLC Defendants placed calls to phone numbers on the Do Not Call List (part of Count I). The FTC has not demonstrated as a matter of law that Defendants are liable for calls initiated by the IBT Partners acting as Defendants' agents (the other part of Count I). However, the FTC has also moved for—and is entitled to— summary judgment on its alternative claim in Count II that Defendants have provided substantial assistance and support to at least one other telemarketer while

2

knowing that the telemarketer was calling numbers on the Do Not Call List. Since the FTC is entitled to judgment on only one of its two alternative theories (absent any attempt to analyze the IBT Partners individually), Defendants are entitled to summary judgment on Count I to the extent it is based on calls initiated by IBT Partners.

Given the age of the summary judgment motions and the substitution of the Estate for Mr. Cumming, the Court will require further input from the parties before ordering an appropriate remedy.

## I.    Introduction

### A.    Statutory Framework

Section 5 of the FTC Act declares unlawful "[u]nfair methods of competition" and "unfair or deceptive acts or practices" in or affecting commerce. 15 U.S.C. § 45(a)(1). The FTC has authority to prescribe "rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce," with certain exceptions that are not applicable here. 15 U.S.C. § 57a(a)(1)(B). Once those rules take effect, "a subsequent violation thereof shall constitute an unfair or deceptive act or practice in violation of section 45(a)(1) …." 15 U.S.C. § 57a(d)(3). The FTC is empowered to bring actions in federal court to enforce violations of Section 5 of the FTC Act and to seek appropriate equitable relief and civil penalties. *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634-35 (7th Cir. 2005). During the time period relevant here, the maximum statutory recovery for each violation of the FTC

Act was between $16,000 and $42,530, depending on exactly when the violation occurred. [See Dkt. 211 at 36, n.20.]

The FTC promulgated the TSR to implement the Telemarketing and Consumer Fraud and Abuse Prevention Act's direction that it "prescribe rules prohibiting deceptive telemarketing acts or practices and other abusive telemarketing acts or practices." 15 U.S.C. § 6102(a)(1). The TSR is codified in Title 16, Part 310 of the Code of Federal Regulations. Violations of the TSR constitute unfair or deceptive acts or practices in violation of section 5(a) of the FTC Act. *F.T.C. v. Pacific First Benefit, LLC*, 472 F. Supp. 2d 974, 980 (N.D. Ill. 2007) (citing 15 U.S.C. § 45(a); 15 U.S.C. § 57a(d)(3); 15 U.S.C. §6102(c)). The TSR defines "telemarketing" to mean "a plan, program, or campaign which is conducted to *induce the purchase of goods or services* or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. . . ." 16 C.F.R. § 310.2(gg) (emphasis added). "Telemarketer means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." *Id.* § 310.2(ff). "Customer means any person who is or may be required to pay for goods or services offered through telemarketing." *Id.* § 310.2(n). "Seller means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." *Id.* § 310.2(dd).

Pursuant to the TSR, "[i]t is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a

4

telemarketer to engage in … (iii) *Initiating* any outbound telephone call to a person when: … (B) That person's telephone number is on the 'do-not-call' registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services *unless* the seller or telemarketer" can demonstrate that the seller either (1) "has obtained the express agreement, in writing, of such person to place calls to that person"; or (2) "has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls …." 16 C.F.R. § 310.4(b)(1)(iii)(B) (emphasis added). An "outbound telephone call" means "a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution." 16 C.F.R. § 310.2(x).

In addition, pursuant to § 310.3(b), it is also "a violation of this Rule for a person to provide *substantial assistance or support* to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates … § 310.4 of this Rule." 16 C.F.R. § 310.3(b) (emphasis added).

### B.    Factual Background

The facts set forth in this opinion are drawn from the statements and exhibits that the parties filed pursuant to Local Rule 56.1. [See Dkts. 212, 227, 228, 229, 230, 231, 232, 235, 236, 237, 241, 242.] These facts are undisputed except where a dispute is noted.[1] Day Pacer is a company that sold consumer leads to various educational

---

[1]    Local Rule 56.1 requires a party opposing a summary judgment motion to file, in response to the movant's statement of material facts, a concise response to the movant's

partners. [See Dkt. 229, ¶ 17; Dkt. 227-2, ¶¶ 4-5 (Tatton affidavit).] Day Pacer previously did business under the name EduTrek, among other names. These LLC Defendants purchased data from websites where people entered their contact information, including their phone numbers. [See Dkt. 229, ¶ 15; Dkt. 236, ¶ 4; Dkt. 227-2, ¶ 5 (Tatton affidavit).] Many—but not all—of the websites collecting consumer contact information contained job postings and advertised themselves as job search sites. [Dkt. 229, ¶ 24.]

After purchasing the consumer contact information from the websites, the LLC Defendants gave those phone numbers to what they refer to as "dialer companies" and paid those companies to call the numbers. [Dkt. 236, ¶¶ 20, 22.] If someone answered the call, the dialing vendor then transferred the call to Day Pacer. [*Id.*, ¶ 23.] Day Pacer operated its own 100 to 200 seat call center, which employed agents called College Search Advisers ("CSAs"). [Dkt. 229, ¶ 15.] If a consumer expressed interest in educational opportunities, Day Pacer sold that contact information to one or more educational institutions as a consumer lead. [Dkt. 236, ¶ 35; Dkt. 227-2, ¶¶ 5 & 18 (Tatton declaration).]

---

statement that shall contain: (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed (Local Rule 56.1(e)(1)), (B) a response to each numbered paragraph in the moving party's statement (Local Rule 56.1(e)(2)), and (C) in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon and a concise explanation of "how the cited material controverts the asserted fact" (Local Rule 56.1(e)(3)). Defendants' Local Rule 56.1 responses include multiple numbered paragraphs that purport to dispute the FTC's facts, but do not actually dispute the contents of the paragraph, do not provide citations to the record, and/or do not "concisely explain how the cited material controverts the asserted fact." This does not comply with Local Rules 56.1(b)(2) and 56.1(e). Where Defendants dispute the FTC's facts but fail to cite the record evidence or explain how it controverts the asserted fact, the FTC's facts are deemed admitted.

In addition to placing their own outbound telephone calls, Defendants also contracted with other telemarketing companies, the "IBT Partners," to place outbound telephone calls to consumers, determine potential eligibility for enrollment in post-secondary education, and transfer the calls to the LLC Defendants for further telemarketing. [See Dkt. 229, ¶ 35 (citing model inbound transfer agreement, PX10).] Many of the IBT Partners are located outside of the United States, for instance in India and the Philippines. [*Id.*, ¶ 39.] The LLC Defendants paid the IBT Partners for the leads that they called and then transferred to the LLC Defendants. [*Id.*, ¶ 43.] In some cases, Defendants provided the IBT Partners with the telephone numbers to call. [*Id.*, ¶ 44.] And in some cases, Defendants reviewed their IBT Partners' call scripts or provided them with scripts to use, or provided the IBT Partners with business information and guidance to increase the number of transfers they provided to the LLC Defendants. [*Id.*, ¶¶ 45, 46.]

According to the FTC, Defendants have violated the TSR by initiating millions of calls to numbers on the Do Not Call List and by assisting and facilitating the IBT partners' violations. For the most part, Defendants do not dispute that these calls occurred and that no efforts were made to comply with the TSR. Specifically, it is undisputed that between March 2014 and June 2019, the LLC Defendants made at least 3,669,914 calls to phone numbers on the Do Not Call List, including interstate calls. [Dkt. 229, ¶ 26.] Calls to numbers on the Do Not Call List accounted for approximately 25% of the outbound telephone calls initiated by the LLC Defendants. [*Id.*] Defendants did not subscribe to the Do Not Call registry and did not scrub their

7

calling lists of DNC numbers. [*Id.*, ¶ 27.] Defendants also admit that they instructed their CSAs to overcome the "objections" of consumers who told the CSAs that they were not interested in speaking about educational opportunities or were displeased about being called. [*Id.*, ¶ 29.] In addition, the FTC has introduced transcribed calling records indicating that numerous consumers were not interested in education or in speaking with Defendants at all. [*Id.*, ¶ 32.]

It is undisputed that between March 22, 2014 and June 12, 2019, the IBT Partners transferred 498,597 calls to Defendants that were the product of outbound telephone calls to numbers on the DNC Registry (20% of the total inbound transfers received from IBT Partners during that period). [Dkt. 229, ¶ 41.] The IBT Partners made an additional approximately 39,847,000 calls to DNC numbers, which did not result in inbound transfers to Defendants. [*Id.*] Defendants operated under the assumption that the IBT Partners did not scrub numbers against the DNC Registry. [*Id.*, ¶ 48; see also Dkt. 232, ¶¶ 26, 27, 41 (Cumming's 56.1 response disputing only that he "personally engaged" in telemarketing calls to numbers on the DNC Registry).]

The LLC Defendants received complaints from consumers, as well as from operators of the websites from which they purchased phone numbers, that they were initiating calls to phone numbers on the DNC registry. [Dkt. 229, ¶ 30; Dkt. 232, ¶ 30.] Defendants also received complaints from schools and other lead purchasers and their compliance companies that they were initiating calls to consumers without collecting proper express written authorization to be contacted. [Dkt. 229, ¶ 33; Dkt.

232, ¶ 33.] At least one major lead purchaser, EducationDynamics, refused to work with the LLC Defendants because it was concerned that their consumer data sources, such as websites, did not properly collect consumers' consent to be contacted. [*Id.*] Defendants admit that the LLC Defendants "continued to purchase consumer data generated from websites after receiving complaints regarding those websites depending on the particular complaint." [Dkt. 212-9 at 124 (response to request to admit no. 16).]

Defendants also received complaints and threatened lawsuits from consumers on the DNC Registry who were called by IBT Partners; Defendants acknowledge this but assert that the claims were false. [Dkt. 229, ¶¶ 49, 93; Dkt. 232, ¶¶ 49, 92; see also Dkt. 212-9 at 124 (response to request to admit no. 17).] Defendants admit that they sometimes continued to work with IBT Partners even after receiving complaints that they were calling DNC Numbers without consent. [See Dkt. 229, ¶ 42; Dkt. 212-9 at 124 (PX521, response to request to admit no. 15).] In one example, Defendants continued working with IBT Partner Bluewater despite repeated complaints and compliance notices. [Dkt. 229, ¶ 42; Dkt. 232, ¶ 42.] The FTC has also introduced call records showing that numerous consumers called by the IBT Partners were not interested in education or in speaking with the LLC Defendants at all. [Dkt. 229, ¶ 50; Dkt. 232, ¶ 50.]

Nonetheless, Defendants maintain that they did not violate the TSR, for three primary reasons: 1) the TSR is unconstitutional or otherwise invalid; 2) Defendants did not offer to sell the called parties anything and therefore are not subject to the

TSR; and 3) the called parties all consented to have their data sent to educational institutions. Defendants argue further that even if their conduct did violate the TSR, they did not have the requisite level of knowledge to be held liable for civil penalties.

The FTC issued a Civil Investigative Demand to EduTrek in 2016. At that time, Cumming told the FTC that EduTrek was dissolved, but did not mention that Day Pacer was operating the same business out of the same location with most of the same employees. [Dkt. 229, ¶ 60; Dkt. 232, ¶ 60.] The FTC filed the present lawsuit in 2019. Raymond and Day Pacer employees subsequently created two new companies, Allied Contract Management LLC and Entropy Leads LLC, to conduct telemarketing operating using Day Pacer employees. [Dkt. 229, ¶ 103.]

## II.    Motion to Substitute

Following David Cumming's death, the FTC timely moved to substitute as defendant his daughter, Margaret Cumming, in her capacity as the personal representative of David's Estate. Federal Rule of Civil Procedure 25 governs the substitution of a party who has died. See *Russell v. City of Milwaukee*, 338 F.3d 662, 663 (7th Cir. 2003). Under Rule 25(a), "if the claim on which the suit is based survives the death (some claims, such as claims of defamation, die with the claimant), the court may order the substitution of the proper party, ordinarily the personal representative of the party who has died." *Atkins v. City of Chicago*, 547 F.3d 869, 870–71 (7th Cir. 2008).

Rule 25(a) is written in permissive terms ("the court may"), but the parties nonetheless debate how much discretion the Court has to deny a timely motion for

substitution following the death of a party. [See Dkt. 267 at 2 (FTC citing *Saylor v. Bastedo*, 623 F.2d 230, 237 (2d Cir. 1980), for the proposition that "it is difficult to imagine a case where discretion might properly be exercised to deny a motion to substitute for a deceased plaintiff made within the rule's time limits"); Dkt. 263 at 2-3 (the Estate citing *In re Baycol Prod. Litig.*, 616 F.3d 778, 783 (8th Cir. 2010), and *Beaudry v. TeleCheck Services, Inc.*, 2016 WL 11398115, at *11 (M.D. Tenn. Sept. 29, 2016), to show that the Court has discretion to deny a Rule 25(a) motion)]. The Court's own limited research indicates that it may be a proper exercise of discretion to deny a Rule 25(a) motion to substitute "where 'circumstances have arisen rendering it unfair to allow substitution." *Symons Int'l Group, Inc v. Continental Cas. Co.*, 2015 WL 1279839, at *9 (S.D. Ind. Mar. 20, 2015) (quoting *S & W X–Ray, Inc. v. Film Recovery Sys., Inc.,* No. 84 C 10479, 1987 WL 6626, at *3 (N.D. Ill. Feb. 9, 1987)); see also Fed. R. Civ. P. 25, advisory committee note to 1963 amendment. Regardless of the exact standard that applies, the Estate has not shown that it would be unfair to allow substitution.

The parties in this case agree that Margaret Cumming would be the proper party for substitution if the FTC's claims survived David's death. But the Estate opposes substitution on the basis that the FTC's claims are penal in nature and, therefore, did not survive David's death. As noted above, the FTC brought this suit to enforce Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the TSR promulgated under the Telemarketing Act, l5 U.S.C. §§ 6101–6108. Neither of these statutes specifies whether a claim brought to enforce it survives the death of the defendant.

Therefore, resolution of the survival issue is governed by federal common law. See *Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 413 (7th Cir. 1980), *overruled on other grounds by Pridegon v. Gates Credit Union*, 683 F.2d 182 (7th Cir. 1982); *see also Hoffman v. Sumner*, 478 F. Supp. 2d 1024, 1030 (N.D. Ill. 2007); *McKinney v. Panico*, 2022 WL 2356476, at *2 (N.D. Ill. June 30, 2022). Under federal common law, remedial claims survive the defendant's death, *Smith*, 615 F.2d at 415; actions for penalties do not, *Schreiber v. Sharpless*, 110 U.S. 76 (1884). But it is not always easy to tell if a statutory claim is remedial or penal.

The FTC Act has long been characterized as a remedial statute. *Sears, Roebuck & Co. v. F.T.C.*, 258 F. 307, 311 (7th Cir. 1919); *see also F.T.C. v. AT&T Mobility*, 883 F.3d 848, 854 (9th Cir. 2018) ("Because the FTC Act is a remedial statute, we are 'guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'" (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). But it also creates a cause of action for what the statute labels as "a civil penalty." 15 U.S.C. § 45(m)(1)(A). Under this provision, "[t]he Commission may commence a civil action to recover a civil penalty … against any person, partnership, or corporation which violates any rule under this subchapter respecting unfair or deceptive acts or practices …. with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." *Id*. The FTC Act "requires that '[i]n determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on

12

ability to continue to do business, and such other matters as justice may require.'" *United States v. Dish Network L.L.C.*, 954 F.3d 970, 980 (7th Cir. 2020) (quoting 15 U.S.C. § 45(m)(1)(C)).

Although the FTC Act labels an action under § 45(m)(1)(C) as one for "penalties," this does not necessarily mean that such an action is penal. The designations "penal" and "penalty" often appear in civil actions where the remedy is not in fact strictly penal. See *Huntington v. Attrill*, 146 U.S. 657, 667 (1892). The Seventh Circuit has not addressed whether an action for civil penalties under the FTC Act should be considered penal or remedial for purposes of allowing substitution of a defendant under Rule 25(a). Since the term penal "is used in different contexts to mean different things," the Seventh Circuit has identified three factors that should be considered in determining whether a statutory action is penal for survival purposes: "(1) whether the purpose of the action is to redress individual wrongs or wrongs to the public; (2) whether recovery runs to the individual or to the public; [and] (3) whether the authorized recovery is wholly disproportionate to the harm suffered." *Smith*, 615 F.2d at 414 (citing *Murphy v. Household Finance Corp.*, 560 F.2d 206, 209 (6th Cir. 1977)). The FTC and the Estate agree that this is the proper framework for assessing survivability. [See Dkt. 247 at 3; Dkt. 263 at 3.]

The FTC argues that the first factor weighs in favor of substitution because the purpose of the TSR is to protect individual consumers from specific telemarketing behavior identified as abusive and coercive. The Estate responds that the civil penalties in this case are intended as a deterrent, so therefore the remedy is meant

13

to address wrongs to the public, not individuals. *Smith* is instructive on how the Court should treat a statute that arguably addresses both general harm to the public and harm to specific consumers. The question in *Smith* was whether a claim for violation of the Truth In Lending Act ("TILA") survived the death of one of the defendants. On the first factor, the Seventh Circuit determined that the purpose of a TILA action is "to remedy abuses resulting from consumer ignorance of the nature of credit arrangements by requiring disclosures in the hope of enable consumers to shop for credit by comparing uniform terms." *Smith*, 615 F.2d at 414. The court acknowledge that "[w]ithout doubt, the statutory scheme ha[d] the effect of redressing a perceived social ill." *Id.* However, "the entire focus of the legislation [w]as on the options open to the individual consumer": it did not mandate terms and conditions of credit but rather "madate[d] only disclosure, leaving the consumer to choose among the available terms and conditions." *Id*; see also *James v. Home Const. Co. of Mobile, Inc.*, 621 F.2d 727, 729–30 (5th Cir. 1980) (agreeing with *Smith* that a TILA action under 15 U.S.C. § 1635 survives the death of the plaintiff). The statutes at issue here also focus on the individual consumer, even though they also have "the effect of redressing a perceived social ill." *Id.* The Congressional findings of the Telemarketing Act recognize that "[c]onsumers and others are estimated to lose $40 billion a year in telemarketing fraud," that "[c]onsumers are victimized by other forms of telemarketing deception and abuse," and that, "[c]onsequently, Congress should enact legislation that will offer consumers necessary protection from telemarketing

deception and abuse." 15 U.S.C. § 6101. The TSR leaves it to consumers to choose if they want telemarketing calls.

The Court is also guided by the Sixth Circuit's decision in *Parchman v. SLM Corp.*, 896 F.3d 728 (6th Cir. 2018), which involved whether a plaintiff's claims for violation of the Telephone Consumer Protection Act ("TCPA") survived the plaintiff's death. The TCPA prohibits much of the same conduct as the TSR, including calling numbers on the DNC List. *Compare* 16 C.F.R. § 310.4(b)(1)(iii)(B) (TSR DNC Registry provision), *with* 47 C.F.R. § 64.1200(c)(2) (TCPA rule DNC Registry provision); *compare* 16 C.F.R. § 310.2(ff)-(gg) (TSR definitions of "telemarketer" and "telemarketing") *with* 47 C.F.R. § 64.1200(f)(15) (TCPA rule definition of "telephone solicitation"); see also 15 U.S.C. § 6153 (directing FCC to "consult and coordinate" with the FTC "to maximize consistency with" rules promulgated by the FTC). The Sixth Circuit found that the claim survived and that the first factor weighed in favor of the plaintiff because "[t]he primary purpose of the TCPA was to protect individuals from the harassment, invasion of privacy, inconvenience, nuisance, and other harms associated with unsolicited, automated calls." *Parchman*, 896 F.3d at 738. The court rejected the notion that because "[t]he harm is widely shared does not mean it is a general public wrong," reasoning that "[t]hese are harms felt by identifiable individuals, as individuals." *Id.* at 739.

Likewise, when a consumer receives a telemarketing call after placing her name on the DNC List, but a telemarketer calls her anyway, the harm is felt by the individual consumer, not the public generally. If consumers do not mind receiving

such calls, and do not place their names on the DNC List, then the FTC will not sue to vindicate their interests. The first *Smith* factor therefore weighs in favor of substitutability. See also *F.T.C. v. Capital City Mortgage Corp.*, 321 F. Supp. 2d 16, 22–23 (D.D.C. 2004) ("While other courts have also acknowledged the dual remedial and penal nature of penalties assessed under consumer protection statutes, those courts have often found those penalties to be remedial, not penal, in nature." (citing *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 376 (1973)); see also *Citronelle–Mobile Gathering, Inc. v. O'Leary*, 499 F. Supp. 871, 887 (S.D. Al. 1980) (explaining that "most modern consumer remedies . . . [have] a dual purpose" that includes "remedying harm to the individual who could not practically protect himself from violations by allowing the government to enforce the law for the individual's benefit" and "deter[ring] prohibited business practices for the good of the general public," and that such a dual purpose does not vitiate the overall remedial nature of the claim); cf. *McKinney v. Panico*, 2022 WL 2356476, at *3 (N.D. Ill. June 30, 2022) (following "[m]ore recent decisions from courts in this District" that have found RICO claims to be remedial; while RICO had "both remedial and punitive aspects," "overall, the statute served to address individual wrongs").

Next, the Court considers *Smith*'s second factor: whether the recovery sought runs to the individual or to the public. The FTC concedes that the recovery it seeks would be paid to the U.S. Treasury, not the allegedly harmed consumers. According to the Estate, this factor is "critical" and requires the Court to deny substitution. [Dkt. 263 at 6.] But according to the FTC, the payment mechanism to the U.S. Treasury

does not by itself transform an otherwise remedial statutory scheme into one that is penal.

Cumming cites *United States v. Edwards*, 667 F. Supp. 1204 (W.D. Tenn. 1987), for the proposition that the second factor is "critical." That case involved the survivability of claims brought to enforce the civil penalty provision of the Clean Water Act. The first factor weighed against survivability because the complaint and "most of the testimony concerning harm dealt with harm to the general public from the destruction of habitats for the wetlands animal and plant life." 667 F. Supp. at 1213. The third factor—whether the civil penalty is disproportionate to the harm suffered—was "not … critical" because it depended on the "value of a fish, a tree, or an active beaver colony," which was subjective. See *id*. at 1213-14. On the second factor, the court contrasted the Clean Water Act with "antitrust, patent/copyright infringement, securities fraud, and truth in lending actions, where the penalty survives the wrongdoer's death'" and "any recovery of the so called 'penal' damages is paid to the injured party and not the government." *Id*. at 1213.

The FTC relies instead on *F.T.C. v. Capital City Mortgage Corp.*, 321 F. Supp. 2d 16 (D.D.C. 2004), which involved claims that City Mortgage Corporation violated the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691(f), and the FTC Act, 15 U.S.C. §§ 41–48. The ECOA authorizes the FTC to use its enforcement powers to implement the ECOA. See *Capital City*, 321 F. Supp. 2d at 20-21; 15 U.S.C. § 1691c(c). The court in *Capital City Mortgage* concluded that under factor two, the penalties sought by the FTC were not penal because the FTC's collection mechanism (to the

public at large rather than individuals) itself came from the FTC Act, a "remedial, consumer protection statute." 321 F. Supp. 2d at 22.

The Court finds *Capital City Mortgage* more relevant and helpful than *Edwards* because it analyzed the FTC Act and consumer protection statutes. See also *F.T.C. v. AMG Services, Inc.*, 2014 WL 2742872, at *2 (D. Nev. June 17, 2014) (granting unopposed motion to substitute trustee for deceased individual defendant in FTC action and noting that "[n]umerous courts have determined that consumer protection statutes, like TILA and the FTC Act, are remedial in nature"). Therefore, the fact that payments go to the public is not determinative of whether the relief is penal or remedial. See *Jim 72 Properties, LLC v. Montgomery Cleaners*, 151 F. Supp. 3d 1092, 1099 (C.D. Cal. 2015) (private right of action provided for under Resource Conservation and Recovery Act, which authorized citizen suit against a polluter, was primarily "remedial" in nature and therefore survivable; the Act was meant to address individual harms, since its focus was not just environmental waste clean-up, but also the health of those who had been harmed by toxic waste, and monetary penalties in the statute were intended to reimburse government for the actual costs of rectifying environmental degradation, not to punish polluter).

Finally, the Court examines whether the authorized recovery is wholly disproportionate to the harm suffered. In its summary judgment papers, the FTC maintains that Defendants are responsible for at least 4,168,511 violations of the TSR. [See Dkt. 211 at 36 & n.20.] If the FTC sought the maximum statutory recovery for each violation (between $16,000 and $42,530, depending on exactly when the

18

violation occurred), the total maximum allowable civil penalty would be in excess of $100 billion. *Id*. Its motion for summary judgment, the FTC proposes a civil penalty of $28,681,863.88—or about $6.88 per call.[2] The Estate argues that, in assessing proportionality, the Court should focus on the maximum recovery authorized by the statute, rather than the amount sought by the FTC. The Estate urges the Court to focus on "the sheer magnitude of the civil penalties [the FTC] has reserved the right to seek," which could reach into the billions of dollars. [Dkt. 263 at 7.]

The Court finds *Parchman* instructive on the third factor, too. The TSR and FTC Act, like the TCPA, allow "the court discretion to decide in each case whether and how much to increase damages, unlike the provisions in the other statutes which automatically provide multiple recovery." *Parchman*, 896 F.3d at 740.[3] Indeed, in *Dish Network*, the Seventh Circuit indicated that the Court should consider the "harm" caused by Defendants as the starting point for determining appropriate penalties, rather than the "wealth" of Defendants. 954 F.3d at 980. Since the statutory framework allows the Court "to evaluate the facts of a particular case and,

---

[2]    The FTC also calculates the per-call penalty using an additional 39,847,000 calls allegedly made "by Defendants' IBT partners," which "works out to approximately $0.65 per call." [Dkt. 247, at 5-6 & n.4.] However, the Court finds it inappropriate to use the larger number of allegedly illegal calls in assessing proportionality because the FTC represents in its summary judgment motion that it is not seeking civil penalties for the additional 39,847,000 calls. [Dkt. 211 at 17, n.6.]

[3]    And even statutes that automatically provide multiple recovery, like RICO, have been found to be remedial. See *Shearson/American Express v. McMahon,* 482 U.S. 220, 240-241 (1987) (the policing or penal function of RICO's treble damages provision is a "secondary concern" to its remedial one); *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406 (2003); *Saleh v. Merchant*, 2017 WL 1478000, at *6 (N.D. Ill. Apr. 25, 2017) (concluding that RICO treble damages are not "wholly disproportionate" and that a RICO claim survives a plaintiff's death).

perhaps, the harm caused to the plaintiff by the defendant's violations in determining the appropriate level of damages," this suggests that the TSR is remedial. *Parchman*, 896 F.3d at 740. Therefore, the Court finds it appropriate to focus on the amount actually sought by the FTC, rather than maximum statutory penalty in the billions.

The Estate further argues that even if the third factor is evaluated using the lower amount of $28.7 million, this is "wholly disproportionate" to the "intangible harm of allegedly unwanted phone calls." [Dkt. 263 at 7.] Plaintiff cites *Hannabury v. Hilton Grand Vacations Company, LLC*, 174 F. Supp. 3d 768 (W.D.N.Y. 2016), in support. In that case, the Western District of New York concluded in a TCPA case that "a $500 award for a phone call, which could be trebled up to $1,500, is wholly disproportionate to the harm suffered" by a plaintiff who received two phone calls from the defendant even though the plaintiff's phone number was on the DNC registry. *Id.* at 776. *Hannabury*, however, appears to be an outlier. The next court in the Western District of New York to consider the same issue declined to follow it, see *Sharp v. Ally Financial, Inc.*, 328 F. Supp. 3d 81, 97 (W.D.N.Y. 2018), and the Sixth Circuit in *Parchman* criticized it. See 896 F.3d at 738; see also *Precise v. Credit One Bank, N.A.*, 2018 WL 11491440, at *2 (N.D. Fla. July 26, 2018) (the TCPA's available remedies are not wholly disproportionate to the contemplated harms, even if they are non-monetary). Moreover, to the extent that *Hannabury* is instructive, it involved a per-call penalty—$500, or $1,500 when trebled—that was many times higher than the $6.88 per call that the FTC seeks here. For this reason, it provides weak support for the Estate's claim that $6.88 per call is wholly disproportionate.

The Estate emphasizes the sheer size of the award sought by the FTC, but that amount is large in great part because Defendants were responsible for placing millions of calls to consumers whose numbers are on the Do Not Call List. As the Seventh Circuit has recognized in the context of TSR violations, "[s]omeone whose maximum penalty reaches the mesosphere only because the number of violations can't complain about the consequences of its own extensive misconduct." *Dish Network L.L.C.*, 954 F.3d at 980. The high volume of allegedly violative calls—which represent individual consumer injuries—translates to a large dollar amount in civil penalties. But it does not follow that the magnitude of the alleged misconduct in this case—which results in the pursuit of high penalties—makes the statutory scheme penal rather than remedial. In light of how many consumers were allegedly harmed, the Court is not convinced that the amount sought by the FTC is grossly disproportionate to the harm caused by Defendants' telemarketing in violation of the TSR. To the extent that the Court has reservations about the size of the penalty sought by the FTC, the Court will explore them with the parties before ordering Defendants—and particularly the Estate—to pay civil penalties.

Outside of the *Smith* factors, the Estate argues that the Court should deny the motion for substitution based on the equities. [Dkt. 263 at 10.] From the Estate's perspective, substituting Margaret Cumming would be unfair because Day Pacer was "not a profitable business" and, as a partial owner, David Cumming invested more than he earned, so the money in the Estate was not the result of ill-gotten gains. [*Id.*] Further, the Estate points to the fact that David Cumming's heirs would be the

21

individuals to bear the financial impact of substitution, despite being unfamiliar with the underlying allegedly violative conduct. *Id*. By the same token, however, it would be inequitable to allow the Estate to avoid any liability while leaving Ian and Raymond responsible for the full penalty amount. The motion for substitution is granted.

## III.    Motions for Summary Judgment

### A.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). Where, as here, the parties have cross-moved for summary judgment, the Court is required to "'construe all inferences in favor of the party against whom the motion under consideration [was] made.'" *Ten Pas v. Lincoln Nat'l Life Ins. Co.*, 31 F.4th 541, 545 (7th Cir. 2022) (quoting *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005)). The Court "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'"

*Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## B. Analysis

### 1. Challenges to the TSR

Defendants raise a number of legal challenges to the TSR itself, which the Court will address before turning to the substance of the FTC's claims.

*First*, Defendants challenge the FTC's authority to bring an action to enforce the TSR on the basis that the FTC does "not maintain the requisite person specific registry" required by § 310.4(b)(1)(iii)(B). [Dkt. 219 at 32.] Instead, the FTC only "maintains a list of telephone numbers that are not identified by, or correlated to, the names of any person" and thus the "Registry does not show, and the FTC does not know, whether the account holder for the telephone number placed the telephone number on the Registry." [*Id*. at 33.] The Court is not convinced that the FTC lacks enforcement authority due to a purported failure to maintain a sufficiently detailed registry. Section 310.4(b)(1)(iii)(B) "does not say the call must be initiated to the person who registered the number on the Registry" in order to violate the TSR. *U.S. v. Network*, 75 F. Supp. 3d 942, 1007 (C.D. Ill. 2014), *vacated in part on reconsideration*, 80 F. Supp. 3d 917 (C.D. Ill. 2015). Rather, "[i]t is an abusive telemarketing act or practice and a violation of [the TSR] for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in … initiating any outbound telephone call to a person when … [t]hat person's telephone number is on the 'do-no-call' registry[.]" 16 C.F.R. § 310.4(b)(1)(iii)(B). A defendant violates the TSR by dialing a person whose number is on the registry, regardless of whether that person is the one who originally registered the number. The only relevant precedent cited by either side is *Dish Network*, with which this Court agrees. See 75 F. Supp. 3d at 1007 ("The TSR states that a violation occurs if the telemarketing call is initiated to a person when the person's telephone number is on the Registry.").

24

*Second*, Defendants raise a related First Amendment "overbreadth" challenge, arguing that enforcement of the TSR is unconstitutional because the registry applies to all calls to a telephone number and is not limited to calls by the person who initially placed the number on the registry. [See Dkt. 230 at 7.] Defendants suggest that the TSR was required to be narrowly tailored, citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015). But they do not explain the relevance of *Reed*, which involved a town sign code that subjected ideological, political, and temporary event signs to different restrictions. "Perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived." *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021).

In any event, telemarketing calls that interrupt a registrant's privacy at home are not somehow less of an invasion if the registrant's family member picks up the call than if the registrant does so. Indeed, the FTC explicitly considered the issue of households with multiple phone users and determined registering phone numbers is necessary to "accomplish its privacy protection objectives," noting that members of one household with differing interests in receiving calls could obtain more than one phone line or provide express authorization to specific telemarketers. 68 Fed. Reg. 4580, 4639 n.708; see also *id*. at 4640 & n.710 (explaining that collecting consumer telephone numbers rather than names was all that was needed to protect privacy, ensure accuracy of the Registry, and efficiently operate the Registry); 15 U.S.C. § 6155(a),(b) (numbers remain indefinitely on the Registry absent the individual to whom the number is assigned requesting removal or the number being disconnected

25

and reassigned). Congress expressly agreed with this approach in ratifying the Registry. 15 U.S.C. § 6151.

*Third*, Defendants also make a First Amendment "underinclusiveness" argument, which is slightly better developed but not supported by the cases on which Defendants rely. [See Dkt. 230 at 8-9.] According to Defendants, the TSR is content-based and therefore subject to strict scrutiny. Defendants cite the Tenth Circuit's decision in *Mainstream Marketing Services, Inc. v. F.T.C.*, 358 F.3d 1228 (10th Cir. 2004). [See Dkt. 230 at 8.] But that case does not support their argument. In *Mainstream Media,* the Tenth Circuit rejected telemarketers' First Amendment challenge to the FTC's and the FCC's do-not-call regulations, which exempted charitable and political callers. The Tenth Circuit applied intermediate scrutiny using *Central Hudson*'s "three-part test governing First Amendment challenges to regulations restricting non-misleading commercial speech that relates to lawful activity": "First, the government must assert a substantial interest to be achieved by the regulation. Second, the regulation must directly advance that governmental interest, meaning that it must do more than provide 'only ineffective or remote support for the government's purpose.' Third, although the regulation need not be the least restrictive measure available, it must be narrowly tailored not to restrict more speech than necessary." *Mainstream Marketing*, 358 F.3d at 1237 (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 564 (1980)). "Together, these final two factors require that there be a reasonable fit between the government's objectives and the means it chooses to accomplish those ends." *Id.* The

26

Tenth Circuit concluded that the DNC regulations satisfied this test because they were enacted to protect the privacy of individuals in their homes and to protect consumers against risk of fraudulent and abusive solicitation; the registry's opt-in character ensured that it did not inhibit any speech directed at the home of a willing listener; the registry blocked a substantial number and significant percentage of unwanted telemarketing calls; and Congress, the FTC and the FCC all determined that commercial calls affected by the registry were most to blame for problems that the regulations sought to redress. *Id.*

To the extent that Defendants urge the Court to apply *Mainstream Marketing Services*, it supports the FTC's position, not Defendants'. The TSR is intended to protect the privacy of individuals in their homes; its opt-in character ensures that it does not inhibit speech directed at willing listeners; and it is aimed at the same type of commercial speech examined by the Tenth Circuit. Although the Seventh Circuit has not expressly adopted this approach, it has cited it approvingly in at least one case. See *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305–06 (7th Cir. 2017) ("No one can deny the legitimacy of the state's goal: Preventing the phone (at home or in one's pocket) from frequently ringing with unwanted calls. … Federal law severely limits unsolicited calls to cell phones, and the FTC maintains a do-not-call registry for landline phones, just as the Postal Service maintains a no-junk-mail list. These devices have been sustained against constitutional challenge." (citing *Rowan v. Post Office*, 397 U.S. 728 (1970); *Mainstream Marketing Services*, 358 F.3d 1228))).

Defendants also rely [Dkt. 230 at 9] on the Supreme Court's decision in *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335, -- U.S. -- (2020). In that case, the Supreme Court considered a First Amendment challenge to an exception to the TCPA's restriction on automated calls or "robocalls" to cell phones, for the collection of debts owed to or guaranteed by the federal government. The Court treated the statute as a content-based law, applied strict scrutiny, and concluded that the statute impermissibly favored debt-collection speech over political and other speech, in violation of the First Amendment. See *id.* at 2346-47. The dissent criticized the majority for applying strict scrutiny and called for the application of intermediate scrutiny evaluating the "restriction's speech-related harms in light of its justifications." *Id.* at 2362 (Breyer, J., dissenting in part). But the majority explained that its holding was limited: "The issue before us concerns only robocalls to cell phones … [and] [o]ur decision is not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity." *Id.* at 2347 (majority opinion). Given *American Association of Political Consultants*' limited holding, the Court finds it inappropriate to apply strict scrutiny to the TSR. And whether the Court applies intermediate scrutiny as in *Mainstream Marketing Services* (as Cumming urges) or the balancing approach used by the Seventh Circuit in *National Coalition of Prayer, Inc. v. Carter*, 455 F.3d 783, 787 (7th Cir. 2006) (as advanced by the FTC), Cumming cannot establish a First Amendment violation.

In *National Coalition of Prayer*, the Seventh Circuit considered a challenge to a provision of Indiana's Telephone Privacy Act, which precluded tax-exempt charities from using professional telemarketers to place fundraising calls to state residents who placed their names on the state's do-not-call list. *Id.* at 784. The Court found that the law was not content-based, and thus, the plaintiff charities' free speech challenge to the provision would be analyzed under the legitimate interest test, rather than the strict scrutiny standard. *Id.* at 789. The court reasoned that since the Do Not Call List allowed residents to opt-in to the Act, the provision did not have to be narrowly tailored to protect residential privacy. *Id.* at 791-92. In addition, the court found that the Act was not underbroad even though it exempted political and charitable speech. The court reasoned that "[b]ecause the Act sharply curtails telemarketing—the speech that was most injurious to residential privacy—while excluding speech that historically enjoys greater First Amendment protection, we are satisfied that the Act is not underbroad." *Id.* at 792.

The TSR's Registry provisions are analogous to the Indiana do-not-call registry in National Coalition, involving an "opt-in" registry of consumer phone numbers. Its exemptions for political and charitable speech reflect the historically greater protection that such speech has enjoyed. And its other exemptions simply reflect that certain industries are not regulated by the FTC, such as banks, securities, insurance companies, and common carriers. Whether the TSR is analyzed using *National Coalition of Prayer*'s balancing approach or intermediate scrutiny as in *Mainstream Marketing*, Cumming is unable to establish a First Amendment violation.

29

*Fourth*, Defendants argue that consumers have a First Amendment right to solicit speech from them. [Dkt. 230 at 6-7 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (acknowledging a First Amendment right to "receive information and ideas" but upholding Attorney General's decision to deny visa to Belgium journalist whom American plaintiffs had invited to participate in academic conferences in the U.S.); *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) (due process right of inmates to seek and receive assistance of attorneys to challenge unlawful convictions and seek redress for violations of constitutional rights).] The Court does not find this argument compelling because the TSR does not prevent individuals who want to receive information from doing so. Consumers register their telephone numbers on the Registry precisely because they *do not* wish to receive telemarketing calls, and the Telemarketing Act and TSR set forth the compelling governmental purpose of protecting consumers' privacy. If Defendants could establish that the dialed parties did, in fact, provide express prior written consent that complies with the rule, then Defendants would not be liable under the TSR. But, as explained below, Defendants have failed to develop a factual record supporting their theory that they obtained consent from consumers to contact them about educational opportunities.

*Fifth*, Defendants argue that their commercial speech cannot be curtailed without violating the First Amendment because consumers could avoid the objectionable speech—the LLC Defendants' calls—by "not provid[ing] a name and phone number on a website." [Dkt. 230 at 18.] This argument also fails due to

Defendants' inability to demonstrate that all customers did, in fact, provide valid consent to be called about educational services that Defendants marketed.[4]

## 2. Statute of Limitations

Defendants argue that the FTC's claims are subject to the three-year statute of limitations set out in 15 U.S.C. § 57b(d) and that, as a result, the FTC is barred from bringing suit based on any act or practice occurring prior to March 22, 2016. According to Defendants, this means that judgment should be entered in favor of EduTrek on all claims against it because EduTrek ceased doing business on October 31, 2015. [Dkt. 219 at 36.]

Defendants are not entitled to summary judgment based on the statute of limitations. Section 57b authorizes the FTC to seek compensatory remedies to redress injuries to consumers and others caused by a violation of an FTC rule. 15 U.S.C. § 57b(b). Claims brought under this provision are subject to a three-year statute of limitations. 15 U.S.C. § 57b(d). But the remedies provided in § 57b are "in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law." *Id*. § 57b(e).

The FTC seeks civil penalties under 15 U.S.C. § 45(m) and injunctive relief under 15 U.S.C. § 53(b). These sections of the FTC Act "contain no express statutes of limitations." *Dish Network*, 75 F. Supp. 3d at 1004. The FTC's claim for civil penalties is governed by the FTC's general five-year statute of limitations for actions

---

[4] Defendants also raise an Eighth Amendment challenge, arguing that the FTC seeks an excessive fine and the suit is therefore penal in nature. The Court will address this argument when determining the appropriate penalty.

for "any civil fine, penalty, or forfeiture." 28 U.S.C. § 2462; see also *Gabelli v. S.E.C.*, 568 U.S. 442, 444 (recognizing § 2462 as the general federal statute of limitations for actions for civil penalties); *United States v. Ancorp Nat'l Servs., Inc.*, 516 F.2d 198, 200 n.5 (2d Cir. 1975) (applying § 2462 to actions for civil penalties under FTC Act for violations of cease and desist order); *Dish Network*, 75 F. Supp. 3d at 1004. And the FTC's claim for equitable relief is not subject to any statute of limitations. See *id.* (citing *F.T.C. v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1012 (N.D. Cal. 2010); *F.T.C. v. Instant Response Systems, LLC*, 2014 WL 558688, at *3 (E.D.N.Y. Feb. 11, 2014); *F.T.C. v. Minuteman Press*, 53 F. Supp. 2d 248, 263 (E.D.N.Y. 1998)).

### 3. Liability for Calls Made by the LLC Defendants

The FTC seeks to hold Defendants responsible for calls placed by the LLC Defendants and their dialing vendors. As noted above, it is undisputed that the LLC Defendants made at least 3,669,914 calls to phone numbers on the Do Not Call List. [Dkt. 229, ¶ 26.] Defendants also do not dispute that at least some of those calls were interstate phone calls. [*Id.*, ¶ 40.][5]

Instead, Defendants take the position that their business is not subject to the TSR because: 1) the TSR does not apply to their calls, which did include sales pitches and were purely informational; and 2) the LLC Defendants only called consumers who solicited and consented to receiving their calls. Further, Defendants contend that even if their understanding of the TSR was wrong, the FTC cannot establish that

---

[5]     In its opening brief, the FTC establishes that Day Payer and EduTrek were operated as a common enterprise such that they their liability should be joint and several. [See Dkt. 211 at 24-25.] The FTC also establishes that Day Pacer is liable for EduTrek's TSR violations as a successor to EduTrek. [See *id.* at 25-26.] Defendants do not dispute either point.

Defendants had actual knowledge or knowledge fairly implied on the basis of objective circumstances that they were violating the TSR.

> **a.    Are the LLC Defendants' Activities Subject to the TSR?**

Defendants argue that they are entitled to summary judgment because the LLC Defendants are not "telemarketers" and have not engaged in "telemarketing" as those terms are defined in the TSR. In support of this argument, Defendants *do not* rely on the TSR's definition of "telemarketer," which includes "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor," 16 C.F.R. § 310.2(ff), or "telemarketing," which means "a plan, program, or campaign which is conducted to induce the purchase of goods or services. . . ." 16 C.F.R. § 310.2(gg). Instead, Defendants rely on a Revised Notice of Proposed Rulemaking and a Statement of Basis and Purpose of the Final Rule, which the FTC issued while promulgating the TSR. [See Dkt.219 at 26-27.] Both of these sources explain: "The Commission intended that the definition of the term 'telemarketer' apply to persons making a telephone call to, or receiving a telephone call from, a customer in connection with or about the purchase of goods or services. It does not include persons making or receiving customer service calls or similar tangential telephone contacts *unless a sales offer is made and accepted during such calls.*" [*Id.* at 26 (quoting 60 Fed. Reg. 30,406, at 30,411 (June 8, 1995), and 60 Fed. Reg. 43,842, at 43,844 (Aug. 23, 1995); emphases by Defendants).] Based on this guidance, Defendants argue that they are not subject to the TSR because they "never engaged in a conversation in which a sales pitch or sales offer was made or accepted during

the conversation, or any sales call of any kind." [*Id.*at 27.] Rather, their conversations were "purely informational." [*Id.*]

Defendants are misreading the FTC's guidance. The language they emphasize—"unless a sales offer is made and accepted during such calls"—is modifying the sentence concerning "customer service calls"; such calls are not considered telemarketing "unless a sales offer is made and accepted during such calls." The FTC has advised in its "FAQs" that "purely informational calls" are limited to incidental contacts "like your cable company confirming a service appointment." [Dkt. 227-7 at 3-4.] Its guidance has no application here, because none of the challenged calls were to existing customers or concerned customer service issues. The FTC's guidance does not modify the plain language of the TSR, which defines "telemarketing" broadly to including any "plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution …." 16 C.F.R. § 310.2(gg). Neither the definition of telemarketer nor telemarketing requires a direct sale or sales offer between the person placing the call and the consumer.

Moreover, Defendants do not dispute that the LLC Defendants' business model was designed to generate consumer leads in order to sell them to educational programs. [See Dkt. 219-2, ¶¶ 4-5 (Tatton affidavit).] For instance, Cumming acknowledges that "[t]he goal of the two call center companies was to sell leads." [Dkt. 230-1, ¶ 10(h).] For-profit educational programs then used those leads in an effort to enroll people in their programs. [Dkt. 229, ¶ 17; Dkt. 212-7 at 33 (deposition

transcript of Brett Larson, who worked for EduTrek and Day Pacer).] Defendants referred to this sales goal as "conversion." [Dkt. 229, ¶ 18; Dkt. 212-3 at 166 *et seq.* (PX64, Day Pacer email concerning conversion).] The FTC has also presented multiple pieces of evidence that Day Pacer self-identified as being part of educational marketing services. [Dkt. 229, ¶¶ 16-19; Dkt. 232, ¶¶ 16-19; Dkt. 212-3 at 227 *et seq.* (PX87, EduTrek Articles of Incorporation); Dkt. 212-5 (PX126, Day Pacer's IRS Form 1065).] In sum, the undisputed facts show that the LLC Defendants engaged in telemarketing as defined by the TSR. Their entire business model depended on being a marketing partner as part of a plan between multiple businesses to connect consumers to various for-profit programs.

In a separate argument, Defendants claim that they did not engage in "telemarketing" because they did not use telephones in any of their conversations with consumers; rather, they used headsets and computers and the calls were all voice over Internet protocol ("VoIP"). Defendants do not cite any authority or offer any explanation for the proposition that VoIP calls should be excluded from the coverage of the TSR. Perfunctory and undeveloped arguments such as this one are waived. See *Britney S. v. Berryhill*, 366 F. Supp. 3d 1022, 1028 (N.D. Ill. 2019) (citing *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016); *Thomas v. Colvin*, 745 F.3d 802, 807-808 (7th Cir. 2014)). In addition, as the FTC noted, the limited case law on this question strongly suggests that calls made using VoIP technology are subject to the TSR. See *Dish Network*, 75 F. Supp. 3d at 936 ("Nothing in the TSR limits the TSR's coverage to residential landlines or excludes wireless or VoIP lines from coverage.");

cf. *FTC v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1019 (W.D. Tex. 2020) (VoIP provider that allegedly participated in deceptive telemarketing scheme could be held liable under the TSR's "substantial assistance" provision; VoIP provider was not covered by exemption from liability for "common carriers").

> **b.** **Did the LLC Defendants have actual knowledge or knowledge fairly implied under the circumstances that their business model was subject to the TSR?**

In order to be held liable for civil penalties, it is not enough that the LLC Defendants were responsible for initiating calls to numbers on the Do Not Call List. Instead, the FTC must show that the LLC Defendants had "actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A). This language provides a "mistake-of-law defense to civil liability." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583-84 (2010); see also *Dish Network*, 954 F.3d at 978 ("§ 45(m)(1)(A) includes a variation on an ignorance-of-the-law defense"). "Whether a defendant has violated a rule with actual or implied knowledge is based on objective factors. A defendant is responsible where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *United States v. National Financial Services, Inc.*, 98 F.3d 131, 139 (4th Cir. 1996) (applying 15 U.S.C. § 45(m)(1)(A)) (citing S.Rep. No. 1408, 93rd Cong., 2nd Sess. 4, 1974 U.S.C.C.A.N. 1772); see also 1974 U.S.C.C.A.N. 7755, 7772 ("In determining whether knowledge of a Commission rule may be fairly implied, it is intended that the courts hold a defendant responsible where a reasonable and prudent man under the circumstances

36

would have known of the existence of the rule and that the act or practice was in violation of its provisions."); *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 929–30 (C.D. Ill. 2017), *rev'd in part on other grounds*, 954 F.3d 970 (7th Cir. 2020); *United States v. Commercial Recovery Systems, Inc.*, 179 F. Supp. 3d 728, 737 (E.D. Tex. 2016).

Defendants claim they did not know, nor did they have any reason to know, that the TSR applied to their businesses. All three of the Individual Defendants, as well as EduTrek's former president Chad Tatton, attested in their affidavits that they knew about the TCPA but did not know or have reason to know that the TSR applied to their businesses, which they characterize as purely informational calls made to consumers who have consented to receiving such calls. More particularly, Ian Fitzgerald, Day Pacer's president beginning in 2016, states that in late April 2016 Day Pacer considered expanding into selling goods and services to consumers, but "learned of the provisions of TSR and decided that Day Pacer would not transition its business from one governed by the TCPA to one governed by the TSR." [Dkt. 219-3, ¶ 23.] Raymond says the same. [Dkt. 219-4, ¶ 18.]

Cumming states in his affidavit that when "new managers" of Day Pacer suggested in 2016 that "the company take on new clients and make calls intended to induce the purchase of those clients' goods or services," he "did some research" (which he does not specifically identify) and "determined that making sales calls would require registration of the company as a telephone solicitor with the State of Utah and would subject the company to regulation under the TSR." [Dkt. 230-1, ¶ 15.] He

"suggested that management review those regulations" and "opposed changing the company's business model to include telemarketing because of the additional regulation and risk that would be involved." [*Id.*] Cumming believed that "the TSR applies only to telephone calls intended to induce the purchase of goods or services." [*Id.*, ¶ 18.] He also emphasized that the LLC Defendants never established goals for sales or the conversion of leads by the schools with which the LLC Defendants contracted. [*Id.*, ¶¶ 19-20.]

The individual Defendants provide no details concerning the research that Cumming (or any other attorneys) performed or why it led them to believe that Day Pacer was exempt from the TSR. To the extent that Cumming's research consisted of reading the FTC guidance that Defendants rely on in their summary judgment briefs, no reasonable and prudent person under the circumstances would have concluded that they authorized Defendants' telemarketing activity. Further, Defendants do not explain how they could reasonably have known they were subject to the TCPA, which applies to a "telephone solicitor" that initiates calls "for the purpose of encouraging the purchase . . . of . . . goods, or services," but not to the TSR, which applies to a "telemarketer" that initiates calls "in connection with" "a plan, program, or campaign which is conducted to induce the purchase of goods or services." *Compare* 47 C.F.R. § 64.1200(f)(15), *with* 16 C.F.R. § 310.2(ff)-(gg).

The LLC Defendants received complaints from consumers, as well as from operators of the websites from which they purchased phone numbers, that they were initiating calls to phone numbers on the DNC registry. [Dkt. 229, ¶ 30; Dkt. 232, ¶

38

30.] Defendants also received complaints from schools and other lead purchasers and their compliance companies that they were initiating calls to consumers without collecting proper express written authorization to be contacted. [Dkt. 229, ¶ 33; Dkt. 232, ¶ 33.] At least one major lead purchaser, EducationDynamics, refused to work with the LLC Defendants because it was concerned that their consumer data sources, such as websites, did not properly collect consumers' consent to be contacted. [*Id.*] Defendants admit that the LLC Defendants "continued to purchase consumer data generated from websites after receiving complaints regarding those websites depending on the particular complaint." [Dkt. 212-9 at 124 (response to request to admit no. 16).]

Defendants' argument that they did not understand the TSR's definition of "telemarketing" is comparable to a "mistake of law" argument that the Seventh Circuit considered and rejected in *Dish*. Dish argued that it lacked the knowledge necessary to be liable for civil penalties for calls made to its former customers, because "it did not know that it lacked an 'established business relationship' with customers who had stopped paying their bills before DISH disconnected their service (a mistake of law)." *Dish Network*, 954 F.3d at 978. Dish maintained that it did not know the legal definition of "established business relationship" under the FTC's rules, because an FTC comment that accompanied the rule purportedly suggested that Dish could start the 18-month time limit for calling former customers on the date it disconnected a customer's service, even if that date came after the customer's subscription expired for lack of payment. *Id.* at 979. The Seventh Circuit agreed with

39

the district court that the text of the rule required the 18-month clock to start from the date of the customer's last payment. The Seventh Circuit found that the rule was not ambiguous and that to the extent the FTC's comments were inconsistent with the TSR's text, "the text prevails," rejecting Dish's "mistake of law" defense. *Id*. Likewise, in this case, Defendants misread the FCC's commentary on "purely informational calls," the TSR is not ambiguous, and Defendants are not entitled to take the mistake of law defense to a jury.

> **c.** **Did the LLC Defendants limit their telemarketing to consumers who solicited and consented to receiving calls about for-profit educational opportunities?**

Defendants argue that they are not subject to the TSR or any requirements to scrub calling lists against the Do Not Call List because the LLC Defendants only called consumers who solicited a conversation with them. Defendants begin with the statute that authorized the FTC to promulgate the TSR, 15 U.S.C. § 6102(a)(3)(A). This provision requires the FTC to include in its rules "a requirement that telemarketers may not undertake a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy." *Id*. Defendants contend that this provision limits the FTC's regulatory authority to "unsolicited" telephone calls. [Dkt. 227 at 18.] Defendants also rely on the TSR's use of the term "initiate." Under the TSR, "[i]t is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller to cause a telemarketer to engage in … (iii) *Initiating* any outbound telephone call to a person when: … (B) That person's telephone number is on the 'do-not-call'

registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services *unless* the seller or telemarketer" can demonstrate that the seller either (1) "has obtained the express agreement, in writing, of such person to place calls to that person"; or (2) "has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section." 16 C.F.R. § 310.4(b)(1)(iii)(B) (emphasis added). Defendants claim that the FTC used the word "initiate" to "distinguish[] between the Congressionally intended prohibited unsolicited calls to consumers and the consumer solicited calls that were not to be prohibited." [Dkt. 227 at 20.] According to Defendants, all of their calls fall into the first bucket.

The Court is not persuaded by Defendants' reading of the statute to impose a burden on the FTC to show that calls to numbers on the DNC Registry were "unsolicited." The language of the TSR, as part of the larger regulatory scheme, makes it clear that a telemarketer initiates a call when it places an outbound call. And a telemarketer violates the TSR when, as here, the telemarketer initiates, that is, places, an outbound call to a phone number on the Do Not Call List. To construe the word "initiate," undefined in the federal rule here, the Court looks to the canons of statutory interpretation. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2419 (2019) ("[A] court must apply all traditional methods of interpretation to any rule, and must enforce the plain meaning those methods uncover."); see also, e.g., *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 668–69 (2007) (invoking the canon

against surplusage in interpretation of regulation); *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007) (invoking the canon that the specific governs the general). The Court starts with the plain meaning of the statute's text. See *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). The "first step ... is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "Where Congress's intent is clear from that language, it must be given effect." *Arobelidze v. Holder*, 653 F.3d 513, 518 (7th Cir. 2011) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984)). The plain language of the TSR makes it clear that to "initiate" a call means to place such a call. It's as simple as that. It is a violation of the TSR to make an outbound call to someone on the do not call registry unless the telemarketer or seller "[c]an demonstrate" that "the seller has obtained the express agreement, in writing, of such person to place calls to that person." 16 C.F.R. § 310.4(b)(1)(iii)(B)(1).

Defendants cannot demonstrate that they have obtained such consent. It is undisputed that neither Defendants nor their dialing vendors owned the websites from which the LLC Defendants purchased phone numbers. Defendants acknowledge that the websites collecting consumer information sold those phone numbers to the company willing to pay the highest price—here, the LLC Defendants. The record does not contain screenshots or other contemporaneous evidence to establish the contents of the websites on which the customers supposedly provided express written consent. In short, the record simply does not support Defendants' position that customers

invited and solicited calls from the yet unknown highest bidder purchasing their contact information.

Defendants' primary evidence of "consent" is their call records, which purport to identify the URLs, or website locations, where the consumers entered their phone numbers. [Dkt. 229, ¶ 107; Dkt. 232, ¶ 106.] However, Defendants have not demonstrated that the URLs lead to pages collecting valid written consents. By contrast, the FTC reviewed a random sample of 750 of the LLC Defendants' call records to see if the URLs were complete and linked to websites that indicated evidence of consent. [Dkt. 229, ¶ 108; Dkt. 232, ¶ 107.] This review indicated that in nearly all cases, the URL records were blank, contained text that was not a web page, or did not point to an active web page. Even when they did point to an active web page, they did not contain any language about telephone calls. [Dkt. 229, ¶ 109; Dkt. 232, ¶ 108.] Defendants criticize how this analysis was performed, primarily because it looked at the webpages as they currently exist rather than using the Wayback Machine to view the webpages as of the dates that the consumers viewed them when the consent was gathered. [See Dkt. 241 at 11-12.] But *Defendants* have the burden to show consent. Here, besides a handful of call transcripts indicating that some customers were interested in the educational opportunities they marketed [see Dkt. 241 at 9; Dkts. 241-2 through 241-15], Defendants have no evidence that consumers wanted to receive calls from the LLC Defendants and their dialing vendors or consented to receiving such calls.

By contrast, records identified by the FTC support its position that the LLC Defendants did not have valid consent. Consumers entered their contact information on websites primarily focused on job opportunities, not education. Defendants dispute this based on generic hearsay and authentication grounds, but fail to discuss the particular evidence offered by the FTC or other evidence establishing the websites' contents. [See 229, ¶ 24.] Several of the statements come from the LLC Defendants' own employees in the course of their employment, which do not constitute hearsay. See Fed. R. Evid.801(d)(2)(D) (hearsay does not include a statement offered against an opposing party that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed"); *Stepp v. Covance Central Laboratory Services, Inc.*, 931 F.3d 632 (7th Cir. 2019). For instance, EduTrek's director of lead generation, Nathan Clegg, testified that job search websites were "the most common type of website where [EduTrek] would receive a lead." [Dkt. 212-7 at 214 (Tr. 28:12-21) (PX309)]. Similarly, Lon Kennard, who was vice president of operations for EduTrek, wrote in a November 2014 email to employees that "[m]any of our leads come from job boards (or similar sites)" and that "these people may not have read/understood the statement asking if they would like a phone call from us regarding their education." [Dkt. 212-3 at 111 (PX37).]

Finally, in further support of their consent argument Defendants point to the fact that consumers consented to their calls being transferred between the dialing vendors and Day Pacer and therefore they could have avoided the call. But by that point, the train had left the station. The dialing vendors had already initiated a call

to a number on the Do Not Call List. Whether the consumers then agreed to be transferred does not show that the dialing vendors somehow had consent to call the consumers in the first place. Viewing the record as a whole and in the light most favorable to Defendants, Defendants fail to show that they only called consumers who solicited and consented to receiving calls about for-profit educational opportunities.

> ### d. Did the LLC Defendants have actual knowledge or knowledge fairly implied under the circumstances that they did not have valid consent to call numbers that appear on the Do Not Call Registry?

The undisputed record, viewed in the light most favorable to Defendants, shows at a minimum that Defendants had knowledge fairly implied under the circumstances that there were not valid written consents for at least a portion of the numbers they purchased and dialed, yet did not take any steps to safeguard against this problem or comply with the TSR.

Defendants admit that they received complaints from schools and other lead purchasers—including their compliance companies—that the LLC Defendants and their dialing vendors were calling consumers without proper consent. Dkt. 229, ¶ 33; Dkt. 232, ¶ 33. For example, one of the educational institutions that bought leads from Day Pacer submitted an incident report to them noting that the registration path to enter consumer information on the job search site lacked a necessary disclaimer that it was a separate educational offer, and that there was no opt out option. [Dkt. 212-6 at 219 *et seq.* (PX222, Corinthian Colleges email).] Another lead purchaser, Education Dynamics, emailed Day Pacer indicating they had reviewed the contact information forms included on various websites. [Dkt. 212-6 at 136 *et seq.*

(PX180).] According to the email from Education Dynamics, the forms did not comply with consent requirements that would allow for phone calls. [*Id*.]

In sum, the summary judgment record shows no material factual dispute that the LLC Defendants initiated at least 3,669,914 calls to phone numbers on the Do Not Call List; that at least some of these calls were interstate [PSOF ¶ 40; DSOF at 27, ¶ 40]; and that Defendants did not maintain records sufficient to demonstrate that it obtained valid consent for all or any portion of its calls to numbers on the Do Not Call List. The summary judgment record belies any claim that Defendants did not know—or that a reasonably prudent person would not know—that they were not getting valid consents. The FTC is entitled to summary judgment on Count 1 to the extent it is based on calls made by the LLC Defendants and their dialers.

### 4.    Liability for Calls Made by the IBT Partners

The FTC also seeks to impose liability on Defendants for calls placed by their IBT Partners. It is undisputed that between March 22, 2014 and June 12, 2019, the IBT Partners transferred 498,597 calls to the LLC Defendants that were the product of outbound telephone calls to numbers on the DNC Registry (20% of the total inbound transfers received from IBT Partners during that period). [Dkt. 229, ¶ 41; Dkt. 232, ¶ 41.] It is also undisputed that the IBT Partners made an additional approximately 39,847,000 calls to DNC numbers, which did not result in inbound transfers to the LLC Defendants. [*Id*.]

The FTC advances two alternative theories for holding the LLC Defendants liable for these calls: First, that the IBT Partners were acting as Day Pacer's agents

when they called numbers on the DNC Registry, making Day Pacer liable as principal; and second, that Day Pacer assisted and facilitated the IBT Partners' violations. The FTC moves for summary judgment on both theories of liability, in the alternative. [See Dkt. 211 at 18-19.]

The FTC asserts three theories of agency liability: actual, implied, and by ratification. Whether an agency relationship exists is normally a question of fact, *Clarendon Nat. Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011), which requires the Court to examine (1) whether the IBT Partners "act on [the LLC Defendants'] behalf and (2) whether they are subject to its control." *F.T.C. v. Lifewatch Inc.*, 176 F. Supp. 3d 757, 773 (N.D. Ill. 2016). The FTC has not provided enough details about the various IBT Partners, or the specific complaints that the LLC Defendants received about them, to allow the Court to conclude as a matter of law that any or all of the IBT Partners were the LLC Defendant's agents.

For instance, the FTC cites to a model inbound transfer agreement (PX10), but does not explain whether any, all, or some subset of the IBT Partners are subject to that agreement. Nor does the FTC elaborate on the level of control that the model agreement—or the parties' actual practice—gives the LLC Defendants over the IBT Partners' operations. Although it is undisputed that the LLC Defendants provided *some* of the IBT Partners with telephone numbers, scripts, and other support, it is not apparent from the record if this was the typical arrangement or less common. To the extent that the FTC's theories of agency liability depend on the LLC Defendants

knowing about and ratifying particular misconduct by their IBT Partners, the record generally lacks the granular detail necessary to make such a determination.

The FTC has traced a clearer path to liability on its alternative "assisting and facilitating" claim. As explained in the next paragraph, the Court agrees with the FTC that it has satisfied its burden to show that the LLC Defendants assisted and facilitated at least one IBT Partners' violations of the TSR. The FTC is therefore entitled to summary judgment on Count II. Pursuant to the Seventh Circuit's decision in *Dish*, the FTC is entitled to judgment on only one theory of liability, at least absent any attempt by the FTC to distinguish between the various IBT Partners. See *Dish Network*, 954 F.3d at 978 ("When an entity is vicariously responsible for another's acts (as a corporation is vicariously for the acts of its employees, and DISH is vicariously responsible for the acts of the order-entry retailers), it makes little sense to treat the entity as assisting itself. It would take clearer language than § 310.3(b) to support such a conclusion. The district court therefore should not have held DISH liable for 'substantially assisting' its own agents."). Therefore, Defendants are entitled to summary judgment on Count I to the extent that it is based on calls placed by the IBT Partners.

Turning to Count II, liability for assisting and facilitating telemarketers' calls to DNC Numbers requires: 1) providing substantial assistance or support to the telemarketer; and 2) knowing or consciously avoiding knowing that the telemarketer is engaged in any act or practice that violates Section 310.4 of the TSR, including initiating calls to DNC Numbers. 16 C.F.R. § 310.3(b). The first element "does not

48

impose a demanding standard, as it requires only that the assistance be 'more than mere casual or incidental dealing with a seller or telemarketer that is unrelated to the violation of the Rule.'" *F.T.C. v. Consumer Health Benefit Ass'n*, 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011) (quoting TSR, 60 Fed. Reg. 43842–01, 43852 (FTC, Aug. 23, 1995) (statement of basis and purpose)); see also *United States v. Dish Network*, 667 F. Supp. 3d 952, 961 (C.D. Ill. 2009); *F.T.C. v. Consumer Health Benefits Ass'n*, 2012 WL 1890242, at *6 (E.D.N.Y. May 23, 2012); *F.T.C. v. HES Merchant Services Co., Inc.*, 2014 WL 6863506, at *7–8 (M.D. Fla. Nov. 18, 2014). Put slightly differently, the FTC simply must show "a connection between the assistance provided and the resulting violations of the core provisions of the TSR." *Dish Network*, 667 F. Supp. 3d at 961.

In this case, the undisputed evidence shows that the LLC Defendants paid the IBT Partners to make calls and transfer leads to them. [Dkt. 229, ¶ 43; Dkt. 232, ¶ 43.] "[N]o assistance could be more substantial or more directly connected to the core violations of the TSR than paying someone to commit the acts that violated the TSR." *Dish Network*, 667 F. Supp. 3d at 961. The undisputed evidence also shows that Defendants knew or consciously avoided knowing that at least one of its IBT Partners was violating the TSR. "Knowledge or conscious avoidance of knowledge may be inferred when the person providing assistance receives complaints about violations." *Consumer Health Benefits Ass'n*, 2011 WL 3652248, at *5 (citing *Dish Network*, 667 F. Supp. 2d at 961). The FTC has demonstrated that the LLC Defendants continued to pay and work with IBT Partners even after receiving complaints from schools,

49

consumers, and compliance monitoring companies that their IBT Partners were calling DNC Numbers without consent. [See Dkt. 229, ¶ 42; Dkt. 232, ¶ 42; Dkt. 212-9 at 124 (PX521, response to request to admit no. 15).] The FTC also provides at least one specific example: Defendants continued working with IBT Partner Bluewater despite repeated complaints and compliance notices. [Dkt. 229, ¶ 42 (citing Dkt. 212-6 at 118 (PX175), 124 (PX177), 129 (PX178), 133 (PX179); Dkt. 212-7 at 168 (PX307); Dkt. 212-9 at 25 (PX508), 118 (PX521); Dkt. 212-10 at 315 (PX593)).] Defendants do not substantively dispute anything about the Bluewater example. [See Dkt. 229, ¶ 42; Dkt. 232, ¶ 42.] The emails and other records cited by the FTC show that Defendants continued working with Bluewater despite repeated complaints and compliance notices. Day Pacer did not terminate the relationship; rather, Bluewater "just kind of disappeared one day." [*Id.*] A few months later, Day Pacer started a new relationship with XactCall Inc., which like Bluewater was operated by Paul Flannery. [*Id.*] The FTC has also introduced call records showing that numerous consumers called by the IBT Partners were not interested in education or in speaking with the LLC Defendants at all. [Dkt. 229, ¶ 50; Dkt. 232, ¶ 50.]

Based on the undisputed record, the FTC is entitled to summary judgment on its substantial assistance claim. The Court finds it unnecessary to determine whether the LLC Defendants substantially assisted each and every one of the IBT Partners, because the FTC does not seek civil penalties based on calls made by the IBT Partners, and its proposed injunction [see Dkt. 211-1] does not contain any provisions concerning the IBT Partners. It is enough for purposes of determining liability that

the FTC has shown that the LLC Defendants substantially assisted Blue Water's violations of the TSR.

### 5. Liability of the Individual Defendants

The FTC seeks to hold the Individual Defendants liable for TSR violations committed by the LLC Defendants. "To impose individual liability on the basis of a corporate practice, the Commission must prove (1) that the practice violated the FTCA; (2) that the individual 'either participated directly in the deceptive acts or practices or had authority to control them'; and (3) that the individual 'knew or should have known about the deceptive practices.'" *FTC v. Credit Bureau Center, LLC*, 937 F.3d 764, 769 (7th Cir. 2019) (quoting *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005)); see also *FTC v. Pacific First Benefit, LLC*, 472 F. Supp. 2d 974, 980 (N.D. Ill. 2007). The FTC is "not required to prove subjective intent to defraud." *World Media Brokers*, 415 F.3d at 764.

The FTC has satisfied the first element by showing that the LLC Defendants initiated millions of calls to numbers on the Do Not Call Registry. It has satisfied the second element, too, because the undisputed facts in the record also show that each of the Individual Defendants either participated directly in the deceptive acts or practices or had authority to control them—Ian by running Day Pacer, and Raymond and Cumming by advising when the LLC Defendants were faced with strategic business decisions and legal complaints.

More particularly, Ian served as President of Day Pacer beginning June 1, 2015. In that role, he was responsible for the day-to-day operation of the company,

51

including hiring and firing employees, signing contracts, and responding to compliance issues. He was responsible for the company's profitability and had access to its bank accounts and accounting records. [Dkt. 229, ¶ 70.] Ian understood the laws and regulations applicable to his businesses. As evidence of this, on October 13, 2015, he wrote an email to Brett Larsen and Nate Clegg about a lawsuit filed by a consumer against EduTrek and opined: "We should sit down with Blake this Friday and talk about how this could have happened if it did. We need to make sure our system is not calling DNC numbers ever." [Dkt. 229, ¶ 81.]

Raymond was a managing member of both EduTrek and Day Pacer. [Dkt. 227-6, ¶ 5.] As a managing member, he was required to "devote the time and effort as is reasonably required in the business of the company" and to "do and perform all … acts as may be necessary to or appropriate to the conduct of the Company's business." [Dkt. 229, ¶ 75.] He invested money, reviewed monthly and quarterly financial statements, met or refused to meet capital calls, and occasionally received distributions. [*Id*.] He also reviewed contracts entered into by the LLC Defendants. Raymond claims that he did not have the expertise or the time to be more involved. [Dkt. 227-6, ¶ 6.] He admits, though, that he "was consulted with respect to claims that threatened lawsuits," including ones involving violations of the TCPA, but claims they were all "false" and "stick-ups." [*Id*. ¶¶ 9-13; see also Dkt. 229, ¶ 90.] Clegg testified that he would go to Raymond if a consumer complained that either company had violated the TCPA. [*Id*. ¶ 92.]

Cumming was a corporate manager of EduTrek and Day Pacer, along with Raymond. [Dkt. 230-1, ¶ 10(c).] Cumming discussed Day Pacer's business model, sales tactics, strategic direction, as well as industry statistics, with Ian and Raymond. [Dkt. 232, ¶ 71.] Cumming understood the laws and regulations applicable to his businesses, including the TSRA and the TRS, and provided legal guidance to the LLC Defendants concerning how those laws applied. [See *id.*, ¶ 80; Dkt. 230-1, ¶¶ 12, 14-18.]

The undisputed evidence in the record also shows that each of the Individual Defendants knew or should have known their businesses were subject to the TSR but that they were not making any attempt to comply. Since 2012, the contracts that Raymond has reviewed represented and warranted to schools and lead purchasers that the LLC Defendants (or their IBT partners) would comply with applicable federal laws including the TSR and the TCPA. [Dkt. 229, ¶¶ 36, 65, 90.] Despite this representation, the Individual Defendants knew that the LLC Defendants did not subscribe to or access the national DNC registry. [*Id.*, ¶ 86; Dkt. 232, ¶ 85.] All three Individual Defendants admit to knowing about the TCPA, which is substantially similar to the TSR. Cumming was involved in "roughly half a dozen claims and class actions against the companies based on the TCPA," including ones that asserted that the LLC Defendants had called numbers on the DNC Registry. [Dkt. 230-1, ¶ 12.].

All three Individual Defendants admit that they learned about the TSR as early as 2016, when "new managers" suggested that Day Pacer take on new clients and "make calls intended to induce the purchase of those clients' goods or services."

53

[Dkt. 230-1, ¶ 15 (Cumming); Dkt. 219-3, ¶ 23 (Ian); Dkt. 219-4, ¶ 18 (Raymond).] Cumming "did some research" and determined that a change in business model would "subject the company to regulation under the TSR." [Dkt. 230-1, ¶ 15.] Defendants should have known by that time, at the latest, that they were failing to comply with the TSR.

Even if Cumming's purported research had not put them on notice, complaining consumers, compliance reports, and the FTC's investigative activities should have. See *United States v. Lasseter*, 2005 WL 1638735, at *5 (M.D. Tenn. June 30, 2005) (defendants' knowledge fairly inferred because FTC had been in contact about potential rule violations three years prior). For instance, in 2014, Cumming and Raymond both learned of an article by David Halperin claiming that EduTrek called individuals who had given their name and telephone number in response to deceptive websites. [Dkt. 230-1, ¶ 13; Dkt. 229, ¶ 89; Dkt. 212-3 at 88-96.] Ian Fitzgerald regularly received reports from the compliance company Omniangle indicating that the websites Day Pacer received consumer information from did not obtain consumers' consent. The FTC also points to a variety of emails in which the Individual Defendants discussed their concerns about the validity of customer consent. For instance, in a March 2016 email Cumming raised with Raymond and Ian what he called "conditional consent," writing: "By opting in on a site advertising at home business opportunities, is the opter consenting to a call about further education. It is unfortunate that we have the potential conditional consent issue but oh, well." [Dkt. 229, ¶ 82; Dkt. 232, ¶ 81; see also Dkt. 212-6 at 100.] And in a

54

November 2016 email, Cumming expressly recognized the risk that the TSR may apply to calls made by IBT Partners. Responding to Raymond's email regarding a consumer who complained that he was called by a Day Pacer IBT Partner (Bluewater) and transferred to Day Pacer, Cumming advised that he was "not certain any FTC or FCC or TCP provision applies but, if Blue Water was determined to be an agent, it might" and "the only colorable regulation would be the FTC TSR." [Dkt. 212-6 at 97.] He continued that "[l]ess likely but more scary is the FTC telemarketing sales rule," under which the FTC "can assess a penalty of $40,000 per violation." [*Id.*] Cumming also acknowledges in his affidavit that he knew since 2014 that some of the calls in which the LLC Defendants engaged were "transferred from call centers in the Philippines" and "had some concern about whether those call centers might be obtaining names and numbers using deceptive websites and thought the names and numbers so obtained could not be considered consensual." [Dkt. 230-1, ¶ 14.]

By April 2016, the Individual Defendants became aware that the FTC was investigating them for illegal practices. The FTC issued Civil Investigative Demands to EduTrek L.L.C. in April 2016 and to both Day Pacer LLC and EduTrek L.L.C. in April 2017, expressly seeking TSR compliance information. [Dkt. 229, ¶ 84.] All of this evidence undermines Defendants' position that they only called individuals (or thought they only called individuals) who provided valid, express consent in compliance with the TSR.

In sum, the summary judgment record shows that that the Individual Defendants knew or should have known about the LLC Defendants' deceptive

practices. All three of the Individual Defendants: knew of the TSR and the penalties it imposed; knew that consumers were complaining about receiving calls from the LLC Defendants and IBT Partners despite having their numbers registered on the DNC List; and knew or should have known that the "consents" that they and the IBT Partners obtained from customers were not valid. The FTC has therefore established that the Individual Defendants should be held liable for the LLC Defendants' TSR violations.

### 6. Remedies

The FTC seeks both civil penalties and injunctive relief against the LLC Defendants and the Individual Defendants.

### a. Injunctive Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." See *FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997) (entering permanent injunction under Section 13(b)). The FTC "need only show that there is a reasonable likelihood of future violations" to obtain an injunction under Section 13(b). *FTC v. Credit Bureau Ctr. LLC*, 325 F. Supp. 3d 852, 867 (N.D. Ill. 2018), *aff'd in part, vacated in part*, 937 F.3d 764, 770 (7th Cir. 2019). In deciding whether to issue an injunction, the Court considers: (1) the gravity of the harm, (2) the extent of [Defendants'] participation, (3) the nature of the infraction and the likelihood that they may become involved in similar conduct in the future; (4) any recognition of culpability; and (5) the sincerity of assurances against further violations. *SEC v.*

56

*Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982). Further, individuals can be held liable for injunctive relief under the FTC Act if they either participated in the acts or practices or had authority to control them. *FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000), *aff'd* 312 F.3d 259 (7th Cir. 2002).

The Court is inclined to issue injunctive relief against the LLC Defendants and Ian and Raymond Fitzgerald, for the same essential reasons that the Fitzgeralds are properly held responsible for the acts of the LLC Defendants. But given the age of the case, and Defendants' suggestion that the industry has changed significantly due to major players in the for-profit education industry going out of business, the Court will require updated information from the parties before determining the proper scope of any injunctive relief. Additionally, since Mr. Cumming is deceased, and the Estate has no role in the affairs of the LLC Defendants, the Court intends to deny injunctive relief as to the Estate.

### b.    Civil penalties

Section 5(m)(1)(A) authorizes the imposition of civil penalties against parties that violate FTC trade regulation rules, including the TSR, "with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." 15 U.S.C. § 45(m)(1)(A); *Commercial Recovery Systems*, 179 F. Supp. 3d at 737 (awarding civil penalties against owner and president on summary judgment). As discussed above, the FTC has demonstrated that both the LLC Defendants and the Individual Defendants

violated the TSR with actual knowledge or implied knowledge based on objective factors. Therefore, the FTC is entitled to seek civil penalties against them.

In determining the amount of the civil penalty, the Court is required to "take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." 15 U.S.C. § 45(m)(1)(C); see also *Dish Network*, 954 F.3d at 980. Further, in *Dish*, the Seventh Circuit advised that even where a statute, like the FTC Act, "permit[s] consideration of wealth," "the best way" to ensure that the penalty is "within a constitutionally allowable range" is to "start from the harm rather than [the] wealth" of the Defendant, "then add an appropriate multiplier, after the fashion of the antitrust laws (treble damages) or admiralty (double damages), to reflect the fact that many violations are not caught and penalized." *Id*.

Here, the FTC seeks an award of civil penalties in the amount of $28,681,863.88—"substantially less than the maximum allowable civil penalty that is in excess of $100 billion." [Dkt. 211 at 36.] This works out to $6.88 per call for 4,168,511 violations. The FTC explains that the $28.6 million figure is "equal to Defendants' gross revenue during the applicable period" of March 22, 2014 to June 12, 2019. [*Id.* at 40.] The FTC seeks to hold the LLC Defendants and the Individual Defendants jointly liable for this amount and has submitted a brief discussing each of the factors that the FTC Act requires the Court to consider before imposing a penalty. [See Dkt. 211 at 36-40.]

The LLC Defendants and the Fitzgeralds respond, in sum, that (1) because they did not violate the TSR they are not liable for civil penalties; (2) the amount is arbitrary, capricious, and premature; (3) the FTC did not provide its calculation for the requested penalty; (4) the amount is intended to destitute the Defendants; and (5) the FTC must prove every conversation that violated the TSR and the fine that applied during that time period. [See Dkt. 241 at 24—25.] Cumming argues that the amount proposed by the FTC is so excessive it would reduce the Defendants to extreme poverty. [Dkt. 239 at 10–11]. He also asserts that his "good faith belief" that the TSR did not apply to Day Pacer's activities precludes civil penalties. [*Id*. at 10–11.] All of these assertions are incorrect and unsupported.

Defendants provide no authority for the bald assertion that in order to attach civil penalties the FTC must prove every individual conversation that violated the TSR. [Dkt. 241.] Nonetheless, the summary judgment record in fact includes admissions that Defendants violated the TSR millions of times—directly contradicting their arguments against civil penalties and showing a high degree of culpability. As noted, many of the FTC's Rule 56.1 facts have been admitted because Defendants failed to properly dispute the statement and, in many cases, failed to point to any evidence or citations in the record. As the FTC points out, it is undisputed that the LLC Defendants violated the TSR at least 4,168,511 times. [Dkt. 211 at n. 20; Dkt. 229 at ¶ 26; (deemed admitted); Dkt. 232 at ¶ 26 (deemed admitted)].

Nor is it true that the FTC has failed to provide a calculation for its proposed penalties. The FTC explained that the proposed penalties correspond to the proceeds

from the misconduct. [Dkt. 211 at 36–40.] The amount, \$28,681,863.88, corresponds to the Defendants' gross revenue during the relevant period (EduTrek's revenue from March 2014 to October 2015 at \$10,709,181.11 and Day Pacer's revenue from November 2015 to June 2019 at \$17,972,682.77). [*Id*. at 40; Dkt. 229, ¶ 64 (deemed admitted); Dkt. 232, ¶ 64 (admitted).] And for further context on the calculation, the FTC provided a detailed calculation of the maximum allowable penalties based on the specific years of the violations and the corresponding civil penalty amount for those ranges of time—2,548,695 violations from 2014 to 2016 at \$16,000 per violation, 366,626 violations from 2016 to 2017 at \$40,000 per violation, 592,650 violations from January 24, 2017 to January 21, 2018 at \$40,654 per violation, 507,894 violations from January 22, 2018 to February 13, 2019 at a rate of \$41,484, and 152,646 violations from February 2019 forward at \$42,530 per violation. [Dkt. 211 at 36–40.] The FTC has established that both the LLC Defendants and the individual Defendants had knowledge fairly implied that their conduct violated the TSR, such that the FTC is entitled to a substantial civil penalty.

The Court is inclined to impose the requested penalty for the reasons given above. Before reaching a final determination on the amount, however, the Court will require some additional information. Substantial time has passed since the parties briefed the issue and this ruling, and the Court does not have current information on some important matters. For example, the Court is uninformed about whether Day Pacer (or any successor) is still doing business in any capacity, and the Court requires more information about Defendants' ability to pay and the effect any penalty would

have on an ability to continue to do business. For this reason, the Court stays a final judgment on the issue of civil penalties subject to a hearing.

## IV.    Conclusion

For these reasons, the FTC's motion for substitution [Dkt. 247] is granted. The Estate is substituted as a defendant in this action. The FTC's motion for summary judgment [Dkt. 211] and the Defendants' two cross-motions for summary judgment [Dkts. 227, 230], are each granted in part and denied in part. The Court grants summary judgment in favor of the FTC and against Defendants on Count I to the extent that count is based on calls initiated by the LLC Defendants. Summary judgment is granted in favor of Defendants and against the FTC on Count I to the extent that count is based on calls initiated by the IBT Partners. Summary judgment is granted in favor of the FTC and against Defendants on Count II.

Enter: 19-cv-1984
Date:  September 1, 2023

_____
Lindsay C. Jenkins
United States District Judge

61